No. 22-10058

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

➤➤◄◄

UNITED STATES OF AMERICA,

*Appellee,*

v.

PANGANG GROUP CO., LTD.; PANGANG GROUP STEEL VANADIUM & TITANIUM CO. LTD.; PANGANG GROUP TITANIUM INDUSTRY CO., LTD.; PANGANG GROUP INTERNATIONAL ECONOMIC & TRADING CO.,

*Defendants-Appellants.*

*On Appeal from the U.S. District Court for the Northern District of California, Hon. Jeffrey S. White, District Judge, Case No. 4:11-cr-00573-JSW*

## BRIEF FOR APPELLANTS

William B. Adams
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Michael T. Packard
Alex H. Loomis
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100

Robert P. Feldman
Joseph E. Reed
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

John M. Potter
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600

*Counsel for Defendants-Appellants*

June 16, 2023

## CORPORATE DISCLOSURE STATEMENT

The government alleges that Defendants-Appellants are instrumentalities of the People's Republic of China. Such instrumentalities are not "nongovernmental corporations" and thus are not subject to Rule 26.1 of the Federal Rules of Appellate Procedure. For the sake of completeness, Defendants-Appellants Pangang Group Company, Ltd., Pangang Group Steel Vanadium & Titanium Company, Ltd., Pangang Group Titanium Industry Company, Ltd. and Pangang Group International Economic & Trading Company state the following:

All of Pangang Group Company, Ltd.'s stock is owned by Angang Group Company, a company in the People's Republic of China.

Pangang Group Steel Vanadium & Titanium Company, Ltd. has issued shares to the public on the Shenzhen Stock Exchange. Pangang Group Company, Ltd. owns a majority of the stock of Pangang Group Steel Vanadium & Titanium Company, Ltd.

All of Pangang Group Titanium Industry Company, Ltd.'s stock is owned by Pangang Group Steel Vanadium & Titanium Company, Ltd.

All of Pangang Group International Economic & Trading Company's stock is owned by Pangang Group Company, Ltd.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF AUTHORITIES.................................................iv

PRELIMINARY STATEMENT ...........................................1

JURISDICTIONAL STATEMENT ......................................3

QUESTIONS PRESENTED ..............................................4

STATEMENT OF THE CASE .............................................4

    A.    Foreign Sovereign Immunity At Common Law ..................................4

    B.    The Foreign Sovereign Immunities Act....................................8

    C.    The Indictment....................................................9

    D.    Defendants' First Motion To Dismiss The Indictment......................11

    E.    Defendants' Renewed Motion To Dismiss The Indictment .............13

SUMMARY OF ARGUMENT.............................................16

STANDARD OF REVIEW...............................................19

ARGUMENT ...........................................................20

I.    DEFENDANTS ESTABLISHED THAT THEY ARE ENTITLED TO ASSERT SOVEREIGN IMMUNITY ........................................20

    A.    Foreign Instrumentalities Are Entitled To Assert Sovereign Immunity At Common Law....................................20

    B.    Defendants Made A Prima Facie Showing That They Are Common Law Foreign Instrumentalities .........................................22

    C.    The District Court Did Not Find Any Facts Against Instrumentality Status ..........................................27

II.    DEFENDANTS ARE IMMUNE FROM CRIMINAL PROSECUTION ........................................................30

    A.    The Common Law Provides Foreign States And Their Instrumentalities With Absolute Immunity In Criminal Cases .........30

        1.    The Common Law Historically Provided Absolute Immunity In Civil And Criminal Cases....................................30

2. The Restrictive Theory Of Foreign Sovereign Immunity Did Not Displace Common Law Immunity In Criminal Cases ............................................................................ 33

3. The FSIA Did Not Displace Common Law Immunity In Criminal Cases ........................................................................ 36

B. Congress Preserved Common Law Immunity In Enacting The EEA ............................................................................................ 38

C. The Executive Branch Cannot Abrogate Common Law Immunity .................................................................................... 41

III. NO EXCEPTIONS TO IMMUNITY APPLY ............................................ 49

A. Defendants' Purported Commercial Conduct Does Not Limit Their Immunity ........................................................................... 49

1. There Is No Commercial-Activity Exception To Common Law Immunity In Criminal Cases ....................... 50

2. This Case In Any Event Does Not Arise From Commercial Activity ............................................................. 53

B. Defendants Did Not Impliedly Waive Immunity ............................. 57

CONCLUSION ............................................................................................... 61

REQUEST FOR ORAL ARGUMENT ........................................................... 62

STATEMENT OF RELATED CASES .......................................................... 63

CERTIFICATE OF COMPLIANCE ............................................................. 64

CERTIFICATE OF SERVICE ....................................................................... 65

STATUTORY ADDENDUM ......................................................................... 66

iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abrams v. Société Nationale des Chemins de Fer Français*,
    332 F.3d 173 (2d Cir. 2003) .......................................................... 5, 31

*Adler v. Federal Republic of Nigeria*,
    219 F.3d 869 (9th Cir. 2000) ............................................................ 56

*United States v. Aerlinte Eireann*,
    No. 89-CR-647, ECF 12 (S.D. Fla. Oct. 6, 1989) ............................ 44

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
    425 U.S. 682 (1976) ......................................................................... 34

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ......................................................................... 43

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
    813 F.3d 98 (2d Cir. 2016) ............................................................... 19

*Autotech Techs. LP v. Integral Res. & Dev. Corp.*,
    499 F.3d 737 (7th Cir. 2007) ............................................................ 36

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964) ..................................................................... 37, 51

*Barapind v. Gov't of Republic of India*,
    844 F.3d 824 (9th Cir. 2016) ............................................................ 58

*Belhas v. Ya'alon*,
    515 F.3d 1279 (D.C. Cir. 2008) ....................................................... 52

*Bergman v. DeSieyes*,
    71 F. Supp. 334 (S.D.N.Y. 1946) ..................................................... 32

*Berizzi Bros. Co. v. The Pesaro*,
    271 U.S. 562 (1926) ......................................................................... 45

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    137 S. Ct. 1312 (2017) .............................................................. 6-7, 33

*Broidy Cap. Mgmt., LLC v. State of Qatar*,
982 F.3d 582 (9th Cir. 2020).......................................................................55, 57

*Ex parte Cabrera*,
4 F. Cas. 964 (C.C.D. Pa. 1805).................................................................32

*Cal. Dep't of Water Res. v. Powerex Corp.*,
533 F.3d 1087 (9th Cir. 2008)......................................... 21-24, 26, 28

*United States v. Campa*,
529 F.3d 980 (11th Cir. 2008)...................................................................58, 60

*Chappell v. Robbins*,
73 F.3d 918 (9th Cir. 1996).........................................................................39, 41

*City of Milwaukee v. Illinois & Michigan*,
451 U.S. 304 (1981) .......................................................................................37

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018)...................................................................43

*Coleman v. State of Tennessee*,
97 U.S. 509 (1878) .........................................................................................30

*Compania Mexicana De Aviacion, S.A. v. U.S. Dist. Court for Cent. Dist. of
California*,
859 F.2d 1354 (9th Cir. 1988)...................................................................60

*Conn. Bank of Com. v. Republic of Congo*,
309 F.3d 240 (5th Cir. 2002)......................................................................36

*Dale v. Colagiovanni*,
337 F. Supp. 2d 825 (S.D. Miss. 2004).................................................38

*United States v. Deutsches Kalisvndikat Gesellschaft, D.C.*,
31 F.2d 199 (S.D.N.Y. 1929) .....................................................................21, 36

*Doe v. Holy See*,
557 F.3d 1066 (9th Cir. 2009)...................................................................49

*Doğan v. Barak*,
932 F.3d 888 (9th Cir. 2019)............................................ 20, 37, 39-41, 51

*Dow v. Johnson,*
  100 U.S. 158 (1879) ........................................................................5, 30

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.,*
  322 F.3d 635 (9th Cir. 2003) .................................................. 24-25, 28

*Elonis v. United States,*
  575 U.S. 723 (2015) ..............................................................................34

*EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.,*
  257 F.3d 992 (9th Cir. 2001) ...............................................................30

*Erie R. Co. v. Tompkins,*
  304 U.S. 64 (1938) ................................................................................51

*Eringer v. Principality of Monaco,*
  533 F. App'x 703 (9th Cir. 2013) ........................................................55

*Et Ve Balik Kurumu v. B.N.S. Int'l Sales Corp.,*
  25 Misc. 2d 299 (N.Y. Sup. Ct. 1960) ...........................15, 20, 25, 27

*F. W. Stone Eng'g Co. v. Petroleos Mexicanos of Mexico, D. F.,*
  42 A.2d 57 (1945) ........................................................................... 28-29

*Filarsky v. Delia,*
  566 U.S. 377 (2012) ........................................................................39, 41

*First Nat'l City Bank v. Banco Nacional de Cuba,*
  406 U.S. 759 (1972) ........................................................................45-46

*Franchise Tax Bd. of Cal. v. Hyatt,*
  139 S. Ct. 1485 (2019) ...................................................................... 4-5

*Gates v. Victor Fine Foods,*
  54 F.3d 1457 (9th Cir. 1995) ...........................................................25-26

*Gould, Inc. v. Mitsui Min. & Smelting Co.,*
  750 F. Supp. 838 (N.D. Ohio 1990) ................................................9, 38

*In re Grand Jury Investigation of the Shipping Indus.,*
  186 F. Supp. 298 (D.D.C 1960) .........................................................35

*In re Grand Jury Proceeding Related to M/V Deltuva*,
  752 F. Supp. 2d 173 (D.P.R. 2010) .................................................44

*Guar. Tr. Co. of New York v. United States*,
  304 U.S. 126 (1938) .......................................................................45

*Hannes v. Kingdom of Roumania Monopolies Inst.*,
  260 A.D. 189 (N.Y. App. Div. 1940) ..............................................20

*Haven v. Rzeczpospolita Polska*,
  215 F.3d 727 (7th Cir. 2000) ..........................................................59

*United States v. Ho*,
  2016 WL 5875005 (E.D. Tenn. Oct. 7, 2016) .................................44

*Int'l Refugee Assistance Proj. v. Trump*,
  883 F.3d 233 (4th Cir. 2018) ..........................................................44

*In re Investigation of World Arrangements with Rel. to the Produc., Transp.,
  Refining & Distrib. of Petroleum*,
  13 F.R.D. 280 (D.D.C 1952) ........................................ 14, 20-21, 23-25, 35, 43

*United States v. Jasin*,
  1993 WL 259436 (E.D. Pa. July 7, 1993) .......................................44

*Keller v. Cent. Bank of Nigeria*,
  277 F.3d 811 (6th Cir. 2002) ..........................................................38

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
  213 F.3d 841 (5th Cir. 2000) ..........................................................28

*Ketland v. Le Cassius*,
  2 U.S. 365 (C.C.D. Pa. 1796) .................................................... 31-32

*Malley v. Briggs*,
  475 U.S. 335 (1986) .......................................................................39

*People v. McLeod*,
  1 Hill 377 (N.Y. Sup. Ct. 1841) .....................................................47

*Medellin v. Texas*,
  552 U.S. 491 (2008) ................................................... 42-43, 46-47

vii

*Miller v. Wright*,
  705 F.3d 919 (9th Cir. 2013) .................................................................19

*In re Muir*,
  254 U.S. 522 (1921) ............................................................................5

*N. Ins. Co. of N.Y. v. Chatham Cnty., Ga.*,
  547 U.S. 189 (2006) ..........................................................................20

*OBB Personenverkehr AG v. Sachs*,
  577 U.S. 27 (2015) ...........................................................................54

*Pan Am. Tankers Corp. v. Republic of Vietnam*,
  291 F. Supp. 49 (S.D.N.Y. 1968) ................................................21, 22, 30

*In re Pangang Grp. Co.*,
  901 F.3d 1046 (9th Cir. 2018) .............................................................11

*United States v. Pangang*,
  6 F.4th 946 (9th Cir. 2021) ................................... 4, 12-13, 23, 27, 30

*Peterson v. Islamic Republic of Iran*,
  627 F.3d 1117 (9th Cir. 2010) ......................................................5, 22, 31

*Pierson v. Ray*,
  386 U.S. 547 (1967) ....................................................................... 39-40

*United States v. Pink*,
  315 U.S. 203 (1942) ..........................................................................48

*Pope v. United States*,
  323 U.S. 1 (1944) .............................................................................45

*Pulliam v. Allen*,
  466 U.S. 522 (1984) ..........................................................................39

*Republic Int'l Corp. v. Amco Eng'rs, Inc.*,
  516 F.2d 161 (9th Cir. 1975) ..............................................................59

*Republic of Argentina v. NML Cap., Ltd.*,
  573 U.S. 134 (2014) ....................................................................... 7-8

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992) ................................................................54

*In re Republic of Philippines*,
   309 F.3d 1143 (9th Cir. 2002).................................................58

