No. 22-10058

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PANGANG GROUP COMPANY, LTD., ET AL.

Defendants-Appellants.

––––––––––––––––––––––––––––––––––

**BRIEF FOR THE UNITED STATES AS APPELLEE**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 4:11-CR-00573 JSW

––––––––––––––––––––––––––––––

**ISMAIL J. RAMSEY**
United States Attorney

**MATTHEW M. YELOVICH**
Chief, Appellate Section, Criminal Division
Assistant United States Attorney

450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7200

**Attorneys for Plaintiff-Appellee**
**July 21, 2023**   **UNITED STATES OF AMERICA**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

JURISDICTION, TIMELINESS, AND BAIL STATUS ........................................ 2

ISSUE PRESENTED ............................................................................................ 2

STATEMENT OF THE CASE .............................................................................. 3

      A.     Criminal charges ...................................................................... 3

      B.     Motions to quash and mandamus .......................................... 3

      C.     Arraignment and court appearances ...................................... 4

      D.     First motion to dismiss ........................................................... 5

      E.     The Pangang Defendants' subsequent appeal ...................... 6

      F.     The second motion to dismiss ................................................ 7

      G.     Stay and *Halkbank* ................................................................. 9

SUMMARY OF ARGUMENT .............................................................................. 9

ARGUMENT ....................................................................................................... 10

      I.     THE PANGANG DEFENDANTS DO NOT ENJOY COMMON LAW IMMUNITY BECAUSE THEY ARE NOT FOREIGN STATES AND THE EXECUTIVE BRANCH HAS DETERMINED THAT THEY LACK IMMUNITY ...................................................... 10

           A.     Standard of review ................................................................. 10

           B.     Foreign state-owned commercial entities like the Pangang Defendants lack common-law immunity. ................................ 11

i

C. Common law foreign sovereign immunity does not extend to cases where the Executive Branch determines that immunity does not apply. ...........................................................................20

D. The Pangang Defendants' arguments to the contrary lack support.........................................................................................28

CONCLUSION ......................................................................................34

STATEMENT OF RELATED CASES ...................................................35

CERTIFICATE OF COMPLIANCE .......................................................36

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alfred Dunhill of London, Inc.* v. *Republic of Cuba*, 425 U.S. 682 (1976)
.................................................................................................. 17, 18, 20

*Bank Markazi v. Peterson*, 578 U.S. 212 (2016) ....................................22

*Bank of the United States v. Planters' Bank of Georgia*, 22 U.S. (9 Wheat.) 904
(1824)...........................................................................................13

*Berizzi Bros. Co. v. Steamship Pesaro*, 271 U.S. 562 (1926).......................... 16, 17

*Biden v. Nebraska*, 600 U.S. ___, No. 22-506, 2023 WL 4277210
(U.S. June 30, 2023) ..................................................................... 13, 14

*Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582 (9th Cir. 2020)....... 19, 30

*Coale v. Société Coop. Suisse des Charbons*, 21 F.2d 180 (S.D.N.Y. 1921)..........14

*Cook Cnty.* v. *United States ex rel. Chandler*, 538 U.S. 119 (2003)......................12

*Doğan v. Barak*, 932 F.3d 888 (9th Cir. 2019)................................................. 10, 24

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)..............................................7, 8

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635
(9th Cir. 2003) ...............................................................................10

*Embassy of the Arab Rep. of Egypt v. Lasheen*, 603 F.3d 1166 (9th Cir. 2010).....18

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983) ..................................................................... 12, 25

*Gould Coupler Co. v. United States Shipping Bd. Emergency Fleet Corp.*,
261 F. 716 (S.D.N.Y. 1919) ...............................................................13

*In re Grand Jury Investigation of the Shipping Industry*, 186 F. Supp. 298
   (D.D.C. 1960) ................................................................................26

*In re Grand Jury Proceeding Related to M/V Deltuva*, 752 F. Supp. 2d 173
   (D.P.R. 2010) ................................................................................26

*In re Grand Jury Subpoena*, 912 F.3d 623 (D.C. Cir. 2019)................................27

*In re Investigation of World Arrangements*, 13 F.R.D. 280 (D.D.C. 1952)..... 26, 27

*In re Pangang Grp. Co., Ltd.*, 901 F.3d 1046 (9th Cir. 2018)........................ 3, 4, 28

*In re Sealed Case*, 825 F.2d 494 (D.C. Cir. 1987)....................................................26

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) .................................13

*Matar v. Dichter*, 563 F.3d 9, 15 (2d Cir. 2009) ....................................................23

*Moodalay v. Morton*, (1785) 28 Eng. Rep. 1245 (Ch.) ...........................................15

*Munaf v. Geren*, 553 U.S. 674 (2008) .............................................................. 22, 23

*Nabob of the Carnatic v. East India Company*, (1793) 30 Eng. Rep. 521 (Ch.)
   ............................................................................................................ 14–15

*New York Cent. & Hudson River R.R. v. United States*, 212 U.S. 481 (1909)........25

*OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015) ...................................30

*Opati* v. *Republic of Sudan*, 140 S. Ct. 1601 (2020) ...............................................21

*Park v. Shin*, 313 F.3d 1138 (9th Cir. 2002)............................................................18

*Pasquantino v. United States*, 544 U.S. 349 (2005) ...............................................23

*Patrickson v. Dole Food Co.*, 251 F.3d 795 (9th Cir. 2001) ............................ 32, 33

*Peterson v. Iran*, 627 F.3d 1117 (9th Cir. 2010) .....................................................24

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992)......................... 18, 20

*Republic of Iraq* v. *Beaty*, 556 U.S. 848 (2009) .......................................................22

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945)....................................... 17, 23

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) .......................................20

*Samantar v. Yousuf*, 560 U.S. 305 (2010) .............................................................22

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ........................................... 18, 19, 20

*Sloan Shipyards Corp. v. United States Shipping Bd. Emergency Fleet Corp.*, 258 U.S. 549 (1922) ...........................................................................................13

*The Swift*, (1813) 1 Dod. 320 .................................................................................. 15

*The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812).... 21, 22, 24

*The Case of Thomas Skinner, Merchant v. The East-India Company*, (1666) 6 State Trials 710 (H.L.)...................................................................................15

*Turkiye Halk Bankasi A.S., aka Halkbank v. United States*, 143 S. Ct. 940 (2023) .......................................................................................... 9, 27, 31, 33

*United States v. Amedy*, 24 U.S. (11 Wheat.) 392 (1826) .......................................12

*United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199 (S.D.N.Y. 1929).......................................................................................... 25, 26

*United States v. Eireann*, No. 89-cr-647 (S.D. Fla. Oct. 6, 1989)..........................26

*United States v. Ho*, No. 16-cr-46, 2016 WL 5875005 (E.D. Tenn. Oct. 7, 2016) ..................................................................................................................27

*United States v. Jasin*, No. 91-cr-602, 1993 WL 259436 (E.D. Pa. July 7, 1993) ..................................................................................................................26

*United States v. Liew*, 856 F.3d 585 (9th Cir. 2017) .................................................3

*United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997)......................................23