*Rodriguez v. Pan Am. Health Org.*,
   29 F.4th 706 (D.C. Cir. 2022) ...........................................54, 56

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ...................................... 7, 31, 36-37, 49

*Missouri ex rel. Schmitt v. People's Republic of China*,
   610 F. Supp. 3d 1174 (E.D. Mo. 2022).....................................48

*Schooner Exchange v. McFaddon*,
   11 U.S. 116 (1812) .............................................................5, 31

*In re Sealed Case*,
   825 F.2d 494 (D.C. Cir. 1987) .................................................44

*United States v. Singleton*,
   165 F.3d 1297 (10th Cir. 1999)................................................40

*United States v. Smith*,
   424 F.3d 992 (9th Cir. 2005)....................................................19

*Southway v. Cent. Bank of Nigeria*,
   198 F.3d 1210 (10th Cir. 1999)................................................38

*United States v. Statoil, ASA*,
   No. 06-CR-960, ECF 5 (S.D.N.Y. Oct. 13, 2006) ....................44

*United States v. Struckman*,
   611 F.3d 560 (9th Cir. 2010)....................................................51

*Sullivan v. State of Sao Paulo*,
   36 F. Supp. 503 (E.D.N.Y. 1941)..............................................22

*Sun v. Taiwan*,
   201 F.3d 1105 (9th Cir. 2000)...................................................57

ix

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981) ...................................................................37

*United States v. Türkiye Halk Bankasi A.S.*,
  16 F.4th 336 (2d Cir. 2021) .....................................................50

*Türkiye Halk Bankasi A.S. v. United States*,
  143 S. Ct. 940 (2023) ............. 1, 3, 9, 15, 23, 31, 36-37, 41, 45-47, 50-51, 57, 59

*USX Corp. v. Adriatic Ins. Co.*,
  345 F.3d 190 (3d Cir. 2003) ...............................................24, 28

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983) .......................................................7, 43, 53

*W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*,
  493 U.S. 400 (1990) ................................................................46

*Will v. Michigan Dep't of State Police*,
  491 U.S. 58 (1989) ..................................................................40

*United States v. Winship*,
  724 F.2d 1116 (5th Cir. 1984) ................................................60

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ...........................................................42, 47

*Zhukovskiy v. Nat'l Bank of Ukraine*,
  2022 WL 526148 (S.D. Fla. Feb. 22, 2022) ............................60

## Constitutional Provisions

U.S. Const., Art. I, § 8, cl. 3 ....................................................43

U.S. Const., Art. I, § 8, cl. 9 ....................................................43

U.S. Const., Art. I, § 8, cl. 10 ..................................................43

U.S. Const., Art. I, § 8, cl. 18 ..................................................43

## Statutes and Rules

18 U.S.C. § 1831(a)........................................................10, 40, 55

x

18 U.S.C. § 1839(1)..................................................................10, 27

18 U.S.C. §§ 1961-68................................................................9

18 U.S.C. § 3231 .......................................................................3, 16

28 U.S.C. § 1291 ........................................................................3

28 U.S.C. § 1441(d)...................................................................53

28 U.S.C. § 1602 ........................................................................9, 46

28 U.S.C. § 1603(b)(2)..............................................................23

28 U.S.C. § 1605(a)(1)..............................................................57

42 U.S.C. § 1983 .......................................................................39

Fed. R. Civ. P. 12(e)..................................................................60

Fed. R. Civ. P. 83 .....................................................................59

Fed. R. Crim. P. 4 ....................................................................11

Fed. R. Crim. P. 7(f)................................................................60

## Legislative History

H.R. Rep. 94-1487 (1976)............................................... 22, 34, 36, 58-59

H.R. Rep. 104-788 (1996)...............................................41

Kleindienst, Richard G. & William P. Rogers, Attorney General and
   Secretary of State, Letter to President of Senate, Jan. 22, 1973, *reprinted
   in* 12 I.L.M. 118 (1973)...........................................8, 45, 48

To Define the Jurisdiction of U.S. Courts in Suits Against Foreign States:
   Hearing on H.R. 11315 Before Subcomm. on Admin. Law &
   Governmental Relations of H. Comm. on the Judiciary, 94th Cong.
   (1976) ...........................................................................8

United States: Draft Legislation on the Jurisdictional Immunities of Foreign
   States (Jan. 26, 1973), *reprinted in* 12 I.L.M. 118 (1973) .................................33

xi

**Other Authorities**

Deák, Francis, *The Plea of Sovereign Immunity and the New York Court of Appeals*, 40 Colum. L. Rev. 453 (1940) ............................................................6

DellaPenna, Joseph, Suing Foreign States (2d ed. 2003).......................................38

Fox, Hazel & Philippa Webb, The Law of State Immunity (3d ed. 2015)....8, 33, 50

Franey, Elizabeth Helen, "Immunity from the Criminal Jurisdiction of National Courts," *in* Research Handbook on Jurisdiction and Immunities in International Law (Alexander Orakhelashvili ed., 2015)..............................33

Heller, J. Roderick, III, *Litigation of Sovereign Immunity Questions*, 70 Am. Soc'y Int'l L. Proc. 42 (1976) .............................................................................7

Keitner, Chimène I., *Between Law & Diplomacy: The Conundrum of Common Law Immunity*, 54 Ga. L. Rev. 217 (2019) ...................................... 5-6

Lauterpacht, Hersch, *The Problem of Jurisdictional Immunities of Foreign States*, 28 Brit. Y.B. Int'l L. 220 (1951) ............................................................54

Murphy, Sean D., *Immunity* Ratione Materiae *of State Officials from Foreign Criminal Jurisdiction: Where is the State Practice in Support of Exceptions?*, 118 Am. J. Int'l L. Unbound 4 (2018).........................................52

Nielsen, Fred K., Solicitor for Department of State, Letter to Judge Julian W. Mack, Aug. 2, 1921, *in* Green Haywood Hackworth, Digest of International Law  (1941)...................................................................................45

Rawle, William, Statement to Secretary of State Timothy Pickering (Dec. 21, 1796), *in* 1 Am. State Papers: Foreign Relations (1833) .............................32

Restatement (Second) of Foreign Relations Law § 66 (1965)...................20, 33, 51

Restatement (Second) of Foreign Relations Law § 69 (1965) ...............................53

Restatement (Second) of Foreign Relations Law § 70 (1965) ...............................58

Restatement (Third) of Foreign Relations Law § 102 (1987) ...............................51

Restatement (Third) of Foreign Relations Law § 461 (1987) ...............................38

Restatement (Third) of Foreign Relations Law IV 5.A Intro. Note (1987) ...........31

Restatement (Fourth) of Foreign Relations Law § 441 (2018) .............................46

Tate, Jack B., *Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments*, 26 Dep't State Bull. 984 (May 19, 1952).........................................7, 31, 34, 45

White, G. Edward, *The Transformation of the Constitutional Regime of Foreign Relations*, 85 Va. L. Rev. 1 (1999)...................................................6, 44

Whiteman, Marjorie M., Digest of International Law (1968)................................21

## PRELIMINARY STATEMENT

This appeal arises from an order of the U.S. District Court for the Northern District of California (White, J.) that declined to dismiss an indictment, which alleges one count each of attempt to commit economic espionage and conspiracy to commit economic espionage, on the basis of foreign sovereign immunity. The district court ruled that Defendants[1] lack immunity under both the Foreign Sovereign Immunities Act of 1976 (the "FSIA") and the common law. While this appeal was pending, the Supreme Court held in *Türkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940 (2023) ("*Halkbank*"), that the FSIA does not apply to criminal cases but expressly left open whether and to what extent instrumentalities of a foreign state have common law immunity from criminal prosecution. This Court then reset briefing of this appeal to account for *Halkbank*.

Defendants are entitled to common law immunity. The government did not dispute below that they were subject to sufficient control by the People's Republic of China that they qualified as foreign instrumentalities capable of invoking sovereign immunity at common law. Common law immunity from prosecution always has been—and remains—absolute.

---

[1] "Defendants" are Defendants-Appellants Pangang Group Company, Ltd., Pangang Group Steel Vanadium & Titanium Company, Ltd., Pangang Group Titanium Industry Company, Ltd. and Pangang Group International Economic & Trading Company.

1

The government conceded in *Halkbank* that prosecution of foreign states is impermissible at common law and that prosecution of foreign instrumentalities is rare. In actuality, there were *zero* cases before this one where the government prosecuted foreign states or instrumentalities that asserted sovereign immunity. Indeed, the United States traditionally afforded foreign states and instrumentalities absolute immunity in both civil and criminal cases. The United States partially changed course in 1952, endorsing the "restrictive theory" under which foreign states could be sued in *civil* cases for their commercial conduct. The FSIA codified the restrictive theory in civil cases, but left common law immunity in criminal cases unchanged.

The district court wrongly ruled that Congress had abrogated this immunity in enacting the Economic Espionage Act ("EEA"). But the EEA, like any statute, does not abrogate common law privileges absent a clear statement to that effect. Under governing precedent, absent such a clear statement, ordinary legislation *incorporates* common law immunities and does not displace them.

The Executive Branch, moreover, has no power to abrogate this immunity. No constitutional or statutory provision gives the Executive Branch such authority. The Executive Branch has never before exercised such authority, nor is there a historical practice of Congress or the judiciary acquiescing to such prosecutions.

2

The government, in fact, has long conceded it has no authority to abrogate sovereign immunity.

The district court did not endorse the government's understanding of executive power. The court instead wrongly ruled that there was a commercial-activity exception in criminal cases, relying entirely on the Second Circuit's cursory ruling that *Halkbank* vacated. Such an exception would not make sense in the criminal context—the most opprobrious crimes are not commercial acts. But even if there were such an exception, this case arises from espionage, a quintessentially governmental act, not commercial activity. The government also argued below that Defendants had waived immunity by participating in this case. Defendants, however, raised sovereign immunity in a timely motion to dismiss following service of the summons and arraignment. That does not reflect any intent to submit the U.S. jurisdiction.

This Court should reverse the district court's order and direct it to dismiss the indictment.

## JURISDICTIONAL STATEMENT

The district court has subject matter jurisdiction under 18 U.S.C. § 3231 notwithstanding Defendants' position that they are immune from criminal prosecution. *See Halkbank*, 143 S. Ct. at 946.

This Court has jurisdiction under 28 U.S.C. § 1291 and the collateral order doctrine to review the district court's February 25, 2022 order denying Defendants' motion to dismiss based on foreign sovereign immunity. *See United States v. Pangang*, 6 F.4th 946, 951-53 (9th Cir. 2021). Defendants filed a timely notice of appeal on March 4, 2022. 2-ER-138-39.

## QUESTIONS PRESENTED

1.      Whether Defendants showed that they are entitled to assert foreign sovereign immunity. 1-ER-8-15.

2.      Whether Defendants have absolute common law immunity from criminal prosecution. 1-ER-15.

3.      Whether Defendants retain their immunity from criminal prosecution notwithstanding any supposed commercial-activity and waiver exceptions to common law immunity. 1-ER-20-22, 1-ER-33-39.

## STATEMENT OF THE CASE

### A.      Foreign Sovereign Immunity At Common Law

Sovereign immunity dates to the Middle Ages maxim *par in parem non habet imperium* (equals have no sovereignty over each other). *See* Yoram Dinstein, Par in Parem Non Habet Imperium, 1 Isr. L. Rev. 407, 407-10 (1966). At this country's founding, this principle was baked into both "common law" and the "law-of-nations," which together "prevented States from being amenable to process in any court without their consent" under any circumstances. *Franchise Tax Bd. of Cal. v.*

4

*Hyatt*, 139 S. Ct. 1485, 1493 (2019). Ever since *Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812), the Supreme Court has recognized that foreign sovereign immunity "exempt[s] [] the person of the sovereign from arrest or detention within a foreign territory." *Id.* at 137.

"At common law, foreign states were *absolutely* immune," *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1126 (9th Cir. 2010) (emphasis added), from both "civil and criminal jurisdiction," *Dow v. Johnson,* 100 U.S. 158, 165 (1879), in all cases. Without exception, a foreign state could not be subject to suit or prosecution without its consent. *See, e.g.*, *Abrams v. Société Nationale des Chemins de Fer Français*, 332 F.3d 173, 177 (2d Cir. 2003) ("Under [the absolute] theory [of sovereign immunity], a sovereign cannot be sued in the courts of another state without that sovereign's consent, regardless of the nature of the activity giving rise to the action."), *judgment vacated on other grounds*, 542 U.S. 901 (2004).