*United States v. Pangang Grp. Co., Ltd.*, 6 F.4th 946 (9th Cir. 2021) ................................................................................ 2, 6, 7, 17, 32

*United States v. Ravara*, 27 F. Cas. 714 (C.C.D. Pa. 1794) ....................................24

*United States v. Sanmina Corp.*, 968 F.3d 1107 (9th Cir. 2020)...........................31

*United States v. Statoil, ASA*, No. 06-cr-960 (S.D.N.Y. Oct. 13, 2006).................26

*United States v. Wilder*, 28 F. Cas. 601 (C.C.D. Mass. 1838)................................14

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) ................... 19, 20

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 17 F.4th 930 (9th Cir. 2021)............ 12, 29

*Ye v. Zemin*, 383 F.3d 620 (7th Cir. 2004)..............................................................23

## STATE CASES

*Molina v. Comision Reguladora del Mercado de Henequen*, 103 A. 397 (N.J. 1918) ..........................................................................................................14

## FEDERAL STATUTES AND RULES

18 U.S.C. § 1831 ......................................................................................................3

18 U.S.C. § 3231 ...................................................................................................2, 5

28 U.S.C. § 1291 ......................................................................................................2

28 U.S.C. § 1603 ............................................................................................. 7, 8, 32

Fed. R. App. P. 4 ......................................................................................................2

Fed. R. Crim. P. 4....................................................................................................3, 4

OTHER AUTHORITIES

Chimene Keitner, *Prosecuting Foreign States*, Va. J. Int'l Law Vol. 61, No. 2 (2021) ........................................................................................................ 11

Chimène I. Keitner, *The Forgotten History of Foreign Official Immunity*, 87 N.Y.U. L. Rev. 704 (2012) ............................................................................ 24

Danny Abir, *Foreign Sovereign Immunities Act: The Right to a Jury Trial in Suits Against Foreign Government-Owned Corporations*, 32 Stan. J. Int'l L. 159 (1996) .......................................................................................................... 15

*Foreign Sovereign Immunities Act: Hearing on H.R. 1149, H.R. 1689, and H.R. 1888 Before the Subcomm. on Admin. L & Gov't'l Rels. of the H. Comm. of the Judiciary*, 100th Cong. 26–27 (1987) (testimony of State Department Deputy Legal Advisor Elizabeth G. Verville) ................................................................. 15

General Assembly resolution 59/38, annex, United Nations Convention on Jurisdictional Immunities of States and Their Property (Dec. 2, 2004) ........... 16

Hazel Fox, The Law of State Immunity 91 (3d ed. 2013) ...................................... 11

Hazel Fox & Philippa Webb, The Law of State Immunity 179 (rev. 3d ed. 2015) ..................................................................................................................... 15

Ingrid Wuerth, *The Due Process and Other Constitutional Rights of Foreign Nations*, 88 Fordham L. Rev. 633 (2019) .................................................... 14, 28

Letter from Edmund Randolph, Sec'y of State, to Christopher Gore, Att'y of the U.S. for the Mass. Dist. (May 21, 1794), *American State Papers: Foreign Relations Vol. VI* ..................................................................................... 24–25

William C. Hoffman, *The Separate Entity Rule in International Perspective: Should State Ownership of Corporate Shares Confer Sovereign Status for Immunity Purposes*, 65 Tul. L. Rev. 535 (1991) ............................. 16, 31, 32

William S. Laufer, *Corporate Liability, Risk Shifting, and the Paradox of Compliance*, 52 Vand. L. Rev. 1343 (1999) ...................................................... 25

Restatement (Second) of Foreign Relations Law § 66(g) (1965) ........................... 29

Restatement (Third) of Foreign Relations Law of the United States, § 461 .......... 29

Restatement (Fourth) of the Foreign Relations of the United States § 452
    reporters' note 12 (Am. L. Inst. 2018) ................................................................ 32

State Immunity Act, R.S.C., 1985, c. S-18, § 2. ................................................... 16

State Immunity Act, 1978, ch.33, § 14 ................................................................. 16

Theodore R. Giuttari, *The American Law of Sovereign Immunity: An Analysis of
    Legal Interpretation* 63 (1970) .......................................................................... 25

No. 22-10058

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

      v.

PANGANG GROUP COMPANY, LTD., ET AL.,

    Defendants-Appellants.

_____

**BRIEF FOR THE UNITED STATES AS APPELLEE**

Defendants-Appellants Pangang Group Company, Ltd., and its subsidiaries Pangang Group Steel Vanadium & Titanium Company, Ltd., Pangang Group Titanium Industry Company, Ltd., and Pangang Group International Economic & Trading Company (collectively, "Pangang Defendants") appeal from the denial of their latest motion to dismiss. Having seen their primary and secondary claims to immunity—protection from the Foreign Sovereign Immunities Act, or supposed lack of subject-matter jurisdiction in the district court—rejected by the Supreme Court this Term, the defendants press a final claim: absolute immunity under the common law. This, too, fails. First, while foreign states have traditionally received immunity at common law, the defendants—separate corporate persons engaged in commercial activity—are not foreign states. Indeed, the federal

government has prosecuted foreign officials since the Founding, even where the foreign state itself enjoyed immunity. Second, courts have long deferred to Executive Branch immunity determinations under the common law, and the Executive Branch itself instituted this action. This Court should affirm.

## JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court (Hon. Jeffrey S. White) had jurisdiction under 18 U.S.C. § 3231. The district court entered its order denying the second motion to dismiss the indictment on February 25, 2022. 1-ER-2–22.[1] The Pangang Defendants filed a timely notice of appeal on March 4, 2022. Fed. R. App. P. 4(b)(1)(A)(i); 2-ER-138–39. This Court has jurisdiction under the collateral order doctrine over foreign sovereign immunity claims under 28 U.S.C. § 1291. *See United States v. Pangang Grp. Co., Ltd.*, 6 F.4th 946, 952 (9th Cir. 2021). Proceedings in the district court have been stayed pending appeal. CR 1313, 1314.

## ISSUE PRESENTED

Whether foreign state-owned commercial entities engaged in commercial activity in the United States are absolutely immune from federal criminal prosecution under the common law.

---

[1] "ER" refers to the excerpts of record, "SER" to the government's supplemental excerpts of record, "AOB" to the Pangang Defendants' opening brief, and "CR" to the district court clerk's record.

2

## STATEMENT OF THE CASE

### A.     Criminal charges

The grand jury charged the Pangang Defendants and employee Hou

Shendong ("Hou"), along with Walter Liew ("Liew"), Liew's American company

USA Performance Technology, Inc. ("USAPTI"), Liew's wife Christina Liew, and

former DuPont employees Robert Maegerle, and Tze Chao, with violations of the

Economic Espionage Act of 1996 ("EEA"), 18 U.S.C. § 1831, based on their

misappropriation of E.I. du Pont de Nemours and Company's trade secrets

concerning the production of titanium dioxide by chloride-route technology.[2]

SER-175–262 (first and second superseding indictments).[3]

### B.     Motions to quash and mandamus

After the indictment, the parties litigated the Pangang Defendants' serial

motions to quash summonses.  *In re Pangang Grp. Co.*, *Ltd.*, 901 F.3d 1046, 1049

(9th Cir. 2018).  Eventually, prompted in part by this case, Fed. R. Crim. P. 4 was

amended in April 2016, over the objection of the Pangang Defendants' counsel,

---

[2]  Titanium dioxide is "a white pigment extracted from ore and used in a wide
variety of products, from paint to the filling in Oreo cookies."  *United States v.
Liew*, 856 F.3d 585, 590 (9th Cir. 2017) (setting forth trial record from co-
defendants' trial).