Because immunity was absolute, there was no need for courts to take instruction on the content of sovereign immunity at common law. Foreign states would often "appear in [a] suit" themselves "to raise the [immunity] question," or instruct their "accredited and recognized representative[s]" to do so. *In re Muir*, 254 U.S. 522, 532 (1921). In cases where the foreign state refused to appear (because they refused to countenance the court's jurisdiction at all), the Executive Branch would sometimes file "suggestion[s]" of immunity. *See* Chimène I. Keitner,

5

*Between Law & Diplomacy: The Conundrum of Common Law Immunity*, 54 Ga. L. Rev. 217, 236-37 (2019). Such instances were rare. *See* Francis Deák, *The Plea of Sovereign Immunity and the New York Court of Appeals*, 40 Colum. L. Rev. 453, 461 (1940) (counting only two cases where the Executive Branch moved "to dismiss [a] suit for want of jurisdiction over a foreign sovereign"). But when the Executive Branch intervened, courts would defer only "to executive findings of 'fact' as to whether [a] government was officially sovereign" and "decide the immunity issue as they would any other issue of common law," without further deference to the Executive Branch. G. Edward White, *The Transformation of the Constitutional Regime of Foreign Relations*, 85 Va. L. Rev. 1, 27-28 (1999).

In the twentieth century, in civil cases, certain countries began to limit their "recognition of sovereign immunity, denying that immunity in cases 'arising out of a foreign state's strictly commercial acts,' but continuing to apply that doctrine in 'suits involving the foreign sovereign's *public acts*.'" *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1320 (2017) (citations omitted). Citing this trend and its view that "persons doing business with [foreign states] [should] have their rights determined in the courts," the U.S. State Department endorsed this "newer or restrictive theory of sovereign immunity" in 1952. Jack B. Tate, *Changed Policy Concerning the Granting of Sovereign*

*Immunity to Foreign Governments*, 26 Dep't State Bull. 984 (May 19, 1952) ("Tate Letter").

The State Department acknowledged that this "shift in policy by the executive cannot control the courts." *Id.* "[A]ware of the expertise of the Executive Branch in matters of foreign affairs, [courts nonetheless] relied heavily upon the advice of that branch when deciding just when and how this 'restrictive' sovereign immunity doctrine applied." *Helmerich & Payne*, 137 S. Ct. at 1320. "Not surprisingly, the governing standards were neither clear nor uniformly applied." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983).

This resulted in "bedlam" and "disarray," as "political considerations" often influenced the State Department's immunity recommendations, *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141-42 (2014) (citations omitted), resulting in "inconsistent application[s] of sovereign immunity," *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010). The process by which the State Department would hear evidence and make recommendations on immunity was excoriated as "reminiscent of Kafka's *The Trial*." J. Roderick Heller III, *Litigation of Sovereign Immunity Questions*, 70 Am. Soc'y Int'l L. Proc. 42, 43 (1976).

The Executive Branch also disliked being put in the position of offering immunity recommendations. The State Department complained that it lacked "the means of really conducting a quasi-judicial hearing to determine whether, as a matter

7

of international law, immunity should be granted in a given case." To Define the Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearing on H.R. 11315 Before Subcomm. on Admin. Law & Governmental Relations of H. Comm. on the Judiciary, 94th Cong. 34 (1976) (statement of Monroe Leigh). It also faced "pressure[] by foreign states to suggest immunity and" risked "adverse consequences" when it declined to do so. Letter from Attorney General Richard G. Kleindienst & William P. Rogers to President of Senate, Jan. 22, 1973, *reprinted in* 12 I.L.M. 118, 120 (1973). Thus, in the 1970s, the Executive Branch began urging Congress to give "courts" full responsibility over sovereign immunity, "without participation by the Department of State." *Id.* at 119-20.

At no point during this time did the United States, any U.S. state, or any local district attorney criminally prosecute foreign states or instrumentalities. The shift to the restrictive theory "left untouched" the rule of absolute immunity in criminal cases. Hazel Fox & Philippa Webb, The Law of State Immunity 91 (3d ed. 2015).

## B. The Foreign Sovereign Immunities Act

In 1976, Congress enacted the FSIA, which created a "'comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state.'" *NML*, 573 U.S. at 141 (citations omitted). The FSIA's "declaration of purpose" was straightforward: "[c]laims of foreign states to immunity should

henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter." 28 U.S.C. § 1602.

The Executive Branch did not prosecute foreign states or instrumentalities (as defined by the FSIA) until the 2010s. *See infra*, Part II. Most courts took the view, albeit in civil cases involving the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), that the FSIA precluded criminal prosecutions. *See, e.g.*, *Gould, Inc. v. Mitsui Min. & Smelting Co.*, 750 F. Supp. 838, 844 (N.D. Ohio 1990); *see also infra*, at 38 & n.7.

Earlier this year, the Supreme Court held "that the FSIA does not apply to criminal proceedings." *Halkbank*, 143 S. Ct. at 951. Instead, "'common law' controls the disposition of any claim of foreign sovereign immunity in criminal cases." *Id.* at 954 (Gorsuch, J., concurring in part and dissenting in part) (quoting *id.* at 951 (majority)). *Halkbank* therefore vacated the Second Circuit's summary rejection of common law immunity and remanded for that court to consider the scope of that immunity. *See id.* at 951-52 (majority).

### C. The Indictment

After obtaining an initial indictment against Defendants in 2012, the government obtained several superseding indictments. The operative third superseding indictment charges Defendants with violating the EEA by attempting and conspiring to commit economic espionage in connection with the alleged theft

of trade secrets relating to the manufacture of titanium dioxide ("TiO2"). 2-ER-81-
101; *see* 18 U.S.C. § 1831(a). The indictment does not allege that Defendants ever
actually used any such trade secrets. As it must to satisfy the EEA, however, the
indictment does allege that Defendants are "foreign instrumentalities" (2-ER-94, 2-
ER-100), and constitute a "state-owned enterprise" controlled by the People's
Republic of China ("PRC") (2-ER-88-90).[2] Defendants are a mining enterprise
engaged in "two industries in which the state has maintained a prominent role: steel
production and non-ferrous metals production." 2-ER-105-06.

The indictment alleges that "[t]he government of the People's Republic of
China (PRC) publicly identified the development of chloride-route titanium dioxide
(TiO2) production technology as a scientific and economic priority" but that "PRC
companies had not been able to develop clean, efficient TiO2 production
technology." 2-ER-88. The indictment further alleges that in light of "the PRC's
national priority" on and "barriers" to accessing TiO2 production technology, certain
individuals "obtained TiO2 trade secrets belonging to [E.I. du Pont de Nemours &
Company ('DuPont')] and conveyed information containing those trade secrets to

---

[2] The EEA defines a "foreign instrumentality" as "any agency, bureau, ministry,
component, institution, association, or any legal, commercial, or business
organization, corporation, firm, or entity that is substantially owned, controlled,
sponsored, commanded, managed, or dominated by a foreign government." 18
U.S.C. § 1839(1).

companies controlled by the PRC government"—Defendants—"without authorization from DuPont." 2-ER-89.

The government was not able to effect service of the summons until 2017, after it had secured an amendment to Criminal Rule 4. *See In re Pangang Grp. Co., 901 F.3d 1046, 1053 (9th Cir. 2018)* (denying mandamus petition). Through Defendants' 2018 mandamus proceedings, counsel for Pangang had appeared *only* for the limited purpose of contesting service. 2-ER-109-10.

### D. Defendants' First Motion To Dismiss The Indictment

Defendants were arraigned in September 2018 following this Court's denial of their mandamus petition and entered not guilty pleas. 2-ER-79. The district court scheduled trial for February 2020 and ordered that "[a]ny motions challenging the indictment" be filed by July 9, 2019. 2-ER-78. On the date ordered by the court, Defendants timely moved to dismiss the indictment on FSIA and common law immunity grounds. 2-ER-182. They relied on the indictment's express allegations that they are "foreign instrumentalities" and the government's express concession of the same before the district court. 1-ER-27. The government further expressly conceded that there was no "significant" difference between the FSIA's and the EEA's definition of a "foreign instrumentality." 2-ER-76. Given the indictment's allegations and the government's concessions, Defendants did not seek to make a

further showing that they are foreign instrumentalities and did not address their status as "organs" of the PRC.

In August 2019, the district court denied the motion. 1-ER-41. The court assumed without deciding that Defendants "satisfy the definition of 'foreign instrumentality' under the FSIA." 1-ER-27. The court did not decide whether the FSIA applies in criminal cases either. Instead, it stated that "assuming the FSIA applies in criminal cases … its exceptions apply as well." 1-ER-32. The court concluded that Defendants could be prosecuted under the waiver and commercial-activity exceptions. 1-ER-39. The court did not address common law immunity. *See* 1-ER-23-41.

Defendants appealed, relying again on the indictment's express allegations and the government's express concession of their instrumentality status, and arguing that they were entitled to both FSIA and common law immunity. *See Pangang*, 6 F.4th at 959. The government changed its position on appeal, however, arguing for the first time that Defendants had *not* made a prima facie showing of instrumentality status under the FSIA. Oral Arg. Audio 14:15, *United States v. Pangang Grp. Co.*, Case No. 19-10306 (9th Cir. Oct. 15, 2020). The government also conceded that pre–Tate Letter common law principles of immunity would apply if the FSIA does not. *See id.* at 22:27-24:02 ("Judge Wardlaw: Assuming that we were to hold that Foreign Sovereign Immunity Act does not apply to criminal proceedings, what

principles would we adhere to in determining if Pangang Group enjoys any sovereign immunity in this area?  Would we return to the pre–Tate Letter common law principles that reigned before FSIA was enacted?  Mr. Yelovich: Yes, Your Honor, I think we would return to the common law that existed outside of the FSIA—that still exists outside the FSIA …. If the FSIA doesn't apply … the common rules of immunity that existed prior to the FSIA would still apply as they always have in this realm.").

This Court affirmed the district court's denial of Defendants' motion to dismiss on the alternative instrumentality ground.  *Pangang*, 6 F.4th at 950.  This Court did not address whether Defendants were organs of the PRC or their common law immunity arguments.  *See id.*

### E.    Defendants' Renewed Motion To Dismiss The Indictment

In light of the changed landscape following this Court's decision, the district court permitted Defendants to bring a second motion to dismiss the indictment.  1-ER-7.  This time, Defendants—relying on the indictment as well as a declaration from the government's expert Andrew Z. Szamosszegi that was filed earlier in the case—argued that they are entitled to sovereign immunity as "organs" of the PRC.  1-ER-12-15.  Mr. Szamosszegi provided detailed evidence to support the government's position that Pangang Group is fully owned by, and acts on behalf of, the PRC.  2-ER-102-08.  The government did not dispute that Defendants qualified

as "organs" under the FSIA or were subject to sufficient control by the PRC that they would be entitled to assert common law immunity. 1-ER-12 ("The Government did not directly respond to this argument in its opposition to the motion to dismiss."); *see* 2-ER-59-62. But the government maintained that this case fell within the FSIA's commercial-activity exception, that any common law immunity had a commercial-activity exception, and that sovereign immunity determinations remain the "prerogative of the Executive Branch." 2-ER-63.

The district court again denied the motion. 1-ER-2-22. The court acknowledged that the government had all but "conceded" Defendants' instrumentality status, but, "given the importance of the issues," declined to accept the government's concession and independently evaluated the record to determine if Defendants met their burden. 1-ER-12. In doing so, the court made no findings of fact against organ status under the FSIA or the common law, and, as to the common law, instead simply stated that the indictment and the Szamosszegi declaration "are not sufficient to establish that they are entitled to assert sovereign immunity." 1-ER-15. It provided no explanation for its determination, citing only opinions ruling that the "'object and purpose of [the] corporation'" and whether the corporation "'functions as a public agency'" determined its entitlement to immunity. 1-ER-15 (first quoting *In re Investigation of World Arrangements with Rel. to the Produc., Transp., Refining & Distrib. of Petroleum*, 13 F.R.D. 280, 290 (D.D.C 1952); second

14

quoting *Et Ve Balik Kurumu v. B.N.S. Int'l Sales Corp.*, 25 Misc. 2d 299, 301 (N.Y. Sup. Ct. 1960)).

The district court additionally concluded that common law sovereign immunity is *not* absolute but is subject to a commercial-activity exception, and ruled that the alleged conduct here fits within that exception. *See* 1-ER-21.[3] The court relied exclusively on the Second Circuit's holding in *Halkbank*—which the Supreme Court later vacated, *see* 143 S. Ct. at 951-52, and which the district court itself acknowledged contained "minimal" "analysis"—that "the restrictive theory of sovereign immunity … would not protect commercial activity." 1-ER-21-22. The court also acknowledged, but did not reconcile its ruling with, leading authorities taking the view that "absolute immunity remains the rule" in criminal cases. 1-ER-21.[4]

The district court did "not find it dispositive that the Department of Justice chose to prosecute this case," but it stated that the government's "decision [to prosecute] [did] factor into [the court's] analysis," in some respect. 1-ER-20-21. The court also suggested that "the legislative history of the EEA" showed that the

---

[3] The court also concluded that Defendants impliedly waived FSIA immunity (1-ER-20) but did not address common law waiver.