[3]  The cases against most of the co-defendants have resulted in convictions and
final judgments.  *See In re Pangang Grp. Co.*, 901 F.3d 1046, 1049 n.1 (9th Cir.
2018) (summarizing results for other defendants).

3

who submitted written opposition to the rule change. SER-136–74 (discussing, at SER-159 & n.3, this case in context of evaluating Quinn Emanuel's opposition to proposed amendments). The Advisory Committee stated that the amendments aimed "to remove an unnecessary impediment to the initiation of criminal proceedings against [foreign] organizations that commit domestic offenses." Fed. R. Crim. P. 4 Advisory Committee's Notes on 2016 Amendments. A member of the Advisory Committee observed that "[w]ithout [the amendment], foreign entities can violate U.S. law with impunity." SER-153.

In January 2016, the government obtained a third superseding indictment against the Pangang Defendants, among others. 2-ER-81–101. The district court reissued summonses, and the Pangang Defendants failed to appear and then again moved to quash, which was denied. *In re Pangang Grp. Co.*, 901 F.3d at 1053–54.

The Pangang Defendants sought a writ of mandamus in this Court directing vacatur of the district court's order regarding compliance with Fed. R. Crim. P. 4(c)(3)(D). *Id.* at 1048. This Court rejected the petition. *Id.* at 1055.

### C.    Arraignment and court appearances

The Pangang Defendants were arraigned on September 6, 2018. CR 1064. They appeared through counsel at status conferences in 2018 and 2019. CR 1110, 1117. They received voluminous discovery from the government—in excess of one million documents, including alleged trade secrets—and litigated numerous

disputes over a protective order and further discovery.  SER-76–82, 107–113; CR

1146, 1151, 1152, 1154, 1164, 1185.  They agreed to trial dates, gave a trial

estimate, and demanded that the government produce a complete trial exhibit list

early.  SER-112.  They set a briefing schedule for pretrial motions.  *Id.*  And they

litigated a motion for a bill of particulars, which was granted in part.  SER-114–23.

### D.    First motion to dismiss

On July 9, 2019, the Pangang Defendants moved to dismiss the indictment,

asserting for the first time in over seven years of litigation that they enjoyed

absolute immunity from prosecution and that the district court lacked jurisdiction

over the case altogether, citing the FSIA for both propositions.  SER-87–94.

At a subsequent hearing on the motion, the Pangang Defendants stated that

they would "accept as true the [indictment's] allegation that they are foreign

instrumentalities for the purposes of this motion."  SER-85.

The district court denied the motion.  1-ER-23–43.  The court began by

addressing "an issue the parties did not address in their briefing, that is whether the

Pangang Defendants are 'foreign instrumentalities' as that term is defined in the

FSIA."  1-ER-27.  The court decided not to reach the question but rather to

"assume that they satisfy the definition of 'foreign instrumentality' under the

FSIA."  *Id.*  The court then concluded that 18 U.S.C. § 3231 granted it subject-

matter jurisdiction over the case and, assuming without deciding that the FSIA

5

applied to criminal cases, also concluded that the FSIA's exceptions applied as well. 1-ER-32. The court found that the Pangang Defendants' activities fell within the commercial activity exception to the FSIA: the Pangang Defendants allegedly entered into and executed commercial contracts with co-conspirators in the United States akin to contracts that private parties could enter, and allegedly built a titanium dioxide production plant and manufactured titanium dioxide, activities in which private parties could engage. 1-ER-33–37. Finally, the district court concluded that the waiver exception within the FSIA applied, finding that the Pangang Defendants' multiyear participation in the case, including, after years of contesting service, their appearing through counsel, agreeing to a trial date and pretrial motion deadlines, moving for bill of particulars, negotiating a protective order, and obtaining discovery and litigation related to discovery including court appearances, all constituted "long and active participation in these criminal proceedings" so as to "amount to an implied waiver of sovereign immunity." 1-ER-37–39.

### E.    The Pangang Defendants' subsequent appeal

This Court affirmed in a published opinion. *United States v. Pangang Grp. Co., Ltd.*, 6 F.4th 946, 950 (9th Cir. 2021) ("*Pangang*"). The Court did not reach the question whether the FSIA applied to criminal cases or whether its exceptions applied, instead holding that the Pangang Defendants had "failed to establish a

prima facie case that they were 'foreign state[s]' entitled to immunity under § 1604 of the FSIA," and concluding that "[t]heir motion to dismiss was therefore properly denied." *Id.* at 960. Significantly, because the Pangang Defendants did not "contend[ ] that they are 'organ[s] of a foreign state or political subdivision thereof," this Court held that the "only question" presented was "whether 'a majority of [each of the Pangang Companies'] shares or other ownership interest is owned by a foreign state or political subdivision thereof.'" *Id.* at 955 (quoting 28 U.S.C. § 1603(b)(2)) (brackets original). Given that the Pangang Defendants "relied solely upon the indictment's allegations, and presented no evidence to support their motion to dismiss," this Court held that they had failed to meet their burden in establishing that they were majority-owned directly by a foreign state so as to qualify as foreign instrumentalities under *Dole Food Co. v. Patrickson*, 538 U.S. 468, 473–77 (2003). *Id.* at 957–60.

### F. The second motion to dismiss

On remand, the Pangang Defendants indicated to the district court that they planned to file more pretrial motions, without specifying the relief in question. SER 6–9. The government noted that any new dispositive motion would be untimely. SER-8. The district court cautioned the Pangang Defendants that "any motion that would be filed should be dealing with the after effect of the Ninth Circuit's opinion and not a matter which on its own unrelated to what the Ninth

7

Circuit did and the appeal, could have been filed way back when." SER-9.

Nevertheless, on November 30, 2021, the Pangang Defendants moved yet again to dismiss the indictment under the FSIA, this time claiming that they had in fact satisfied their burden under the *Dole Food* ownership test. SER-59. Alternatively, the Pangang Defendants claimed for the first time that they were "organ[s]" of a foreign state under 28 U.S.C. § 1603(b)(2). SER-60–64. Finally, in addition to their previous FSIA arguments, the defendants also claimed that they independently qualified for immunity under the common law. SER-64–69. The government opposed. CR 1297.