[4] The court further ruled that the FSIA does not apply to criminal cases. 1-ER-15-20. That is no longer in dispute following *Halkbank*. *See* 143 S. Ct. at 951.

statute "was intended to cover and punish a 'foreign government that uses its classic espionage apparatus to spy on a company.'" 1-ER-21 (citation omitted).

Defendants timely appealed. 2-ER-138-39. After the parties filed their principal briefs, the Supreme Court granted certiorari in *Halkbank* to consider whether courts may exercise subject matter jurisdiction over criminal prosecutions of foreign states and instrumentalities under 18 U.S.C. § 3231 and in light of the FSIA. *See* Pet. for Writ of Certiorari, *Türkiye Halk Bankasi A.S. v. United States*, No. 21-1450 (U.S. May 13, 2022). This Court stayed this appeal pending the Supreme Court's decision (ECF 30), and following that decision reset the briefing so that the parties could focus on the common law issues that *Halkbank* left open (ECF 34).

## SUMMARY OF ARGUMENT

**I.** Defendants made a prima facie showing that they are common law instrumentalities of the PRC and thus presumptively entitled to foreign sovereign immunity. At common law, foreign sovereign immunity extends to an entity that makes a prima facie case that it was created under a foreign state's laws and exercises functions comparable to an agency of the state. The government did not contest that Defendants satisfied this standard. Indeed, the record contains more than sufficient evidence to meet Defendants' prima facie burden: a declaration by the government's own expert attested that they are operated and controlled by the PRC, act for the

16

PRC's benefit, and lack independence from the PRC. The government also alleges that Defendants are foreign instrumentalities under the EEA. The district court did not find any facts against instrumentality status but ruled only that this evidence did not constitute a prima facie showing. This too was error: if the court found the record insufficient, it should have requested further factual submissions.

**II.** Foreign instrumentalities like Defendants have absolute common law immunity from criminal prosecution.

Foreign states and their instrumentalities have always had absolute immunity from criminal prosecution under the common law. The government itself admitted in *Halkbank* that international law and common law prohibit prosecutions of foreign states, and the government has long acknowledged that foreign instrumentalities are entitled to the same immunities as foreign states. The restrictive theory of foreign sovereign immunity displaced common law immunity in civil cases, but not in criminal ones. There were no pre-FSIA or post-FSIA criminal cases against foreign instrumentalities that asserted sovereign immunity. Rather, courts would quash federal grand jury subpoenas directed at foreign instrumentalities when such subpoenas could lead to criminal charges.

Congress preserved, and did not repeal, this absolute common law immunity in enacting the EEA. Common law immunities are deemed to have been

17

incorporated into a statute absent a clear statement by Congress that it intended to repeal them. There is no such clear statement in the EEA.

The Executive Branch has no authority to abrogate this immunity. No constitutional or statutory provision gives the Executive Branch such a power; rather, the power to dictate sovereign immunity belongs to Congress or, in the absence of legislative action, to the courts. Nor is there a longstanding practice of congressional acquiescence to criminal prosecutions of foreign instrumentalities. There never were any before this case. Even in civil cases, courts were not bound by Executive decree. Introducing such a rule in criminal cases would conflict with the separation of powers and Congress's desire in enacting the FSIA to deny the Executive Branch authority over immunity determinations. Denying an absolute common law bar on criminal prosecutions could also prove dangerous, as nothing would prevent state and local prosecutors from indicting foreign states and instrumentalities, threatening the federal political branches' control over foreign policy.

**III.** The district court erred to the extent it ruled that Defendants lack sovereign immunity due to purported commercial-activity underlying the indictment and implied waiver.

*First,* there is no commercial-activity exception to common law immunity in criminal cases. That exception arose only in civil cases. Even if there were such an

exception, it would not apply here. The indictment may allege some commercial activity—meetings, contracts, and plans for commercial products—but that is not the core, wrongful conduct alleged. The core conduct alleged here, which the government must prove to prevail, is economic espionage, which is not commercial activity.

*Second*, Defendants did not waive sovereign immunity. They raised this defense in a timely motion to dismiss the indictment, and their other litigation conduct (*e.g.*, seeking to quash service) does not evidence any intention to submit to U.S. jurisdiction.

## STANDARD OF REVIEW

This Court "review[s] de novo questions of sovereign immunity." *Miller v. Wright*, 705 F.3d 919, 923 (9th Cir. 2013); *cf. United States v. Smith*, 424 F.3d 992, 999 (9th Cir. 2005) (reviewing de novo whether indictment should be dismissed for lack of jurisdiction). When the facts bearing on foreign sovereign immunity are "undisputed" on a motion to dismiss, appellate "review is de novo." *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 107 (2d Cir. 2016).

19

## ARGUMENT

**I.    DEFENDANTS ESTABLISHED THAT THEY ARE ENTITLED TO ASSERT SOVEREIGN IMMUNITY**

### A.    Foreign Instrumentalities Are Entitled To Assert Sovereign Immunity At Common Law

Common law foreign sovereign "immunity … extends to: … a corporation created under [a foreign state's] laws and exercising functions comparable to those of an agency of the state."  Restatement (Second) of Foreign Relations Law § 66(g) (1965); *see, e.g.*, *Hannes v. Kingdom of Roumania Monopolies Inst.*, 260 A.D. 189, 200 (N.Y. App. Div. 1940) (considering whether "corporations are used as governmental agencies"); *Et Ve Balik Kurumu*, 25 Misc. 2d at 301 (courts would extend immunity to corporation "where the corporation functions as a public agency or instrumentality or where evidence of corporate separateness from the government was not strong").  This Court too has held that Section 66 of the Second Restatement is an accurate summary of "[c]ommon-law foreign sovereign immunity."  *Doğan v. Barak*, 932 F.3d 888, 893-94 (9th Cir. 2019).   This standard mirrors Eleventh Amendment immunity, under which "arms of the State possess immunity from suits authorized by federal law."  *N. Ins. Co. of N.Y. v. Chatham Cnty., Ga.*, 547 U.S. 189, 193 (2006).

The same principle holds in the few criminal cases implicating sovereign immunity.  In *World Arrangements*, 13 F.R.D. 280, for example, although Britain's government held only about a third of the "capital investment" in the oil company at

20

issue, the court nevertheless found the company to be an instrumentality of the British state, based on the company's "object and purpose." *Id.* at 290. The court did so because, ownership aside, (i) the British government still had some control over the company's operations, and (ii) the company's purpose was to assure that the British navy had access to petroleum products, which the court found to be a "fundamental government function serving a public purpose." *Id.* In so ruling, the court drew a "distinction between" a government-owned "commercial venture entirely divorced from any governmental function" from "a seafaring island-nation maintaining a constant supply of maritime fuel." *Id.* at 291 (distinguishing *United States v. Deutsches Kalisvndikat Gesellschaft, D.C.*, 31 F.2d 199 (S.D.N.Y. 1929)).

The government has long accepted these principles. In an official 1968 State Department publication, the government reprinted the Restatement (Second)'s government functions test. *See* 6 Marjorie M. Whiteman, Digest of International Law § 21, at 592 (1968). In *Halkbank* too, the government cited approvingly *World Arrangements*' "public purpose" test. *See* U.S. Br. 26, *Türkiye Halk Bankasi A.S. v. United States*, No. 21-1450 (U.S. Dec. 14, 2022) ("U.S. *Halkbank* Br.").

This common law understanding of a government instrumentality is quite similar to the definition of an "organ" under the FSIA. A company qualifies as an "organ" under the FSIA if it "engages in a public activity on behalf of the foreign government." *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th

Cir. 2008) (internal quotation marks omitted). This Court's FSIA "organ" jurisprudence is thus instructive for common law immunity.

### B. Defendants Made A Prima Facie Showing That They Are Common Law Foreign Instrumentalities

The district court erred in ruling that Defendants failed to make a prima facie showing that they are common law instrumentalities. *See* 1-ER-15. To establish that it is a foreign instrumentality entitled to assert sovereign immunity, under both the FSIA and common law, a defendant need only make "a prima facie case." *Peterson*, 627 F.3d at 1124; *see* H.R. Rep. 94-1487, at 17 (1976) (explaining that the "prima facie" test accords with "the way in which the law of sovereign immunity has developed" at common law). Thus, in *Pan American Tankers Corp. v. Republic of Vietnam*, 291 F. Supp. 49 (S.D.N.Y. 1968), the court ruled that Vietnam needed only to make "a prima facie case to sustain its plea." *Id.* at 53; *see, e.g.*, *Sullivan v. State of Sao Paulo*, 36 F. Supp. 503, 506-07 (E.D.N.Y.) (affording São Paolo immunity after it made "a prima facie case"), *aff'd*, 122 F.2d 355 (2d Cir. 1941). This prima facie requirement is satisfied where "it is apparent from the pleadings *or uncontested* that the defendant is a foreign state." *Peterson*, 627 F.3d at 1125 (emphasis added). The fact that the district court considered sovereign immunity "importan[t]" (1-ER-12) did not justify it disregarding the government's concession.

In moving to dismiss, Defendants made a prima facie showing that they were instrumentalities of the PRC. Relying on the indictment, the government's own

expert declaration, and additional evidence, Defendants argued that, based "on the same factual record," they were both "organs" under 28 U.S.C. § 1603(b)(2), which suffices to qualify for FSIA immunity, *see Powerex*, 533 F.3d at 1100, and instrumentalities entitled to invoke common law immunity, 1-ER-15; *see* 2-ER-55, 2-ER-67-70.[5]

The government itself asserted that Defendants were created and controlled by the PRC. *See, e.g.*, *World Arrangements*, 13 F.R.D. at 290 (considering how "Anglo-Iranian came into being"); *cf. Powerex*, 533 F.3d at 1098 (considering, for organ status, "the entity's creation"). The indictment alleges that Pangang Group is a "state-owned enterprise controlled by SASAC." 2-ER-89. SASAC is a "government agency" directly controlled by the State Council, the PRC's "highest government authority." 2-ER-89. The government also contends that, since 2003, the SASAC has maintained 100% ownership of Pangang Group, either directly or indirectly. 2-ER-104-07. Whether the ownership is direct or indirect is irrelevant when the SASAC "dominates the ownership" of, and "controls," the company overall. *World Arrangements*, 13 F.R.D. at 288-89 (focusing on "the British

---

[5] This Court previously held that Defendants had not shown that the PRC directly owned a "majority" of their shares (which would suffice to establish instrumentality status under the FSIA), but did not reach whether they were "organs" under the FSIA or entitled to common law immunity. *See Pangang*, 6 F.4th at 955; *cf. Halkbank*, 143 S. Ct. at 953 (Gorsuch, J., concurring in part and dissenting in part) ("[T]he question of immunity may be revisited as the case proceeds.").

Government['s]" actual control, even though it held only "35% of the total capital"); *cf. USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 213 (3d Cir. 2003) (insurer was instrumentality of Ireland because Ireland "indirectly has complete control over [its] shares"); *Powerex*, 533 F.3d at 1102 ("wholly-owned, second-tier subsidiary of British Columbia" was instrumentality).

The indictment also alleges that the SASAC indirectly owned a majority of Pangang Group's subsidiaries' shares through a combination of shares owned by (i) Pangang Group, (ii) its subsidiaries, and (iii) other state-owned enterprises under SASAC's dominion. Pangang Group and Pangang Group Steel Vanadium & Titanium Co. Ltd. ("PGSVTC") allegedly "owned and controlled" both Pangang Titanium and PIETC. 2-ER-105-07; 2-ER-89-90. The PRC continues to own a majority of PGSVTC's shares through its state-owned enterprises and subsidiaries that those enterprises control (2-ER-89-90, 2-ER-107, 2-ER-114-15).

The indictment further alleges that Defendants act with a public purpose too. *See, e.g.*, *World Arrangements*, 13 F.R.D. at 290 ("[O]f far more potency is the object and purpose of the corporation."). The indictment states that the "[PRC] publicly identified the development of chloride-route titanium dioxide (TiO2) production technology as a scientific and economic priority" (2-ER-88, 2-ER-113), and then used Pangang Group and its subsidiaries to advance this state interest (2-ER-89-90, 2-ER-113-15). *Cf. EIE Guam Corp. v. Long Term Credit Bank of Japan,*

24

*Ltd.*, 322 F.3d 635, 640-41 (9th Cir. 2003) (private Japanese company carrying out commercial functions was an instrumentality because it was created by Japanese law, and the motivation for creating it was "related to the revitalization of the Japanese financial system"); *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460-61 (9th Cir. 1995) (a marketing board was an instrumentality of a Canadian province when the board's "purpose" was "to advance the province of Alberta's interest in marketing Alberta hogs").