The district court again denied the defendants' motion. 1-ER-2–22. The court held that the Pangang Defendants (1) had not met their burden to establish direct majority ownership by a foreign state at the time of indictment; (2) failed to establish a prima facie case under their new theory that they might instead be "organ[s]" of the PRC; and (3) did not provide sufficient evidence to establish that they were entitled to sovereign immunity under the common law. 1-ER-10–15. The court further concluded in the alternative that the FSIA did not apply to criminal cases, but even if it did, its exceptions applied as well, and incorporated by reference its previous finding that the charged acts fell within the commercial activity and waiver exceptions to FSIA immunity. 1-ER-15–20. Finally, the court

rejected the Pangang Defendants' new claim of absolute immunity under the common law.  1-ER-20–22.

### G.    Stay and *Halkbank*

The Pangang Defendants appealed, and the parties filed their principal briefs.  On October 19, 2022, this Court stayed this appeal pending the Supreme Court's resolution in *Turkiye Halk Bankasi A.S., aka Halkbank v. United States*, No. 21-1450, which occurred on April 19, 2023.  Dkt. 30.  In *Halkbank*, the Supreme Court rejected the petitioner's arguments in that case, like Pangang Defendants' previous arguments in this case, that (1) the FSIA provided immunity in criminal cases, and (2) federal courts lacked jurisdiction over criminal prosecutions of foreign instrumentalities.  143 S. Ct. 940, 945–46 (2023).

This Court lifted its stay on May 10, 2023, and ordered new briefing.  Dkt. 34.

## SUMMARY OF ARGUMENT

The defendants' last remaining claim for immunity depends on a fatal conflation of two concepts:  immunity for a foreign state, and immunity for a separate state-controlled corporate entity engaged in commerce.  The common law has traditionally extended immunity to the former, but has never extended immunity to the latter.  Indeed, the law routinely respects corporate separateness, and the common law has historically distinguished between the prosecution of

9

foreign states and the prosecution of individual foreign officials—*i.e.*, separate legal persons.  If there were any doubt on such score, courts have long deferred to Executive Branch determinations of foreign sovereign immunity.  Here, the Executive Branch instituted the prosecution in question, which weighs heavily against the Pangang Defendants' claim of common law immunity.  Given this history, this Court should decline to adopt the defendants' sweeping new rule, which would render foreign state-owned entities absolutely immune from criminal prosecution for which domestic entities would otherwise be prosecutable.  The Court should affirm.

## ARGUMENT

## I. THE PANGANG DEFENDANTS DO NOT ENJOY COMMON LAW IMMUNITY BECAUSE THEY ARE NOT FOREIGN STATES AND THE EXECUTIVE BRANCH HAS DETERMINED THAT THEY LACK IMMUNITY

### A. Standard of review

This Court reviews issues of common-law sovereign immunity de novo. *Doğan v. Barak*, 932 F.3d 888, 892 (9th Cir. 2019).  The Court reviews for clear error a district court's factual findings underlying a motion to dismiss for foreign sovereign immunity.  *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 639 (9th Cir. 2003).

**B.** **Foreign state-owned commercial entities like the Pangang Defendants lack common-law immunity.**

1.     This prosecution is of four affiliated corporate entities—not a foreign state.  While the defendants spend much of their brief urging that the common law provides absolute immunity for foreign states, *see* AOB 30–38, their brief fails to grapple meaningfully with the distinction between foreign *states* and foreign state-owned *entities*.  Foreign states qua states have traditionally not been subjected to criminal prosecutions.  *See* Hazel Fox, The Law of State Immunity 91 (3d ed. 2013) (international law bars applying "criminal law to regulate the public governmental activity of the foreign State"); *id.* at 91 n.65 (states shielded from claims "related to the exercise of governmental powers").  But foreign state-owned enterprises, as separate legal persons, may be subjected to criminal prosecution. *See* Chimene Keitner, *Prosecuting Foreign States*, Va. J. Int'l Law Vol. 61, No. 2 (2021) at 6 ("Although foreign states themselves are not generally subject to prosecution in domestic courts, there is no categorical bar to criminal proceedings against foreign state-owned enterprises in either domestic or international law."); *see also id.* 25–34 (collecting authorities).  Just as this Court found it "compelling" that "neither the State Department nor any court has ever applied foreign official immunity to a foreign private corporation under the common law," it should find equally compelling the dearth of authority supporting a common-law bar to an

11

Executive Branch prosecution of a foreign state-owned corporation. *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 17 F.4th 930, 940 & n.8 (9th Cir. 2021).

The divergent rules for foreign states, on the one hand, and foreign state-owned entities, on the other, follows from bedrock principles of corporate separateness. As the Supreme Court has long explained, "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626–27 (1983). At common law, corporations were "deemed persons" under both civil and criminal statutes, subject to legal liability. *United States v. Amedy*, 24 U.S. (11 Wheat.) 392, 412 (1826); *see Cook Cnty.* v. *United States ex rel. Chandler*, 538 U.S. 119, 125–27 (2003). And the baseline rule of corporate liability was not materially different when a sovereign government owned or controlled the relevant corporation.

2. Even though the foreign sovereign itself generally possessed immunity from suit, the government-owned entity generally lacked immunity, at least where the suit arose from its commercial activities.

In the domestic context, the Supreme Court has long recognized that a commercial enterprise owned or controlled by a sovereign generally lacks immunity from suit. As Chief Justice Marshall explained for the Court, "[i]t is, we

think, a sound principle, that when a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen." *Bank of the United States v. Planters' Bank of Georgia*, 22 U.S. (9 Wheat.) 904, 907 (1824). An opinion for the Court by Justice Holmes similarly rejected the "notion" that a government-owned corporation would "share the immunity of the sovereign from suit," calling it "a very dangerous departure from one of the first principles of our system of law." *Sloan Shipyards Corp. v. United States Shipping Bd. Emergency Fleet Corp.*, 258 U.S. 549, 566 (1922). Judge Learned Hand similarly observed "that, in entering upon industrial and commercial ventures, the governmental agencies used should, whenever it can fairly be drawn from the statutes, be subject to the same liabilities and to the same tribunals as other persons or corporations similarly employed." *Gould Coupler Co. v. United States Shipping Bd. Emergency Fleet Corp.*, 261 F. 716, 718 (S.D.N.Y. 1919).[4]

---

[4] The Supreme Court's recent decision in *Biden v. Nebraska*, 600 U.S. ___, No. 22-506, 2023 WL 4277210 (S. Ct. June 30, 2023), is not to the contrary. That case did not involve any question of immunity, let alone any discussion of customary international law; it concerned the wholly different question of Article III standing. The Court made this clear when it explained that "a public corporation can count as part of the State for some but not 'other purposes,'" *id.* at *8 n.3, and relied on cases holding that corporate status *does* "deprive[] [the relevant corporation] of sovereign immunity from suit," *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995); *see Nebraska*, 2023 WL 4277210, at *8.