Moreover, the government asserts that Defendants lack independence from the PRC, such that "evidence of corporate separateness from the government [is] not strong." *Et Ve Balik Kurumu*, 25 Misc. 2d at 301. The indictment alleges that the PRC created the SASAC "to exercise ownership of state-owned enterprises on the government's behalf." 2-ER-104. SASAC (i) "appoints executives" for those enterprises, and (ii) "provides [them] strategic guidance through five-year plans that are proposed[,] drafted[,] and approved" by the PRC. 2-ER-104-05. Pangang Group's "Chairman and certain other senior managers … were officials of the Communist Party." 2-ER-89, 2-ER-115; *see, e.g.*, *World Arrangements*, 13 F.R.D. at 289 (citing the fact that the British government ordered the company not to produce documents in response to subpoena). Pangang Group is alleged to "belong[] to two industries in which the [Chinese] state has maintained a prominent role: steel production and non-ferrous metals production." 2-ER-105-06. PRC has maintained

"a strong control position" in both of these "pillar industries." 2-ER-86. Several of the PRC's five-year plans are alleged to have "identified the comprehensive exploitation of Panzhihua's vanadium and titanium resources as a National Key Project," and "other official documents indicate that the [PRC] promoted the production of chlorination process titanium dioxide." 2-ER-86. This parallels *Powerex*, where this Court held that a corporation was an instrumentality when it was owned by a state agent, its board was selected by the state agent, and its work fulfilled a "mission" dictated by the state. 533 F.3d at 1099-102; *see, e.g.*, *Gates*, 54 F.3d at 1460-61 (instrumentality status supported by fact that provincial government's "laws and regulations narrowly circumscribe the entity's ability to act independently").

Pangang Group, in turn, allegedly shares its personnel with certain subsidiaries, including "senior management" at PGSVTC and executives at Pangang Titanium (2-ER-89-90, 2-ER-115). This sharing of key personnel is, according to the government, a practice "typical of the relationship between [state-owned enterprises] and their subsidiaries[,] and a means by which the [Communist] Party and SASAC control [state-owned enterprises]," like Pangang Group, "and their subsidiaries," like the other Defendants (2-ER-107-08). The fact that "nothing [] suggest[ed] that SASAC directed the Pangang Group to create these subsidiaries,"

1-ER-14, has no bearing on the "evidence of corporate separateness from the government," *Et Ve Balik Kurumu*, 25 Misc. 2d at 301.

The government said not a word to dispute any of this below. Nor could it: the indictment alleges that all Defendants were "instrumentalities" under the EEA (2-ER-94, 2-ER-100), meaning that they were "substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government" (18 U.S.C. § 1839(1))—a definition that does not materially differ from the common law understanding of an instrumentality (*see supra*, at 10 n.2). As the government argued in the prior appeal, "the question of whether the Pangang [Defendants] qualify as 'agencies or instrumentalities of a foreign state' under the FSIA … overlap[s] with the merits issue of whether they are 'foreign instrumentalities' under the EEA who were benefitted by the theft of trade secrets." *Pangang*, 6 F.4th at 952-53 (alterations omitted). Indeed, as recently as February 2023, the government described its charges as alleging "a scheme ... to commit economic espionage for the benefit of Defendants as *state[ ]-controlled entities and for the benefit of the PRC*." District Court ECF 1329 at 3 (emphasis added).

## C. The District Court Did Not Find Any Facts Against Instrumentality Status

Given this record, the district court erred in ruling that Defendants had not made a prima facie showing of their instrumentality status. 1-ER-15. This is especially the case because the government *did not dispute* that they were organs or

27

common law instrumentalities. *See* 2-ER-55, 2-ER-57-63.[6] The district court itself acknowledged that "the Government did not directly respond to this argument in its opposition to the motion to dismiss" and that "[i]n any other situation the Court would treat the argument as conceded." 1-ER-12. But the court disregarded the government's concession and proceeded to "independently evaluate[] the record." 1-ER-12. The court, however, did not make a single finding against instrumentality status. It simply announced that the "record is not sufficient to establish that they are entitled to assert sovereign immunity under the common law." 1-ER-15.

This ruling was error. The court stated that a few factors that courts have considered in assessing organ status under the FSIA were unaddressed, including whether the employees of Defendants were government employees. 1-ER-13. But courts do not apply the FSIA "organ" factors mechanically. *See, e.g.*, *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 847 (5th Cir. 2000). And "employment policies do not obviously qualify [defendants] or disqualify [them] as an" instrumentality under the FSIA, *see Powerex*, 533 F.3d at 1102, let alone at common law. Indeed, entities can be FSIA "organs" even when their employees are not civil servants. *See, e.g.*, *EIE Guam*, 322 F.3d at 640-41; *USX*, 345 F.3d at 212-14.

---

[6] While the government disputed at oral argument that Defendants "are entitled to [sovereign] immunity," it said nothing about whether they were instrumentalities under the common law. 2-ER-46-48 (contending only that they are not "majority owned" by the PRC).

The district court also stated, "there is nothing to suggest ... that SASAC provides funding to them," but that is not essential either. 1-ER-14. "[A] well-run nationalized firm *should* make a reasonable profit; nor should it have to borrow from the government itself." *Powerex*, 533 F.3d at 1102 (citations omitted). In *F. W. Stone Engineering Co. v. Petroleos Mexicanos of Mexico, D. F.*, 42 A.2d 57 (1945), for example, both the State Department and the Supreme Court of Pennsylvania agreed that a Mexican government-controlled oil company was a "governmental instrumentality … entitled to sovereign immunity." *Id.* at 59-60. It was "irrelevant [] that the foreign instrumentality conducts a commercial enterprise which, it was contemplated, would show a profit." *Id.* at 60. "Nor [was] it of any significance that the governmental instrumentality is a separate corporation." *Id.* "[T]he enterprise was for the development of the trade and commerce of the foreign government and to supply revenues for its treasury[]—appropriate concerns of that government." *Id.* at 60. So too here, according to the government's own indictment.

At minimum, given the government's concession on organ status, if the district court found Defendants' evidence insufficient, it should have requested further evidentiary submissions, rather than fault Defendants for failing to rebut arguments that the government had waived. When "the current record" does not allow a court to "determine whether" a defendant "qualifies as an instrumentality," the district court should "conduct an appropriate factual inquiry to determine" the

29

defendant's status.  *EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.*, 257 F.3d 992, 999 (9th Cir. 2001).  The same was true at common law.  *See Pan Am. Tankers*, 291 F. Supp. at 53 ("Should The Republic of Vietnam succeed in establishing at least a prima facie case to sustain its plea, the Court may order an evidentiary hearing to further develop the record ….").  Were this Court to affirm the district court's instrumentality ruling, that "appropriate factual inquiry" would inevitably happen at trial because instrumentality status would remain unresolved.  This deferred determination would defeat a key purpose of foreign sovereign immunity, which is to protect foreign sovereigns from litigation and standing trial in U.S. courts.  *See, e.g.*, *Pangang*, 6 F.4th at 952 ("[T]he asserted right of a foreign sovereign 'to be free from suit' is so important that a court normally should 'reach a decision about immunity as near to the outset of the case as is reasonably possible.'") (alterations and citation omitted).  A remand on this issue is thus warranted at the very least.

## II.    DEFENDANTS ARE IMMUNE FROM CRIMINAL PROSECUTION

### A.    The Common Law Provides Foreign States And Their Instrumentalities With Absolute Immunity In Criminal Cases

#### 1.    The Common Law Historically Provided Absolute Immunity In Civil And Criminal Cases

Foreign states and instrumentalities traditionally had immunity under common law and international law from both "civil and criminal jurisdiction." *Dow,* 100 U.S. at 165; *see, e.g.*, *Coleman v. State of Tennessee*, 97 U.S. 509, 515-16 & n.1

30

(1878) (stating that "troops of a foreign prince" and "an armed vessel of war" are both entitled to "[t]he same exemption from the civil and criminal jurisdiction of the place"). This "doctrine of foreign sovereign immunity developed as a matter of common law long before the FSIA was enacted in 1976." *Samantar*, 560 U.S. at 311; *see Halkbank*, 143 S. Ct. at 945-46 (same). Foreign states and instrumentalities were historically considered outside the "territorial jurisdiction" of the United States. *Schooner Exchange*, 11 U.S. at 137. Such immunity did not need to "be expressed" or "stipulated" by statute; "it [was] implied from the circumstances of the case" and "reserved by implication." *Id.* at 137-38.

Common law immunity is "absolute," Restatement (Third) of Foreign Relations Law IV 5.A Intro. Note (1987), and applies "regardless of the nature of the activity giving rise to the action," *Abrams*, 332 F.3d at 177. *See, e.g.*, *Peterson*, 627 F.3d at 1126 ("At common law, foreign states were *absolutely* immune …..") (emphasis added). As the State Department acknowledged in 1952, the "virtually absolute theory of sovereign immunity has generally been followed by the courts of the United States." Tate Letter, *supra*.

This absolute immunity doctrine has always extended to criminal cases. In *Schooner Exchange*, 11 U.S. 116, the Supreme Court recognized that foreign sovereign immunity "exempt[s] [] the person of the sovereign from arrest or detention within a foreign territory." *Id.* at 137. In *Ketland v. Le Cassius*, 2 U.S.

31

365 (C.C.D. Pa. 1796), the United States successfully advocated dismissal of a qui tam action enforcing a criminal statute (the Neutrality Act) against a French ship, on the grounds that "[o]ne sovereign is not amenable to the tribunals of another." Statement of William Rawle to Secretary of State Timothy Pickering (Dec. 21, 1796), *in* 1 Am. State Papers: Foreign Relations 637 (1833). And in *Ex parte Cabrera*, 4 F. Cas. 964 (C.C.D. Pa. 1805), Justice Washington held that a secretary of the "Spanish legation … is under the protection of the law of nations; and is not amenable to the tribunals of this country, upon a civil or criminal charge." *Id.* at 965; *see, e.g.*, *Bergman v. DeSieyes*, 71 F. Supp. 334, 341 (S.D.N.Y. 1946) ("[A] foreign minister is immune from the jurisdiction, both criminal and civil, of the courts in the country to which he is accredited, on the grounds that he is the representative, the alter ego, of his sovereign who is, of course, entitled to such immunity," as is "a foreign minister en route, either to or from his post in another country[.]").

Critically, the government itself has admitted that the common law recognizes absolute sovereign immunity from criminal prosecution. When pressed at argument in *Halkbank*, the government "acknowledge[d] that there is a strong customary international law principle against prosecuting a state qua state," and disavowed any intention "to do so," full stop. Tr. 50:15-18, *Türkiye Halk Bankasi A.S. v. United States*, No. 21-1450 (U.S. Jan. 17, 2023) ("*Halkbank* Tr."). Given that "a

corporation ... exercising functions comparable to those of an agency of the state" is entitled to raise the same immunity defenses as the state itself, Restatement (Second) of Foreign Relations Law § 66(g); *supra*, Part I.A, this concession as to foreign states carries through to foreign instrumentalities like Defendants. As the State Department itself explained in 1973: "The traditional rule was that [] agencies and instrumentalities of a foreign government were entitled to the same immunities as the government itself, especially if they engaged in clearly governmental activities." United States: Draft Legislation on the Jurisdictional Immunities of Foreign States (Jan. 26, 1973), *reprinted in* 12 I.L.M. 118, 135 (1973).

### 2. The Restrictive Theory Of Foreign Sovereign Immunity Did Not Displace Common Law Immunity In Criminal Cases

In the mid-twentieth century, U.S. courts and other states began to recognize "commercial" exceptions to sovereign immunity in *civil* cases, *Helmerich & Payne*, 137 S. Ct. at 1320, but this shift to the so-called restrictive theory "left untouched" the international law rule of absolute immunity in criminal cases. Fox & Webb, *supra*, at 91. Around the world, "[a] state can be liable under civil law, but it cannot be prosecuted"; "criminal liability is the liability of an *individual* for his own unlawful actions." Elizabeth Helen Franey, "Immunity from the Criminal Jurisdiction of National Courts," *in* Research Handbook on Jurisdiction and Immunities in International Law 205, 207 (Alexander Orakhelashvili ed., 2015) (emphasis added; footnote omitted).

33

Citing this international trend and its view that "persons doing business with [foreign states] [should] have their rights determined in the courts," the U.S. State Department endorsed this "newer or restrictive theory of sovereign immunity" in 1952. Tate Letter, *supra*. But the State Department never purported to abandon, in the Tate Letter or elsewhere, the absolute theory of sovereign immunity for criminal cases. In the United States, restrictive theory cases against foreign states and instrumentalities involved "unjust enrichment," "securities law" violations, "wrongful discharge," H.R. Rep. 94-1487 at 19, and other "adjudications of commercial liability," *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 698 (1976) (plurality) (citation omitted), not the sort of "conscious" "wrongdoing" that criminal statutes prescribe, *Elonis v. United States*, 575 U.S. 723, 734 (2015) (citations omitted).