Courts have long applied the same principle to foreign-government-owned corporations. *See, e.g.*, *Coale v. Société Coop. Suisse des Charbons*, 21 F.2d 180, 181 (S.D.N.Y. 1921) (denying immunity to a corporation created, owned, and partially controlled by Swiss government); *Molina v. Comision Reguladora del Mercado de Henequen*, 103 A. 397, 398–99 (N.J. 1918) (denying immunity to corporate "governmental agency of the state of Yucatan" and noting "that no authority can be found in the books for the proposition that foreign corporations which happen to be governmental agencies are immune from judicial process").[5]

That principle accords with the British rule that had applied to the East India Company, which functioned largely as an instrumentality of the British government. *See* Ingrid Wuerth, *The Due Process and Other Constitutional Rights of Foreign Nations*, 88 Fordham L. Rev. 633, 687 (2019). While the East India Company received immunity for its sovereign acts like treatymaking, see *Nabob of*

---

Moreover, even the Article III holding was premised on the fact that the nonprofit State-controlled government corporation there was "harm[ed] . . . in the performance of its *public* function," *id.* (emphasis added)—not in the performance of commercial activities like those performed by the Pangang Defendants here. *See id.* (explaining that a corporation can be "part of the Government" when it is "created and operated to fulfill a public function").

[5] A similar principle has applied in the context of immunity for ships. As Justice Story emphasized when riding circuit, while immunity "might well apply to property like public ships of war, held by the sovereign jure coronae," it would not necessarily "be applicable to the common property of the sovereign of a commercial character, or engaged in the common business of commerce." *United States v. Wilder*, 28 F. Cas. 601, 603 (C.C.D. Mass. 1838).

*the Carnatic v. East India Company*, (1793) 30 Eng. Rep. 521, 523 (Ch.), it

received no immunity for its commercial acts, *see Moodalay v. Morton*, (1785) 28

Eng. Rep. 1245, 1246 (Ch.). As the English Court of Chancery explained, if the

company "enter[s] into bonds in India, the sums secured may be recovered"

because "as a private Company, [it] ha[s] entered into a private contract, to which

[it] must be liable." *Id.* (emphasis added); *see The Swift*, (1813) 1 Dod. 320, 339

(articulating similar rule); *The Case of Thomas Skinner, Merchant v. The East-*

*India Company*, (1666) 6 State Trials 710, 724 (H.L.) (awarding damages against

East India Company); Danny Abir, *Foreign Sovereign Immunities Act: The Right*

*to a Jury Trial in Suits Against Foreign Government-Owned Corporations*, 32

Stan. J. Int'l L. 159, 178–79 (1996); *see also* Hazel Fox & Philippa Webb, The

Law of State Immunity 179 (rev. 3d ed. 2015) (noting that, under English law,

"[s]eparate entities are generally to be treated as private parties").

Indeed, state-owned commercial enterprises are simply "not considered part

of the state for foreign sovereign immunity purposes by the international

community generally." *Foreign Sovereign Immunities Act: Hearing on H.R. 1149,*

*H.R. 1689, and H.R. 1888 Before the Subcomm. on Admin. L & Govt'l Rels. of the*

*H. Comm. of the Judiciary*, 100th Cong. 26–27 (1987) (testimony of State

Department Deputy Legal Advisor Elizabeth G. Verville); *see also id.* at 26 ("Even

absolute immunity states generally agree that state-owned commercial entities may

15

be sued abroad."). For example, Canada's immunity statute does not apply to agencies and instrumentalities at all. *See* State Immunity Act, R.S.C., 1985, c. S-18, § 2. The United Kingdom's State Immunity Act provides immunity to such entities only when the claim arises from conduct done "in the exercise of sovereign authority." State Immunity Act, 1978, ch.33, § 14. In passing the State Immunity Act, "Parliament enacted a provision strikingly similar to the 'old' American rule turning on incorporation" and this approach "has been followed elsewhere." William C. Hoffman, *The Separate Entity Rule in International Perspective: Should State Ownership of Corporate Shares Confer Sovereign Status for Immunity Purposes*, 65 Tul. L. Rev. 535, 553–54 (1991) (citing statutes from Pakistan, Singapore, and South Africa); *see also id.* at 554–65 (discussing caselaw from Switzerland, Germany, France, and Belgium, and ultimately concluding that, aside from the FSIA in the United States "[n]o other country in the world has adopted state ownership as a basis for conferring sovereign legal status on commercial corporations"); *see also* G.A. Res. 59/38, annex, United Nations Convention on Jurisdictional Immunities of States and Their Property (Dec. 2, 2004) (not yet in force) (providing immunity to instrumentalities only with regard to acts performed "in the exercise of the sovereign authority of the State").

The Pangang Defendants highlight (AOB 45) the one case, *Berizzi Bros. Co. v. Steamship Pesaro*, 271 U.S. 562 (1926), in which the Supreme Court "allowed

the immunity, for the first time, to a *merchant* vessel owned by a foreign government and in its possession and service," *Hoffman*, 324 U.S. at 35 n.1 (emphasis added).  But the Court later recognized that decision as a poorly reasoned aberration, in which "[t]he propriety of . . . extending the immunity" in the absence of an endorsement from the Executive Branch "was not considered." *Id.*  In recognizing that, at the least, the Executive Branch's refusal of immunity should have made a difference, the Court necessarily rejected the proposition that *Berrizi Brothers* stood for any bedrock principle of law that the judgment of the Executive Branch could not overcome.  *See id.* at 39-40 (Frankfurter, J., concurring) ("heartily welcom[ing]" the Court's "implied recession from the decision in *Berizzi Bros.*," which rested on "considerations [that] have steadily lost whatever validity they may then have had"); *accord Alfred Dunhill of London, Inc.* v. *Republic of Cuba*, 425 U.S. 682, 699 (1976) (plurality opinion) (observing that *Berizzi Brothers* was "severely diminished by later cases").

Accordingly, the longstanding distinction between a foreign state and a separate entity owned by a foreign state dooms the Pangang Defendants' appeal. They are not a foreign state.  They are separate legal persons.  *See Pangang*, 6 F.4th at 955 ("[T]here is no dispute that the Pangang Companies are separate corporate persons . . . .").  And as a result, they are subject to criminal prosecution.

17

3.    While foreign state-owned enterprises may be eligible for immunity for their *governmental* acts, they plainly lack immunity for their *commercial* acts. Indeed, not even foreign states qua states receive immunity for their commercial acts in the civil context.  *See*, *e.g.*, *Alfred Dunhill*, 425 U.S. at 701–02.  And as the district court correctly found, the Pangang Defendants allegedly engaged in such commercial acts here.

Commercial activity occurs when a foreign state or foreign state-owned enterprise "acts in the manner of a private player within the market."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (internal quotation marks and citation omitted).  The key inquiry focuses on "whether the particular actions that the [entity] performs . . . are the type of actions by which a private party engages in trade and traffic or commerce," *Embassy of the Arab Rep. of Egypt v. Lasheen*, 603 F.3d 1166, 1170 (9th Cir. 2010) (internal quotation marks and citation omitted), or whether the powers being exercised are those "peculiar to sovereigns," *Nelson*, 507 U.S. at 360; *see Park v. Shin*, 313 F.3d 1138, 1145 (9th Cir. 2002) ("[A]n activity is commercial unless it is one that only a sovereign state could perform.").  Significantly, in engaging in this analysis, courts look not to the purpose or motive behind the relevant state or entity's actions, but rather to whether those actions "are the *type* of actions by which a private party engages in" commerce.  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (citations omitted).