At no point during this time did the United States, any U.S. state, or any local district attorney criminally prosecute foreign states or instrumentalities. As Justice Kagan remarked during the *Halkbank* argument, "criminal actions were never brought" against foreign states and instrumentalities. *Halkbank* Tr. 35:5-7. While the government, to be sure, maintained that it could commence criminal prosecutions "against corporations partly or wholly owned by a foreign government," U.S. *Halkbank* Br. 24, it could not identify a single case in which it brought criminal

charges against a foreign instrumentality exercising functions comparable to those of an agency of the state. *See id.* at 24-26.

There were no pre-FSIA criminal cases against foreign states or instrumentalities. One of the government's cited cases involved merely a grand jury subpoena directed against foreign instrumentalities, and even this subpoena was quashed because "[t]he consequences of a successful prosecution of" the company "would in reality be to charge and find" a foreign government "guilty of violating a law of the United States, which imposes criminal penalties." *World Arrangements*, 13 F.R.D. at 291 (cited in U.S. *Halkbank* Br. 25-26). Another case reserved judgment on whether to quash a subpoena directed to a foreign instrumentality because "the Court [was] unable to ascertain whether the grand jury will use the information it seeks to possibly attempt to indict the Philippine National Lines" as in *World Arrangements. In re Grand Jury Investigation of the Shipping Indus.*, 186 F. Supp. 298, 319 (D.D.C 1960) (cited in U.S. *Halkbank* Br. 25-26). *Shipping Industry* notably declined to defer to the Justice Department's assertion that the company was "a purely commercial venture," or the "State Department refus[al] to recognize the claim of sovereign immunity." *Id.* The third case, a "suit to enjoin violations of the anti-trust laws," did not involve the criminal process at all but recognized that "[t]he person of the foreign sovereign and those who represent him are immune, whether their acts are commercial, tortious, criminal, or not, no matter

where performed." *Deutsches Kalisyndikat Gesellschaft*, 31 F.2d at 200-01 (citations omitted).

Finally, any criminal prosecution of a foreign sovereign would be impracticable at common law. Even after the United States' adoption of the restrictive theory, foreign states had, at common law, "complete immunity … from execution against their property," even when the property is used for commercial purposes. *Conn. Bank of Com. v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002); *see* H.R. Rep. No. 94-1487, at 8, 27. "This rule required plaintiffs who successfully obtained a judgment against a foreign sovereign to rely on voluntary repayment by that State." *Autotech Techs. LP v. Integral Res. & Dev. Corp.*, 499 F.3d 737, 749 (7th Cir. 2007). Criminal penalties would thus not be enforceable, even if there were an exception for commercial activity (which there is not, *see infra*, Part III.A.1).

### 3. The FSIA Did Not Displace Common Law Immunity In Criminal Cases

In 1976, Congress codified the restrictive theory for civil cases in the FSIA. "After the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity" in *civil* cases. *Samantar*, 560 U.S. at 313. But because "the FSIA does not apply to criminal proceedings," *Halkbank*, 143 S. Ct. at 951, "'common law' controls the disposition of any claim of foreign sovereign immunity

36

in criminal cases," *id.* at 954 (Gorsuch, J., concurring in part and dissenting in part) (quoting *id.* at 951 (majority)); *see id.* at 951-52 (remanding to the Second Circuit "to consider the parties' common-law arguments in a manner consistent with this opinion"); *Samantar*, 560 U.S. at 324 ("Even if a suit is not governed by the Act, it may still be barred by foreign sovereign immunity under the common law.").

Foreign sovereign immunity in criminal cases is governed by federal common law. "When Congress has not spoken to a particular issue ... and when there exists a 'significant conflict between some federal policy or interest and the use of state law,'" courts have applied "federal common law." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 313 (1981) (citations omitted). And U.S. courts have long "appl[ied] international law as a part of our own in appropriate circumstances." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964) (holding that the act of state doctrine is governed by federal common law); *see, e.g.*, *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (federal common law covers "relations with foreign nations"); *Doğan*, 932 F.3d at 894-95 (extending "common-law foreign sovereign immunity" to foreign officials).

Because Congress did not change the common law of foreign sovereign immunity for criminal cases in the FSIA, foreign states and instrumentalities continue to retain absolute immunity from criminal prosecution. *See supra*, Part II.A.1. This case is the first criminal prosecution of a foreign instrumentality that

37

has asserted sovereign immunity in U.S. history.  Before this case, no country had even "contemplated the possibility of bringing a criminal prosecution against a foreign state, as such, in the courts of another state."  Joseph DellaPenna, Suing Foreign States 37 (2d ed. 2003); *see, e.g.*, Restatement (Third) of Foreign Relations Law § 461 cmt. c (1987) ("A state itself is generally not subject to the criminal process of another state …").  And through the early 2000s, U.S. courts rejected civil RICO claims against foreign instrumentalities because "no criminal jurisdiction exists in our courts over foreign sovereigns."  *Gould*, 750 F. Supp. at 844 ("[I]n peacetime situations, this country does not bring criminal proceedings against other nations.").[7]  Defendants' absolute common law immunity from criminal prosecution thus remains unabated.

### B. Congress Preserved Common Law Immunity In Enacting The EEA

The district court wrongly ruled that Congress expressed an intent to criminally prosecute foreign states under the EEA to support its interpretation of the FSIA.  *See* 1-ER-21.  To the contrary, Congress in fact incorporated, not repealed, common law immunity principles into the EEA.

---

[7]  *See, e.g.*, *Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 818-20 (6th Cir. 2002), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *Dale v. Colagiovanni*, 337 F. Supp. 2d 825, 842 (S.D. Miss. 2004), *vacated and remanded on other grounds*, 443 F.3d 425 (5th Cir. 2006).  *But see Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1214-16 (10th Cir. 1999).

38

The Supreme Court has long held that "'common-law principles of ... immunity were *incorporated* into our judicial system and that they should not be abrogated absent clear legislative intent to do so.'" *Filarsky v. Delia*, 566 U.S. 377, 389 (2012) (emphasis added; ellipsis in original) (quoting *Pulliam v. Allen*, 466 U.S. 522, 529 (1984)).  In *Filarsky*, for example, the Court held that 42 U.S.C. § 1983 incorporates traditional qualified immunity for independent contractors.  *Id.  Pierson v. Ray*, 386 U.S. 547 (1967), similarly held that the same statute incorporates judicial immunity on the "presum[ption] that Congress would have specifically so provided had it wished to abolish the doctrine." *Id.* at 555.

"In determining whether a common-law immunity has been abrogated," this Court "follow[s] the Supreme Court's lead and appl[ies] a clear statement rule." *Chappell v. Robbins*, 73 F.3d 918, 923 (9th Cir. 1996).  "For example, the Supreme Court in *Pierson* declined to find a statutory override because the legislative record gave no 'clear indication' that Congress intended to abolish common-law immunity." *Id.* (quoting 386 U.S. at 554).  "[T]here must be sufficient evidence in the statute or legislative history to show a specific 'clear legislative intent' to waive immunity." *Id.* (quoting *Pulliam*, 466 U.S. at 529).  "Thus, even where 'the statute on its face admits of no immunities,' the Court will read it 'in harmony with general principles of tort immunities and defenses rather than in derogation of them.'" *Doğan*, 932 F.3d at 894 (quoting *Malley v. Briggs*, 475 U.S. 335, 339 (1986)).

39

Applying this precedent, this Court held in *Chappell* that RICO, a primarily criminal statute, did not repeal judicial immunity because the statute contained no "clear indication that Congress affirmatively intended to abrogate immunity." 73 F.3d at 924. And in *Doğan*, this Court rejected the contention that the Torture Victims Protection Act repealed foreign official immunity, even though the statute "imposes liability on 'every person who'" commits a wrongful act. 932 F.3d at 894 (quoting *Pierson*, 386 U.S. at 554).

The district court disregarded these principles of statutory interpretation. There is nothing in the text of the EEA that remotely addresses the scope of foreign sovereign immunity. Rather, the EEA authorizes criminal prosecution of "whoever" spies while "intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent." 18 U.S.C. § 1831(a). The word "whoever" refers only to "persons," not governments. *See United States v. Singleton*, 165 F.3d 1297, 1300 (10th Cir. 1999) (en banc) ("construing 'whoever' to include the government is semantically anomalous"); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) ("'[P]erson' does not include the sovereign ...."). And until now the EEA has never been used to prosecute a foreign state or instrumentality over a sovereign immunity defense.

The district court also asserted that, in the "legislative history of the EEA, ... Congress stated the act was intended to cover and punish a 'foreign government that

40

uses its classic espionage apparatus to spy on a company.'" 1-ER-21 (quoting H.R. Rep. 104-788, at 5 (1996)). This is incorrect: the legislative history contains no mention of any desire to punish foreign governments (which the government concedes is impermissible, *supra*, at 32) or foreign instrumentalities acting on their behalf, let alone to take away their immunity from criminal prosecution. Even if the legislative history supported the district court's ruling, a desire "to effect a statute's purpose offers no authority for [a court] to read into the statute or its legislative history evidence of a legislative intent that simply isn't there." *Chappell*, 73 F.3d at 924.

Because the statute "is silent as to whether any common law immunities are abrogated," and merely states that an "individual" will be liable, this Court must "'assume that common-law principles of immunity were incorporated" into the EEA. *Doğan*, 932 F.3d at 895 (alterations omitted) (quoting *Filarsky*, 566 U.S. at 389).

### C. The Executive Branch Cannot Abrogate Common Law Immunity

Just as it did in the district court here (2-ER-63), the government asserted in *Halkbank* "that the common law does not provide for foreign sovereign immunity when, as here, the Executive Branch has commenced a federal criminal prosecution." 143 S. Ct. at 951 (stating government position); *see* U.S. *Halkbank* Br. 21. The district court rightly did not endorse this view (although it vaguely and

incorrectly deferred in part to the fact "that the Department of Justice chose to prosecute this case"). 1-ER-21. *Halkbank* did not endorse this view either, and neither should this Court. As discussed above, foreign sovereign immunity is *absolute* at common law, not subject to the Executive's case-by-case prerogative. Five additional reasons reinforce that the Executive Branch cannot abrogate common law immunity. *See generally* Br. of Professors Ingrid (Wuerth) Brunk & William S. Dodge as Amici Curiae in Support of Neither Party, *Türkiye Halk Bankasi A.S. v. United States*, No. 21-1450 (U.S. Nov. 21, 2022) ("Brunk & Dodge Br.").

*First*, the Executive Branch has no authority to dictate the substantive rules of decision of sovereign immunity. "The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'" *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).

The government has never identified any part of the Constitution or any statute that permits the Executive Branch to abrogate foreign sovereign immunity, because there is none. "The President has an array of political and diplomatic means available to enforce international obligations, but unilaterally" dictating foreign sovereign immunity law "is not among them." *Id.* at 525 (holding that President lacked authority to unilaterally convert a non-self-executing treaty into a self-

42

executing one). Instead, the power to prescribe foreign sovereign immunity rules belongs to Congress, and derives from "its powers to prescribe the jurisdiction of federal courts, Art. I, § 8, cl. 9; to define offenses against the 'Law of Nations,' Art. I, § 8, cl. 10; to regulate commerce with foreign nations, Art. I, § 8, cl. 3; and to make all laws necessary and proper to execute the Government's powers, Art. I, § 8, cl. 18." *Verlinden*, 461 U.S. at 493 n.19. Thus, "when it comes to" foreign sovereign immunity, "the President has none of 'his own constitutional powers' to 'rely' upon." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233-34 (9th Cir. 2018) (holding the Executive Branch may not withhold properly appropriated funds without congressional authorization).

*Second*, there is no "'particularly longstanding practice' of congressional acquiescence" to criminal prosecutions of foreign instrumentalities. *Medellin*, 552 U.S. at 532 (quoting *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003)). The government itself asserts that such cases were "rare." U.S. *Halkbank* Br. 24. And even that is an exaggeration: there were no such criminal prosecutions before this case. *Supra*, Part II.A. When there was a risk that subpoenas could lead to criminal prosecution against foreign instrumentalities, the subpoenas were quashed on immunity grounds. *See World Arrangements*, 13 F.R.D. at 290-91. In *Halkbank*, the government contended (U.S. Halkbank Br. 25-26) that such criminal

prosecutions existed, but it offered no apposite examples.[8]  The Executive Branch thus has no authority to dictate sovereign immunity in criminal cases.  *Cf. Int'l Refugee Assistance Proj. v. Trump*, 883 F.3d 233, 306-07 (4th Cir. 2018) (Gregory, C.J., concurring) (finding no Presidential power to exclude nonimmigrants by proclamation because "[n]o President has ever asserted such a unilateral power").