18

"Whether a state [or entity] acts in the manner of a private party is a question of behavior, not motivation." *Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582, 594 (9th Cir. 2020) (internal quotation marks, citation, and brackets omitted).[6]

Applying these principles, the district court correctly found, 1-ER-20–22, 33–37, that the Pangang Defendants' charged conduct "is commercial in nature." 1-ER-22. The charges here—conspiracy and attempt to steal DuPont's trade secrets—arise from a contractual relationship between the Pangang Defendants, on the one hand, and co-defendant Walter Liew and his company USAPTI, on the other. Specifically, the Third Superseding Indictment alleges $27 million in contracts between those parties, located in the United States. 2-ER-88–101. Those contracts involved agreeing to engage in the production of titanium dioxide in China at a manufacturing plant. *Id.* Furthermore, the defendants allegedly attempted to build a titanium dioxide plant and manufacturing of titanium dioxide in China. *Id.* They did so by, among other things, putting out a request for

---

[6] Although these cases interpret the FSIA, which does not apply to criminal cases, their construction of commercial activity bears on the common law question here because the Supreme Court has stated that "the meaning of 'commercial' for purposes of the Act must be the meaning Congress understood the restrictive theory to require at the time it passed the statute." *Nelson*, 507 U.S. at 359. The restrictive theory, in turn, confined "immunity . . . to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden*, 461 U.S. at 487; *accord Nelson*, 507 U.S. at 360 (contrasting "sovereign or public acts (*jure imperii*)" with "private or commercial" acts "(jure gestionis)").

proposal, hiring design consultants, and holding meetings in San Francisco. *Id.*

Contracts and construction of a manufacturing plant are the "*type* of actions by

which a private party engages in" commerce, regardless of the Pangang

Defendants' motivations. *Weltover*, 504 U.S. at 614. These are not acts "peculiar

to sovereigns," *Nelson*, 507 U.S. at 360, but instead fall well within the realm of

commercial acts that courts have traditionally identified as not bearing the same

sovereign immunities as state acts. *See Alfred Dunhill of London, Inc. v. Cuba*,

425 U.S. 682, 695–96 (1976) (collecting examples).

### C. Common law foreign sovereign immunity does not extend to cases where the Executive Branch determines that immunity does not apply.

The Pangang Defendants' immunity claim also fails because the common

law does not recognize immunity where, as here, the Executive Branch determines

that immunity is unwarranted. Under the common law, foreign sovereign

immunity is "a matter of grace and comity on the part of the United States, and not

a restriction imposed by the Constitution." *Verlinden B.V. v. Cent. Bank of

Nigeria*, 461 U.S. 480, 486 (1983). And out of respect for the separation of

powers, courts have "traditionally deferred to the decisions of the political

branches . . . on whether to take jurisdiction over actions against foreign

sovereigns." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 821 (2018)

(citation and internal quotation marks omitted). Here, the Executive Branch has

determined that immunity is unwarranted by instituting a federal criminal case against the Pangang Defendants.[7] Granting those Defendants' demand for immunity here—where the federal government is the very party prosecuting them—would be unprecedented and erroneous.

Starting with *The Schooner Exchange v. McFaddon*, courts have long deferred to the Executive Branch's foreign sovereign immunity determinations. In that case, the Court "accept[ed] a suggestion from the Executive Branch" to extend immunity to a foreign-government-owned vessel. *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1605 (2020). In so doing, *Schooner Exchange* recognized that the implication, *see* 11 U.S. (7 Cranch) 116, 146 (1812), of immunity for foreign states upon which the Pangang Defendants rely, *see* AOB 31, applies only where "the sovereign power has impliedly consented to wa[i]ve its jurisdiction"—and not where it has "destroy[ed] this implication" by "subjecting [the foreign sovereign] to the ordinary tribunals." 11 U.S. (7 Cranch) at 146. "[A]s Chief Justice Marshall explained in the *Schooner Exchange,* 'exemptions from territorial jurisdiction . . .

---

[7] Contrary to the Pangang Defendants' alarm, this Court need not determine whether courts owe absolute deference to Executive Branch immunity determinations in these circumstances, AOB 40–49. At minimum, it is indisputable that the Executive Branch's determination has historically carried significant weight under the common law of foreign sovereign immunity. Thus, in this case, the Executive's determination—in combination with the traditional lack of common law immunity for foreign state-owned entities (as opposed to foreign states qua states)—is more than sufficient to affirm denial of the Pangang Defendants' motion to dismiss the indictment.

must be derived from the consent of the sovereign of the territory' and are 'rather questions of policy than of law, that they are for diplomatic, rather than legal discussion.'" *Munaf v. Geren*, 553 U.S. 674, 701 (2008) (quoting *Schooner Exchange*, 11 U.S. (7 Cranch) at 143, 146).

Deference to the Executive Branch continued in the ensuing years. *See Bank Markazi v. Peterson*, 578 U.S. 212, 235 (2016) (describing the practice). Before passage of the FSIA, "the granting or denial" of foreign sovereign immunity was "the case-by-case prerogative of the Executive Branch." *Republic of Iraq v. Beaty*, 556 U.S. 848, 857 (2009). In civil suits against foreign-government-owned instrumentalities such as "seized vessels," the "diplomatic representative of the sovereign could request a 'suggestion of immunity' from the State Department," to which the court would defer. *Samantar*, 560 U.S. at 311. "[I]n the absence of recognition of the immunity by the Department of State, a district court had authority to decide for itself whether all the requisites for such immunity existed." *Id.* (citation and internal quotation marks omitted). But even in exercising that authority, a court still followed the Executive's lead, inquiring "whether the ground of immunity is one which it is the established policy of the State Department to recognize." *Id.* at 312 (citation and internal quotation marks omitted).

The Supreme Court has also made clear that just as courts must not "deny an immunity which our government has seen fit to allow," they also must not "allow

an immunity on new grounds which the government has not seen fit to recognize." *Hoffman*, 324 U.S. at 35. As the Court has explained, "recognition by the courts of an immunity upon principles which the political department of government has not sanctioned may be equally embarrassing to it in securing the protection of our national interests and their recognition by other nations." *Id.* at 36.

Nothing could embarrass the Executive Branch more than a judge-made principle that would vitiate a federal criminal prosecution. In "electing to bring [a] prosecution, the Executive has" had the opportunity to "assess[] th[e] prosecution's impact on this Nation's relationship with" other countries, *Pasquantino v. United States*, 544 U.S. 349, 369 (2005), and to determine that the prosecution is in the national interest. *See, e.g.*, *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997). The Executive Branch, which "possess[es] significant diplomatic tools and leverage the judiciary lacks," is better positioned than courts to make that determination. *Munaf*, 553 U.S. at 703 (citation omitted). This is why countless courts have deferred to the Executive's immunity determination under the common law. *See, e.g.*, *Matar v. Dichter*, 563, F.3d 9, 15 (2d Cir. 2009) ("[I]n the common-law context, we defer to the Executive's determination of the scope of immunity."); *Ye v. Zemin*, 383 F.3d 620, 627 (7th Cir. 2004) ("Pursuant to their respective authorities, Congress or the Executive Branch can create exceptions to blanket immunity. In such cases the courts would be obliged to respect such

exceptions."); *see also Doğan*, 932 F.3d at 893 (declining to decide in circumstances of case whether Executive's immunity determination is afforded "substantial weight" or "absolute deference," because either way defendant was entitled to immunity as suggested by Executive); *see generally Peterson v. Iran*, 627 F.3d 1117, 1126 (9th Cir. 2010) (summarizing history of authoritative Executive suggestions regarding immunity under common law).