Even in *civil* cases, determining sovereign immunity law is a judicial function at common law.  Historically, courts would at most defer only "to executive findings of 'fact' as to whether [a] government was officially sovereign."  White, *supra*, at 27-28.  But once the Executive Branch made that suggestion, courts would "decide the immunity issue as they would any other issue of common law," without deference to the Executive Branch.  *Id.* at 28.  As the Supreme Court explained, the political branches' "action in recognizing a foreign government … [is] conclusive on all domestic courts," but courts are "free to draw for themselves [recognition's] legal consequences in litigations pending before them" without reference to the

---

[8]  *See United States v. Ho*, 2016 WL 5875005 (E.D. Tenn. Oct. 7, 2016) (prosecution of individual working for foreign instrumentality who did not raise immunity); *United States v. Jasin*, 1993 WL 259436 (E.D. Pa. July 7, 1993) (same); *United States v. Statoil, ASA*, No. 06-CR-960, ECF 5 (S.D.N.Y. Oct. 13, 2006) (foreign instrumentality did not contest criminal charges or assert immunity); *United States v. Aerlinte Eireann*, No. 89-CR-647, ECF 12 (S.D. Fla. Oct. 6, 1989) (same); *In re Sealed Case*, 825 F.2d 494, 495 (D.C. Cir. 1987) (per curiam) (grand jury investigation against state-owned bank and foreign state that did not invoke sovereign immunity); *In re Grand Jury Proceeding Related to M/V Deltuva*, 752 F. Supp. 2d 173, 176-180 (D.P.R. 2010) (grand jury investigation into shipping company that did not consider common law sovereign immunity arguments).

44

Executive Branch. *Guar. Tr. Co. of New York v. United States*, 304 U.S. 126, 137-38 (1938); *see, e.g.*, *Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562, 576 (1926) (holding, contrary to government's position, that "merchant ships owned and operated by a foreign government have the same immunity that war ships have").[9] The State Department thus repeatedly acknowledged that its "policy" on sovereign immunity "cannot control the courts." Tate Letter, *supra*; *see, e.g.*, Kleindienst & Rogers, *supra*, at 118 (a sovereign immunity determination "is made by the court").

*Third*, "requir[ing] the judiciary to receive the Executive's permission before" accepting a plea of sovereign immunity would "conflict with" "the doctrine of separation of powers." *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 773 (1972) (Powell, J., concurring in the judgment). The political branches lack "constitutional authority to control the exercise of [federal courts'] judicial power." *Pope v. United States*, 323 U.S. 1, 8 (1944); *cf. Halkbank*, 143 S. Ct. at 954-55 (Gorsuch, J., concurring in part and dissenting in part) (expressing "concern[] that deference to the Executive's immunity decisions risks relegating courts to the status of potted plants, inconsistent with their duty to say what the law is in the cases that come before them").

---

[9] For the State Department's letter urging the court to reject immunity, see Letter from Fred K. Nielsen, Solicitor for Department of State, to Judge Julian W. Mack, Aug. 2, 1921, *in* 2 Green Haywood Hackworth, Digest of International Law 438-39 (1941).

Consider the act of state doctrine, which requires dismissal of a case that would "require[] the Court to declare invalid ... the official act of a foreign sovereign," *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). In *First National City Bank*, "six of the Justices" rejected the view that the Executive Branch has "authority to override the act of state doctrine." Restatement (Fourth) of Foreign Relations Law § 441 reporter's note 13 (2018). If a court were to act as "a mere errand boy for the Executive Branch," 406 U.S. at 773 (Douglas, J., concurring in the judgment), it would "politicize[] the judiciary" by "supplanting the political branch in its role as a constituent of the international law-making community," and violate "the separation of powers," *id.* at 790-92 (Brennan, J., dissenting). There is no reason to give the Executive Branch any more control over foreign sovereign immunity than it has over the act of state doctrine, as "[b]oth doctrines relate to the extension or application of judicial power to foreign sovereigns." Brunk & Dodge Br. 8.

*Fourth*, Congress has also "implicitly prohibit[ed]" the Executive Branch from dictating sovereign immunity in individual cases, *Medellin*, 552 U.S. at 526. Again, the EEA incorporates foreign sovereign immunity from criminal prosecution. *Supra*, Part II.B. Additionally, the main purpose of the FSIA was to "transfer[] primary responsibility for immunity determinations ... to the Judicial Branch." *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004); *see* 28 U.S.C. § 1602. As

a result, the Executive Branch's purported unilateral abrogation of immunity in criminal cases would be "incompatible with the ... implied will of Congress," leaving the Executive Branch's "power [] at its lowest ebb." *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring).

*Finally*, absent an absolute bar against criminal prosecutions of foreign states, "*state* prosecutors would [] be free to commence criminal proceedings against foreign states and their instrumentalities," leaving state judges to decide this area of law. *Halkbank*, 143 S. Ct. at 950. The Executive Branch lacks the power to forestall such prosecutions. In the 1840s, for example, Secretary of State Daniel Webster attempted to block, on sovereign immunity grounds, New York's prosecution of a British militant, but New York's highest court refused to defer to the Executive Branch's immunity suggestion. "[T]he trial of crimes [is] exclusively in the hands of the judiciary" and cannot "be confided to the executive power." *People v. McLeod*, 1 Hill 377, 433 (N.Y. Sup. Ct. 1841). Defendants know of no other "instance in which the President has attempted (or Congress has acquiesced in) a Presidential directive issued to state courts" regarding foreign sovereign immunity. *Medellin*, 552 U.S. at 532.

The potentially enormous foreign policy implications of *criminally prosecuting a foreign sovereign* in state court would allow local prosecutors to "defeat or alter our foreign policy": "[t]he nation as a whole would be held to answer

47

if a State created difficulties with a foreign power." *United States v. Pink*, 315 U.S. 203, 232 (1942). And this risk is not an idle one. States have launched unsuccessful civil suits against foreign states seeking recompense for a variety of public acts. *See, e.g.*, *Missouri ex rel. Schmitt v. People's Republic of China*, 610 F. Supp. 3d 1174, 1178 (E.D. Mo. 2022). Without a federal common law rule of sovereign immunity in criminal cases, nothing would preclude states from bringing criminal prosecutions based on the same conduct, no matter how outlandish the theory.

Even if the Executive Branch could veto state court prosecutions, this would merely reintroduce the Kafkaesque bedlam that the government was ill-equipped to handle before the FSIA's enactment. The Executive Branch would be dragged into every purported dispute between a state or local prosecutor and a foreign state, facing domestic pressure to allow the case to proceed and foreign "pressures" and threats to quash the case. Kleindienst & Rogers, *supra*, at 120.

These risks to foreign relations far outweigh the district court's concern, when addressing the FSIA, that affording instrumentalities immunity from criminal prosecutions would "create a loophole" that would "gut[] the government's crime-fighting toolkit." 1-ER-18 & n.10 (citation omitted). Such criminal prosecutions have never been part of the "government's crime-fighting toolkit," so there was no fabric in which to "create a loophole." The government always has used other tools to check foreign states, including sanctions; civil actions against the

48

instrumentalities (which Dupont, the alleged victim here, declined to do despite suing other participants in the alleged conspiracy, *see E.I. Du Pont De Nemours & Co. v. USA Performance Tech., Inc.*, Case No. 11-cv-01665-JSW (N.D. Cal.)); criminal prosecutions of individuals (which the government undertook here); and "international dispute-resolution mechanisms to which private individuals have no access," *Doe v. Holy See*, 557 F.3d 1066, 1096 (9th Cir. 2009) (Berzon, J., dissenting in part).

For all these reasons, the government's decision to pursue this criminal prosecution has no bearing on Defendants' immunity.

## III.   NO EXCEPTIONS TO IMMUNITY APPLY

### A.   Defendants' Purported Commercial Conduct Does Not Limit Their Immunity

The district court did not dispute that the common law historically granted foreign states and instrumentalities absolute immunity from criminal prosecution. Instead, it wrongly ruled that it could update the common law to allow for prosecution of "commercial" conduct because "'customary international law [now] recognizes the restrictive theory of sovereign immunity,'" 1-ER-21-22 (citations omitted), under which "'immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts,'" 1-ER-9 (quoting *Samantar*, 560 U.S. at 312-13).  The

district court then compounded its error by wrongly ruling that the indictment arises from such purported commercial activity.  *See* 1-ER-20-22, 1-ER-33-39.

### 1.  There Is No Commercial-Activity Exception To Common Law Immunity In Criminal Cases

The district court erroneously ruled that there is a commercial-activity exception to common law sovereign immunity from criminal prosecution.  The "adoption of a restrictive doctrine has not been treated as having any relevance in relation to the Absolute Immunity of the foreign State from criminal proceedings." Fox & Webb, *supra*, at 94.  The one contrary decision the district court cited, *United States v. Türkiye Halk Bankasi A.S.*, 16 F.4th 336, 351 & n.70 (2d Cir. 2021), contained "minimal analysis" of the issue (1-ER-21) and did not cite a single authority suggesting that the restrictive theory applied in criminal cases.  For this reason, the Supreme Court vacated the Second Circuit's analysis as incomplete, and remanded with instructions to address common law anew.  *Halkbank*, 143 S. Ct. at 951-52.  The Second Circuit's since-vacated analysis, moreover, does not stand up to scrutiny.

The restrictive theory of sovereign immunity has never applied in criminal cases.  As noted above, there have been no criminal prosecutions of foreign instrumentalities in the United States or elsewhere, and the restrictive theory has never been understood to apply to criminal cases.  *Supra*, Part II.A.  This lack of criminal prosecution of foreign sovereigns and instrumentalities forecloses the

district court's ruling: no rule of customary international law allowing criminal prosecutions in commercial cases can develop absent "a general and consistent practice of states followed by them from a sense of legal obligation." Restatement (Third) of Foreign Relations Law § 102(2) (1987); *see, e.g.*, *United States v. Struckman*, 611 F.3d 560, 576 (9th Cir. 2010) (rejecting customary international law argument because the defendant had "not provided any international law materials concerning the [customary international law] rights he asserts, much less materials that address the application of the asserted rights under the circumstances of this case").

The district court also could not properly invent a commercial-activity exception for common law immunity in criminal cases. "[S]ince *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts have largely disclaimed the power to *develop* federal common law …." *Halkbank*, 143 S. Ct. at 955 (Gorsuch, J., concurring in part, dissenting in part) (emphasis added). Instead, when applying common law immunity doctrines, courts must limit themselves to applying longstanding common law principles that existed before *Erie*. *See, e.g.*, *Sabbatino*, 376 U.S. at 425 ("It seems fair to assume that the Court did not have rules like the act of state doctrine in mind when it decided *Erie* …."); *Doğan*, 932 F.3d at 893-94 (Federal "[c]ommon-law foreign sovereign immunity" turns on the rules that governed in the "Restatement (Second) of Foreign Relations Law § 66(f) (1965).").

The government has thus conceded that "the pre–Tate Letter common law principles" of sovereign immunity should apply if the FSIA does not. *See* Oral Arg. Audio 22:27-24:02, *United States v. Pangang Grp. Co.*, Case No. 19-10306 (9th Cir. Oct. 15, 2020). That "pre–Tate Letter" regime was one of absolute immunity. *Supra*, Part II.

A commercial-activity exception would not make sense in the criminal context. Under such a rule, the government would be able to prosecute foreign instrumentalities for ordinary commercial misconduct, but not the most serious and blameworthy acts criminalized in the U.S. Code, like terrorism, torture, and extrajudicial killing. Indeed, although some have contended that foreign officials lack absolute immunity for committing human rights abuses, *but see Belhas v. Ya'alon*, 515 F.3d 1279, 1292 (D.C. Cir. 2008) (Williams, J., concurring) (rejecting this argument); Sean D. Murphy, *Immunity* Ratione Materiae *of State Officials from Foreign Criminal Jurisdiction: Where is the State Practice in Support of Exceptions?*, 118 Am. J. Int'l L. Unbound 4, 8 (2018) (same), no authority, to Defendants' knowledge, has ever suggested that a commercial-activity exception applies to foreign official immunity.

Creating a commercial-activity exception would, by contrast, invite instability. No court has ever defined the contours and principles applicable to such an exception in criminal cases, and neither has the Executive Branch. Absent a

default rule of absolute immunity (until Congress determines it is necessary to enact new legislation), courts nationwide—both federal and state—would be left to create the bounds of sovereign immunity in the criminal context on an ad hoc basis.  And with no way to remove state criminal prosecutions of foreign sovereigns and their instrumentalities to federal court—the FSIA permits removal of only "civil actions," *see* 28 U.S.C. § 1441(d)—such a scheme would undermine Congress's desire "to channel cases against foreign sovereigns away from the state courts and into federal courts," *Verlinden*, 461 U.S. at 497.

### 2. This Case In Any Event Does Not Arise From Commercial Activity

Even if the common law did allow for a commercial-activity exception in criminal cases (it does not), the district court wrongly ruled that the exception applies to this case.  1-ER-20, 1-ER-33-39.