In accord with the separation of powers, Chief Justice Marshall observed in *Schooner Exchange* that a foreign official's "crimes" may "render him amenable to the local jurisdiction" if they "violat[e] the conditions under which he was received as the representative of a foreign sovereign." 11 U.S. (7 Cranch) at 139. That observation is reflected in the Founding-era federal government's criminal prosecutions of non-diplomatic foreign officials in certain cases. *See* Chimène I. Keitner, *The Forgotten History of Foreign Official Immunity*, 87 N.Y.U. L. Rev. 704, 710 n.23 (2012). In 1794, for instance, the United States prosecuted the consul from the Republic of Genoa for extortion, and the circuit court held "that the offence was indictable, and that the defendant was not privileged from prosecution in virtue of his consular appointment." *United States v. Ravara*, 27 F. Cas. 714, 715 (C.C.D. Pa. 1794). The same year, the United States prosecuted the Chancellor of the French Consulate at Boston on a charge of arming a privateer. *See* Letter from Edmund Randolph, Sec'y of State, to Christopher Gore, Att'y of

24

the U.S. for the Mass. Dist. (May 21, 1794), in *American State Papers: Foreign Relations Vol. VI* at 60 (1998).

The 20th century saw a dramatic expansion in the activities of foreign-government-owned entities, such as corporations, particularly after World War I. *See First Nat'l City Bank*, 462 U.S. at 624; Theodore R. Giuttari, *The American Law of Sovereign Immunity: An Analysis of Legal Interpretation* 63 (1970). During that same period, the government increased its prosecutions of private domestic corporations. *See New York Cent. & Hudson River R.R. v. United States*, 212 U.S. 481, 494–95 (1909); William S. Laufer, *Corporate Liability, Risk Shifting, and the Paradox of Compliance*, 52 Vand. L. Rev. 1343, 1356 (1999). Similar federal proceedings against corporations partly or wholly owned by a foreign government, while appropriately rare given the weighty concerns that may attach to them, were commenced as well, with courts almost invariably allowing them.

In *United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199 (S.D.N.Y. 1929), for instance, the United States sought injunctive relief, under a statute providing for criminal and civil penalties, against a corporation that was majority-owned and controlled by the French government. *Id.* at 200. France argued that immunity should attach because the suit was "in effect, a suit against the Republic of France." *Id.* In response, the State Department informed the court

that "it has long been the view of the Department of State that agencies of foreign governments engaged in ordinary commercial transactions in the United States enjoy no privileges or immunities not appertaining to other foreign corporations, agencies, or individuals doing business here, and that they should conform to the laws of this country." *Id.* The court accordingly held that "[n]either principle nor precedent requires that th[e] immunity, which, as a matter of comity, is extended to a foreign sovereign and his ambassador, should be extended to a foreign corporation merely because some of its stock is held by a foreign state, or because it is carrying on a commercial pursuit, which the foreign government regards governmental." *Id.* at 203.

Indeed, for at least the past 70 years, the federal government has been applying federal criminal jurisdiction (often through subpoenas) to foreign-government-owned corporations, without any indication that these entities would be immune. *See In re Investigation of World Arrangements*, 13 F.R.D. 280, 288–91 (D.D.C. 1952); *In re Grand Jury Investigation of the Shipping Industry*, 186 F. Supp. 298, 318–20 (D.D.C. 1960); *In re Sealed Case*, 825 F.2d 494, 495 (D.C. Cir. 1987) (per curiam); *United States v. Eireann*, No. 89-cr-647, D. Ct. Doc. 12 (S.D. Fla. Oct. 6, 1989); *United States v. Jasin*, No. 91-cr-602, 1993 WL 259436, at *1 (E.D. Pa. July 7, 1993); *United States v. Statoil, ASA*, No. 06-cr-960, D. Ct. Doc. 2 (S.D.N.Y. Oct. 13, 2006); *In re Grand Jury Proceeding Related to M/V Deltuva*,

26

752 F. Supp. 2d 173, 176–80 (D.P.R. 2010); *United States v. Ho*, No. 16-cr-46, 2016 WL 5875005, at *6 (E.D. Tenn. Oct. 7, 2016); *In re Grand Jury Subpoena*, 912 F.3d at 626; *Halkbank*, 140 S. Ct. at 933–34.

Out of this entire history, a court has granted immunity in only one of those cases—but did so on the ground that the entity was engaging in "a fundamental government function serving a public purpose," not a "commercial venture." *In re Investigation of World Arrangements*, 13 F.R.D. at 290–91. This unbroken line of cases belies the Pangang Defendants' repeated assertions that there "never were any" federal criminal cases involving foreign sovereign-owned entities. AOB 18. Immunity from prosecution would presumably mean immunity from compulsory process, and the Pangang Defendants do nothing to explain this historical practice that contradicts their asserted novelty. In short, the Pangang Defendants' approach would invite an unprecedented judicial override of the Executive Branch's constitutionally rooted authority and discretion over prosecutorial and foreign-policy decision making.

That approach would greatly impede our national security. Under the Pangang Defendants' theory, a corporation that is 50.1% owned by a foreign government could engage in rampant criminal misconduct affecting U.S. citizens—from hacking computer systems, to advancing a foreign adversary's nuclear program, to providing material support to terrorists—while facing no

27

criminal accountability at all.  Wuerth, 88 Fordham L. Rev. at 641 (citing real-world examples of such misconduct).  This case is a prime illustration:  a commercial entity allegedly stole trade secrets from a U.S. company and yet would face no criminal consequences if this Court adopted the Pangang Defendants' position.  The Executive Branch would be left to resort to diplomacy alone, but as shown by this case, diplomatic pressure is often not a reliable method through which to ensure compliance with U.S. law.  *See In re Pangang Grp. Co.*, 901 F.3d at 1050, 1053 (Chinese government refused to serve summonses on Pangang Defendants in 2012 and 2016).  In this case and others, the Executive Branch has sometimes determined that criminal prosecution is the best way to protect national security.  Nothing in the common law of foreign sovereign immunity prevents the Executive Branch from making that determination.

> **D.** **The Pangang Defendants' arguments to the contrary lack support.**

Since, at common law, foreign officials could be prosecuted, foreign-government-owned commercial entities could be sued, and Executive Branch immunity determinations received deference, the Pangang Defendants' absolute immunity rule simply has no support.  In urging otherwise, the Pangang Defendants make a series of discrete arguments that do not change the analysis.