The district court seemed to assume that the FSIA's commercial-activity exception analysis would apply to a common law commercial-activity exception. *See* 1-ER-22.  The common law rule in civil cases is that sovereign immunity does "not apply to a proceeding arising out of commercial activity outside [the foreign state's] territory."  Restatement (Second) of Foreign Relations Law § 69 (1965). And whether activity is commercial turns on "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'"  *Republic of*

53

*Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (citation omitted) (invoking common law restrictive theory to interpret the FSIA's commercial-activity exception).[10]

The district court, however, erred in ruling that the indictment's allegations "could" qualify as commercial activity. 1-ER-37. The commercial conduct must "itself [be] wrongful—as opposed to wrongful based only on other conduct." *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 (D.C. Cir. 2022); *see, e.g.*, *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33 (2015) (explaining that the conduct, "if proven, [must] entitle a plaintiff to relief") (citations omitted). Here, the case does not arise from Defendants' commercial activity in the United States. The case arises from—as the government repeatedly emphasizes in the indictment— alleged economic espionage. 2-ER-88, 2-ER-94, 2-ER-99. The indictment alleges that "companies owned and controlled by the PRC government" conspired to "illegally obtain technology that had been developed by Dupont." 2-ER-94. Economic espionage is thus "the core" of the government's case. *Sachs*, 577 U.S. at 35.

---

[10]   *Weltover* held that the FSIA's definition of "commercial activity" aligned with "the meaning generally attached to that term under the restrictive theory at the time the statute was enacted." 504 U.S. at 612-13; *see, e.g.*, Hersch Lauterpacht, *The Problem of Jurisdictional Immunities of Foreign States*, 28 Brit. Y.B. Int'l L. 220, 225 (1951) (formulating the restrictive theory "test" as "whether, irrespective of its object, the juridical nature of the transaction is such that it can be entered into by an individual").

But economic espionage is not a "commercial activity" by which a private party typically engages in trade or commerce. By definition, it is a uniquely sovereign act performed for the "benefit [of] any foreign government." 18 U.S.C. § 1831(a). As this Court held in *Broidy Capital Management, LLC v. State of Qatar*, 982 F.3d 582 (9th Cir. 2020), *cert. denied,* 141 S. Ct. 2704 (2021), a foreign state that hires people to steal "trade secrets" cannot be sued under the FSIA's commercial-activity exception because "espionage," not incidental contracts in furtherance of espionage, is the "basis for [the] suit." *Id.* at 594 (citations omitted); *cf. Eringer v. Principality of Monaco*, 533 F. App'x 703, 705 (9th Cir. 2013) (employment dispute between intelligence official and foreign government was not commercial because employment as a spy "is not the type of employment private parties can undertake").

The district court wrongly considered only whether the indictment anywhere alleged *some* commercial activity, not whether proving that commercial conduct would entitle the government to relief. The court concluded that the commercial-activity exception applied because Defendants (1) entered into contracts in the United States "for projects that involved the production of TiO2" in China, and (2) "prepar[ed] designs for the TiO2 projects and [had] meetings about those projects" in the United States. 1-ER-37. But entering into contracts in the United States for "production of TiO2" in China and "preparing designs for the TiO2 projects" are not

55

the gravamen of the indictment. This conduct is not "wrongful" on its own, and so proving these allegations at trial would not "entitle" the government to a conviction "under [its] theory of the case." *Rodriguez*, 29 F.4th at 716 (citation and quotation marks omitted). Here, the contracts and designs that the district court identified are not the gravamen of the government's case—the alleged wrongful, injurious act is espionage (*see* 2-ER-88, 2-ER-94, 2-ER-99).

The district court also misplaced reliance on this Court's decision in *Adler v. Federal Republic of Nigeria*, 219 F.3d 869 (9th Cir. 2000). 1-ER-30, 1-ER-36-37. In *Adler*, the plaintiff alleged that Nigerian officials breached their contractual promise to pay the plaintiff $60 million in embezzled state funds in exchange for bribes. *See* 219 F.3d at 871-73, 876. This Court held that the commercial-activity exception applied because the plaintiff "and the Nigerian officials made a *contract* for illegal activity," and "[a] contract for services is plainly commercial" even if "the contract was for an illegal purpose." *Id.* at 875. The contract in *Adler* was thus— unlike here—at the "core" of the plaintiff's action because the wrongful conduct was the failure to perform under the contract.

Finally, the government also failed to show that Defendants' alleged espionage campaign was conducted in connection with a commercial activity of the foreign state elsewhere. The government does not allege any substantive causal link between the alleged espionage and TiO2 manufacturing—the indictment alleges

only that Defendants' underlying motive was "to develop chloride-route TiO2 production capabilities." 2-ER-94. That supposed motive is irrelevant to whether any commercial-activity exception applies. *See, e.g.*, *Sun v. Taiwan*, 201 F.3d 1105, 1107-08 (9th Cir. 2000) ("[W]e look to the state's acts as opposed to the reason for its acts."). And the government does not allege that Defendants have "deploy[ed]" any stolen "trade secrets" against its "commercial rival[s]." *Broidy*, 982 F.3d at 595 (economic espionage allegations do not satisfy the commercial activity test when "there is no allegation that [the foreign state or instrumentality] made commercial use of the materials").

Thus, even if there were a commercial-activity exception to foreign sovereign immunity in criminal cases, it would not apply here.

## B.    Defendants Did Not Impliedly Waive Immunity

The district court applied the FSIA's waiver exception, 28 U.S.C. § 1605(a)(1), to rule that Defendants had impliedly waived immunity under the FSIA, but did not rule that any waiver applied to common law immunity. *See* 1-ER-20, 1-ER-37-39. The FSIA waiver ruling was incorrect, but *Halkbank* has mooted the issue, and there is no basis to conclude that Defendants waived their common law immunity.

Although a foreign instrumentality can "waive" immunity at common law, *Halkbank*, 143 S. Ct. at 952 (Gorsuch, J., concurring in part and dissenting in part),

this waiver exception is extremely narrow. "[T]he courts have found such waivers in cases where a foreign state has agreed to arbitration in another country," "where a foreign state has agreed that the law of a particular country should govern a contract," and "where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity," but no other circumstances. H.R. Rep. 94-1487, at 18; *see, e.g.*, Restatement (Second) of Foreign Relations Law § 70(1)-(2) (1965) (recognizing waiver exclusively by agreement or counterclaim). The FSIA incorporates this limited, common-law understanding of implied waiver, *see In re Republic of Philippines*, 309 F.3d 1143, 1151 (9th Cir. 2002), and courts require "*strong evidence* that [waiver] is what the foreign state *intended*," *Barapind v. Gov't of Republic of India*, 844 F.3d 824, 829 (9th Cir. 2016) (citations omitted). Given this authority—and common sense—it is difficult to conceive of a circumstance in which a foreign state could be found to have intentionally waived its immunity from criminal prosecution.

The district court ruled (1-ER-38-39) that Defendants' "'long and active participation' in these criminal proceedings amount to an implied waiver of sovereign immunity" (quoting *United States v. Campa*, 529 F.3d 980, 1001 (11th Cir. 2008)). But it never found that Defendants *intended* to waive immunity, and their limited participation in these proceedings hardly suggests any such *intent*; the district court never suggested otherwise. Defendants raised immunity in their first

motion to dismiss on the date set for "motions challenging the indictment." 2-ER-78. They could not have expected that filing their motion on a court-ordered deadline was too late and thus did not intentionally waive immunity.

The district court erroneously concluded that Defendants' "three motions to quash the summons on the basis that service was improper" contributed to an implied waiver. 1-ER-38. "[O]bjecting to the propriety of service" without raising sovereign immunity does not constitute an implied waiver of that immunity. *Haven v. Rzeczpospolita Polska*, 215 F.3d 727, 732-33 (7th Cir. 2000). "[U]ntil it was established that service of process had been properly executed, [a defendant is] under no obligation to" participate in the case. *Id.* Plus, objecting to service is strong evidence that Defendants *did not* intend to submit to U.S. jurisdiction. And though the district court noted that Defendants "did not raise the FSIA as a basis to assert that the Court should quash the summons" (1-ER-38), that is irrelevant because the FSIA does not apply in criminal cases, *see Halkbank*, 143 S. Ct. at 944, and common law sovereign immunity traditionally imposed no limits on service, *see, e.g.*, *Republic Int'l Corp. v. Amco Eng'rs, Inc.*, 516 F.2d 161, 165-66 (9th Cir. 1975) (upholding service on state-owned corporation under Fed. R. Civ. P. 83); H.R. Rep. 94-1487, at 23 (referring to the "void in existing Federal and State law" governing service on foreign states). Defendants thus could not have raised common law immunity when they moved to quash service.

59

The district court also mentioned that Defendants had "obtained discovery" from the government and moved for a "bill of particulars," 1-ER-39, but this is not evidence, much less strong evidence, of an intention to waive immunity either. Fed. R. Crim. P. 7(f) requires that a bill of particulars be sought "within 14 days after arraignment," before motions to dismiss are filed. Just as a Fed. R. Civ. P. 12(e) motion for a more definite statement does not waive FSIA immunity, *see, e.g.*, *Zhukovskiy v. Nat'l Bank of Ukraine*, 2022 WL 526148, *1 (S.D. Fla. Feb. 22, 2022), seeking a bill of particulars does not waive substantive rights, *see, e.g.*, *United States v. Winship*, 724 F.2d 1116, 1124 (5th Cir. 1984) (seeking bill of particulars does not waive venue objections).

This case bears no resemblance to *Campa*, 529 F.3d 980, the one case on which the district court relied. The *Campa* defendant "filed several motions, which included motions to dismiss on other grounds," "*appeared at trial*," and waited until *the close of the government's case at trial* to raise sovereign immunity. *Id.* at 1001 (emphases added). Immunity had already been "lost" by then because sovereign immunity "is an immunity from suit" and "trial." *Compania Mexicana De Aviacion, S.A. v. U.S. Dist. Court for Cent. Dist. of California*, 859 F.2d 1354, 1358 (9th Cir. 1988). Here, Defendants asserted immunity in a timely motion to dismiss, months before the then-scheduled trial. 2-ER-78. No case has found common law waiver in circumstances like this.

60

## **CONCLUSION**

The district court's order should be reversed, and the indictment should be dismissed.

Dated:  June 16, 2023                         Respectfully submitted,

                                                                s/ Robert P. Feldman

William B. Adams                            Robert P. Feldman
QUINN EMANUEL URQUHART        Joseph E. Reed
  & SULLIVAN, LLP                    QUINN EMANUEL URQUHART
51 Madison Avenue, 22nd Floor           & SULLIVAN, LLP
New York, NY  10010                       555 Twin Dolphin Drive, 5th Floor
(212) 849-7000                                Redwood Shores, CA  94065
                                                       (650) 801-5000


Michael T. Packard                           John M. Potter
Alexander H. Loomis                         QUINN EMANUEL URQUHART
QUINN EMANUEL URQUHART          & SULLIVAN, LLP
  & SULLIVAN, LLP                    50 California Street, 22nd Floor
111 Huntington Ave, Suite 520          San Francisco, CA  94111
Boston, MA 02199                            (415) 875-6600
(617) 712-7100

*Counsel for Defendants-Appellants*

## **REQUEST FOR ORAL ARGUMENT**

Appellants respectfully request that this Court hear oral argument in this appeal.

## **STATEMENT OF RELATED CASES**

Pursuant to Circuit Rule 28-2.6, Appellants state that they are not aware of any related cases pending in this Court.

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule

32-1, the foregoing opening brief is in 14-point, proportionally spaced Times New

Roman type and contains 13,965 words, excluding the items exempted by Fed. R.

App. P. 32(f).


Dated:  June 16, 2023          s/ Robert P. Feldman_____
                               Robert P. Feldman

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed the foregoing Brief for Appellants

and Excerpts of Record with the Clerk of the Court for the United States Court of

Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that

all participants in the case are registered CM/ECF users and that service will be

accomplished by the appellate CM/ECF system.

Dated: June 16, 2023          <u>s/ Robert P. Feldman          </u>
                              Robert P. Feldman

## STATUTORY ADDENDUM

### TABLE OF CONTENTS

**Statute:**                                                **Page:**

18 U.S.C. § 1831                                              67

18 U.S.C. § 1839(1)                                           67

## 18 U.S.C. § 1831

(a) In General.—Whoever, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent, knowingly—

(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains a trade secret;

(2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys a trade secret;

(3) receives, buys, or possesses a trade secret, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

(4) attempts to commit any offense described in any of paragraphs (1) through (3); or

(5) conspires with one or more other persons to commit any offense described in any of paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy,

shall, except as provided in subsection (b), be fined not more than $5,000,000 or imprisoned not more than 15 years, or both.

(b) Organizations.—Any organization that commits any offense described in subsection (a) shall be fined not more than the greater of $10,000,000 or 3 times the value of the stolen trade secret to the organization, including expenses for research and design and other costs of reproducing the trade secret that the organization has thereby avoided.

## 18 U.S.C. § 1839(1)

As used in this chapter—(1) the term "foreign instrumentality" means any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government;