*Restatement*.  The Pangang Defendants cite several sources that stand for the proposition that foreign states may not be subject to criminal prosecution.  AOB

31, 32, 33, 37, 38.  That premise is not in dispute.  What is disputed is whether

parties that are not themselves a foreign state but are instead corporate commercial

entities somehow enjoy the identical treatment as a foreign state.  On that score,

the defendants largely rest their conflation on a single sentence from the

Restatement (Second) of Foreign Relations Law § 66(g) (1965):  common law

foreign sovereign "immunity . . . extends to: . . . a corporation created under [a

foreign state's] laws and exercising functions comparable to those of an agency of

the state."  AOB 20.  At the outset, that definition does not apply to the Pangang

Defendants, as their conduct involved commercial activity—not sovereign

functions.  And the Restatement (Third) of Foreign Relations Law of the United

States, § 461 cmt. c., also makes clear that while a "state itself is generally not

subject to the criminal process of another state," the "state's responsibility does not

immunize the agent"—and any other "juridicial person[]" is subject to criminal

process, *id.* cmt. a.  The Pangang Defendants do not grapple with this reality.

Moreover, the defendants cite no authorities recognizing their urged rule  for

foreign state-owned entities—not a single case.  And this Court has found that fact

"compelling" in analogous circumstances.  *WhatsApp*, 17 F.4th at 940 & n.8

("There is not a single documented instance of the State Department

recommending conduct-based immunity for a foreign private corporation. . .  Nor

have we found any case contemplating the same." (citations omitted)).

*Commercial activity.*  The Pangang Defendants do not dispute the commercial nature of their alleged acts.  Instead, they insist upon a different level of granularity, positing that economic espionage is the "gravamen" of the case, and since espionage is not a commercial activity by which a private party typically engages in the market, they should be afforded common law immunity.  AOB 53–57.  This argument misapprehends the nature of the charges in the indictment.  This is not a case involving secret agents or international intrigue; it is a case about businesses trying to steal a competitor's technology.

Analyzing what the Pangang Defendants allegedly did—not what they hoped to achieve or were motivated to achieve—reveals the core or gravamen of the case.  *Cf. OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 395–96 (2015) (interpreting gravamen inquiry under FSIA).  Here, the defendants are alleged to have violated the law through activity that private parties engage in—entering contracts, holding meetings, and planning and building a chemical manufacturing plant to rival DuPont's.  *See Broidy Cap. Mgmt.*, 982 F.3d at 595 (indicating without deciding that commercial activity under FSIA would apply to "stealing the trade secrets of a 'commercial rival' and deploying them against that rival").  As a result, the activities alleged involved substantial commercial activity in furtherance of an agreement and attempt to accomplish an illegal objective.

30

Even if their brief could be read to take issue with the district court's findings that their conduct was commercial, it is difficult to see how such findings amount to clear error without the defendants having adduced any contrary evidence on the nature of the acts in question beyond the allegations in the indictment. *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) ("A finding is clearly erroneous if it is illogical, implausible, or without support in the record." (internal quotation marks and citation omitted)).

*Status as "organs" of foreign state*. The Pangang Defendants insist that the case law regarding FSIA immunity for "organs" of foreign states "is . . . instructive for common law immunity." AOB 22. Not so. First, the FSIA does not apply to criminal cases, so whether the defendants can satisfy that statute's definitional components is irrelevant. *Halkbank*, 143 S. Ct. at 948 (concluding that "the FSIA's provisions concerning suits against foreign states and their instrumentalities do not extend to . . . criminal proceedings.").

On the contrary, the FSIA actually "abolished," for purposes of civil liability, "the 'separate entity rule,'" followed in American common law since at least 1824 and still "the internationally recognized rule." Hoffman, 65 Tul. L. Rev. at 540. Under that internationally recognized and American common-law rule, "foreign state-owned entities with separate legal personalities generally are not entitled to assert sovereign immunity." *Id.* Accordingly, looking to "organ"

jurisprudence, as the Pangang Defendants urge, is inapt—the FSIA "provides a broader definition of 'foreign state' than is typical under foreign and international practice," Restatement (Fourth) of the Foreign Relations of the United States § 452 reporters' note 12 (Am. L. Inst. 2018), and otherwise departs from the common law sharply in this area. In other words, even if the defendants are controlled by a foreign state, they are separate corporate persons (not the state qua state) engaged in commercial activity, in a scenario where the Executive Branch has determined they should not have immunity. Under the common law, that means they lack immunity. No potential showing on organ status could affect that reality.

Finally, even assuming they are positioned to offer this new theory[8] and it was relevant to the common-law analysis, the Pangang Defendants are not actually "organs" of a foreign state, as the district court correctly found. 1-ER-12–15; *see Patrickson v. Dole Food Co.*, 251 F.3d 795, 808 (9th Cir. 2001) (rejecting organ status despite foreign state specifically classifying company as state-owned and record showing that state had right to approve appointment of directors and officers, approve changes in capital structure of entities, and entities had to present annual financial data to state). Here, the Pangang Defendants rely most heavily on

---

[8] *See Pangang*, 6 F.4th at 955 ("[T]he Pangang Companies have not contended that they are 'organ[s] of a foreign state or political subdivision thereof.'" (quoting 28 U.S.C. § 1603(b))).

their ownership status, AOB 23–24, which this Court in *Patrickson* rejected as insufficient even when more tightly tied to the state.

*Hypothetical state prosecutions*. The Pangang Defendants speculate that without "an absolute bar against criminal prosecutions" of foreign state-owned enterprises, state prosecutors could theoretically commence criminal cases against such enterprises. AOB 47. But the Supreme Court considered this precise "consequentialist argument" in *Halkbank* and indicated that it rested on faulty "premise[s]." 143 S. Ct. at 950. There is "no history of state prosecutors subjecting foreign states or their instrumentalities to criminal jurisdiction." *Id.* at 951. "And if such a state prosecution were brought, the United States could file a suggestion of immunity," and the prosecution "might be preempted under principles of foreign affairs preemption." *Id.* Accordingly, there is no sound basis for a novel expansion of common law immunity based on the specter of hypothetical state prosecutions that have never previously occurred.

\* \* \*

As just shown, the Pangang Defendants lack any meaningful support for their claim of common law sovereign immunity. History and tradition establish that foreign state-owned entities engaged in commercial activity are not entitled to share a foreign state's sovereign immunity, and that the federal government has consistently received deference for its non-immunity determinations—including its

decisions to prosecute foreign officials in the Founding era. This Court should accordingly reject the Pangang Defendants' claim of blanket immunity for foreign-state-owned companies to flout United States criminal laws with impunity.

## CONCLUSION

For the reasons set forth above, this Court should affirm.

Dated: July 21, 2023

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

  /s/ *Matthew M. Yelovich*
MATTHEW M. YELOVICH
Chief, Appellate Section, Criminal Division
Assistant United States Attorney

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**   **22-10058**

The undersigned attorney or self-represented party states the following:

[X ]   I am unaware of any related cases currently pending in this court.

[  ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**      *s/ Matthew M. Yelovich*          **Date** July 21, 2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

35

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**   22-10058

I am the attorney or self-represented party.

**This brief contains**   **7,768**   **words,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   *s/ Matthew M. Yelovich*   **Date** July 21, 2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

36