No. 22-10058

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

————▸▸◂◂————

UNITED STATES OF AMERICA,

*Appellee,*

v.

PANGANG GROUP CO., LTD.; PANGANG GROUP STEEL VANADIUM & TITANIUM CO. LTD.; PANGANG GROUP TITANIUM INDUSTRY CO., LTD.; PANGANG GROUP INTERNATIONAL ECONOMIC & TRADING CO.,

*Defendants-Appellants.*

————————

*On Appeal from the U.S. District Court for the Northern District of California, Hon. Jeffrey S. White, District Judge, Case No. 4:11-cr-00573-JSW*

## REPLY BRIEF FOR APPELLANTS

William B. Adams
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Michael T. Packard
Alex H. Loomis
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100

Robert P. Feldman
Joseph E. Reed
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

John M. Potter
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600

*Counsel for Defendants-Appellants*

August 11, 2023

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 3

I. THE GOVERNMENT DOES NOT REBUT DEFENDANTS'
SHOWING THAT THEY ARE ENTITLED TO ASSERT
SOVEREIGN IMMUNITY ................................................................... 3

    A. The Government Ignores The Relevant Standard For Foreign-
Instrumentality Status .......................................................... 3

    B. The Government Does Not Dispute That Defendants Satisfy
The Relevant Standard For Foreign-Instrumentality Status ............... 6

II. THE GOVERNMENT'S ARGUMENTS AGAINST ABSOLUTE
IMMUNITY ARE UNPERSUASIVE ........................................................... 7

    A. Immunity Extends To Common Law Instrumentalities ...................... 8

    B. Immunity Extends To Commercial Cases ......................................... 12

    C. Immunity Is Not Subject To Executive Veto Or Deference .............. 16

III. THE GOVERNMENT FAILS TO SHOW THAT ANY
PURPORTED SOVEREIGN IMMUNITY EXCEPTION WOULD
APPLY HERE ........................................................................................ 21

    A. The Gravamen Of This Case Is Economic Espionage ...................... 22

    B. Economic Espionage Is Not Commercial Activity ........................... 27

CONCLUSION ............................................................................................. 30

CERTIFICATE OF COMPLIANCE ............................................................ 31

CERTIFICATE OF SERVICE ..................................................................... 32

i

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

### <u>Cases</u>

*Adler v. Federal Republic of Nigeria*,
    219 F.3d 869 (9th Cir. 2000).................................................................27

*Bank of the United States v. Planters' Bank of Georgia*,
    22 U.S. 904 (1824) ...........................................................................4

*Bergman v. DeSieyes*,
    71 F. Supp. 334 (S.D.N.Y. 1946) .........................................................9

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) .......................................................................5

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    137 S. Ct. 1312 (2017) ...............................................................15, 17

*Broidy Cap. Mgmt., LLC v. State of Qatar*,
    982 F.3d 582 (9th Cir. 2020)..........................3, 23, 25, 26, 27, 28, 30

*United States v. Buckner*,
    610 F.2d 570 (9th Cir. 1979)................................................................24

*California v. Deep Sea Rsch., Inc.*,
    523 U.S. 491 (1998) ........................................................................21

*United States v. Chung*,
    659 F.3d 815 (9th Cir. 2016)................................................................24

*Cicippio v. Islamic Republic of Iran*,
    30 F.3d 164 (D.C. Cir. 1994) ...................................................24, 26, 27

*Coale v. Societe Coop. Suisse Des Charbons, Basle*,
    21 F.2d 180 (S.D.N.Y. 1921) .........................................................4, 13

*Coleman v. State of Tennessee*,
    97 U.S. 509 (1878) ..........................................................................9

*Consultants 1, Inc. v. Republic of Peru*,
   719 F. App'x 47 (2d Cir. 2017) ......................................................... 25

*Democratic Nat'l Comm. v. Russian Fed'n*,
   392 F. Supp. 3d 410 (S.D.N.Y. 2019) ............................................... 28

*United States v. Deutsches Kalisvndikat Gesellschaft*,
   31 F.2d 199 (S.D.N.Y. 1929) .............................................................. 4

*Devengoechea v. Bolivarian Republic of Venezuela*,
   889 F.3d 1213 (11th Cir. 2018) .................................................... 24, 30

*Does 1-6 v. Reddit, Inc.*,
   51 F.4th 1137 (9th Cir. 2022) ........................................................... 23

*Doğan v. Barak*,
   932 F.3d 888 (9th Cir. 2019) ............................................................... 9

*EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins.*,
   257 F.3d 992 (9th Cir. 2001) ............................................................... 6

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ............................................................................ 13

*Et Ve Balik Kurumu v. B.N.S. Int'l Sales Corp.*,
   25 Misc. 2d 299 (N.Y. Sup. Ct. 1960) ............................................... 4

*F. W. Stone Eng'g Co. v. Petroleos Mexicanos of Mexico, D. F.*,
   42 A.2d 57 (1945) ................................................................................ 5

*France.com, Inc. v. French Republic*,
   992 F.3d 248 (4th Cir. 2021) ........................................................ 24, 30

*In re Grand Jury Investigation of Shipping Indus.*,
   186 F. Supp. 298 (D.D.C 1960) ....................................................... 11

*Guar. Tr. of New York v. United States*,
   304 U.S. 126 (1938) .......................................................................... 19

*In re Investigation of World Arrangements with Rel. to Prod., Transp.,*
   *Ref. & Distribution of Petroleum*,
   13 F.R.D. 280 (D.D.C 1952) ........................................................ 3, 10

*Jam v. Int'l Fin. Corp.*,
    3 F.4th 405 (D.C. Cir. 2021) ...................................................................22, 25

*Lebron v. Nat'l R. Passenger Corp.*,
    513 U.S. 374 (1995) .............................................................................................5

*L'Invincible*,
    14 U.S. 238 (1816) ...........................................................................................10

*Matar v. Dichter*,
    563 F.3d 9 (2d Cir. 2009) ..................................................................................6

*People v. McLeod*,
    1 Hill 377 (N.Y. Sup. Ct. 1841) ....................................................................16

*United States v. Mead*,
    533 U.S. 218 (2001) .........................................................................................17

*Medellin v. Texas*,
    552 U.S. 491 (2008) ...................................................................................17, 21

*Merlini v. Canada*,
    926 F.3d 21 (1st Cir. 2019) ............................................................................24

*Molina v. Comision Reguladora del Mercado de Henequen*,
    103 A. 397 (N.J. 1918) ....................................................................................13

*Moodalay v. Morton*
    28 Eng. Rep. 1245 (Ch. 1785)........................................................................13

*N. Ins. Co. of N.Y. v. Chatham Cnty., Ga.*,
    547 U.S. 189 (2006) ...........................................................................................5

*United States v. Noriega*,
    117 F.3d 1206 (11th Cir. 1997).......................................................................12

*United States v. Nosal*,
    844 F.3d 1024 (9th Cir. 2016).........................................................................29

*OBB Personenverkehr AG v. Sachs*,
    577 U.S. 27 (2015) ...........................................................................................22

iv

*Opati v. Republic of Sudan*,
140 S. Ct. 1601 (2020) ................................................................... 20

*United States v. Pangang Grp. Co.*,
6 F.4th 946 (9th Cir. 2021) ............................................................. 23

*Patrickson v. Dole Food Co.*,
251 F.3d 795 (9th Cir. 2001) ............................................................ 6

*Ex parte Quirin*,
317 U.S. 1 (1942) ........................................................................... 10

*United States v. Ravara*,
27 F. Cas. 714715 (C.C.D. Pa. 1794) ............................................. 12

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992) ....................................................................... 28

*Republic of Mexico v. Hoffman*,
324 U.S. 30 (1945) ......................................................................... 20

*Ex parte Republic of Peru*,
318 U.S. 578 (1943) ....................................................................... 21

*Rodriguez v. Pan Am. Health Org.*,
29 F.4th 706 (D.C. Cir. 2022) ............................................ 22, 23, 24

*Salinas v. United States*,
522 U.S. 52 (1997) ......................................................................... 26

*United States v. Sanmina Corp.*,
968 F.3d 1107 (9th Cir. 2020) ........................................................ 29

*Schooner Exchange v. McFaddon*,
11 U.S. 116 (1812) ................................................................... 18, 19

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ................................................................. 17, 18

*Skinner v. East-India Co.*,
6 State Trials 710 (1666) ................................................................ 13

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) ........................................................................ 14

*Steel Co. v. Citizens for Better Env't*,
523 U.S. 83 (1998) .......................................................................... 20

*The Santissima Trinidad*,
20 U.S. 283 (1822) .......................................................................... 19

*United States v. Türkiye Halk Bankasi A.S.*,
16 F.4th 336 (2d Cir. 2021) ........................................................... 14

*Türkiye Halk Bankasi A.S. v. United States*,
143 S. Ct. 940 (2023) ............................................................... 14, 18

*Underhill v. Hernandez*,
168 U.S. 250 (1897) ........................................................................ 26

*Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*,
336 F.2d 354 (2d Cir. 1964) ........................................................... 20

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*,
17 F.4th 930 (9th Cir. 2021) .......................................................... 11

## Statutes and Rules

18 U.S.C. § 1831 ..................................................................................... 29

18 U.S.C. § 1831(a) ................................................................................. 27

18 U.S.C. § 1831(a)(5) ............................................................................ 23

18 U.S.C. § 1832 ..................................................................................... 27

18 U.S.C. § 1836(b)(3)(B)(i) ................................................................... 29

28 U.S.C. § 2241(c)(4) ............................................................................ 16

## Legislative History

Kleindienst, Richard G. & William P. Rogers, Attorney General and
Secretary of State, Letter to President of Senate, Jan. 22, 1973 ........................ 19

vi

United States: Draft Legislation on the Jurisdictional Immunities of
Foreign States (Jan. 26, 1973) ...................................................... 8

## International Authorities

G.A. Res. 59/38, U.N. Doc. A/RES/59/38 (Dec. 16, 2004) .................................. 5

State Immunity Act, R.S.C., 1985, c. S-18, § 2 (Canada) ........................................ 5

## Other Authorities

6 American State Papers: Foreign Relations (1998) ............................................... 12

23 Foreign Relations of the United States (1841) ..................................................... 9

Bederman, David J., *The Cautionary Tale of Alexander Mcleod:
Superior Orders and the American Writ of Habeas Corpus*,
41 Emory L.J. 515 (1992) ..................................................... 16

*Commission on the Responsibility of the Authors of the War and on
Enforcement of Penalties*,
14 Am. J. Int'l L. 95 (1920) .................................................... 8

Dickinson, Edward D., *The Law of Nations As National Law:
"Political Questions,"*
104 U. Pa. L. Rev. 451 (1956) ............................................. 21

Fox, Hazel & Philippa Webb, The Law of State Immunity
(3d ed. 2015) ..................................................................... 14

Hoffman, William C., *The Separate Entity Rule in International
Perspective: Should State Ownership of Corporate Shares Confer
Sovereign Status for Immunity Purposes?*,
65 Tul. L. Rev. 535 (1991) .............................................. 4, 7

Keitner, Chimène I., *Prosecuting Foreign States*,
61 Va. J. Int'l L. 221 (2021) .............................................. 13

Keitner, Chimène I., *The Forgotten History of Foreign Official
Immunity*,
87 N.Y.U. L. Rev. 704 (2012) ........................................... 20

Moore, John Bassett, 2 Digest of International Law (1906) ....................................9

Randolph, Edmund, Secretary of State, Letter to Christopher Gore,
    May 21, 1794 ....................................................................................12

Restatement (Second) of Foreign Relations Law § 66 (1965) .............................4, 9

Restatement (Second) of Foreign Relations Law § 69 (1965) ........................22, 26

Restatement (Third) of Foreign Relations Law § 461 (1987) ............................9, 10

Restatement (Fourth) of Foreign Relations Law § 452 (2018) ...............................7

Stern, Philip J., Empire, Incorporated (2023)........................................................13

Tate, Jack B., *Changed Policy Concerning the Granting of Sovereign
    Immunity to Foreign Governments*,
    26 Dep't State Bull. 984 (May 19, 1952)........................................................19

Webster, Daniel, Secretary of State, Letter to Attorney General John J.
    Crittenden, Mar. 15, 1841 ...............................................................................9

Whiteman, Marjorie M., 6 Digest of International Law (1968)..............................11

Whiteman, Marjorie M., 7 Digest of International Law (1970)..............................12

**INTRODUCTION**

Copying verbatim substantial portions of the brief it filed in *Türkiye Halk Bankasi A.S. v. United States*, No. 21-1450,[1] the government's answering brief here responds to arguments Defendants never made, fails to engage with Defendants' actual arguments, and endorses a test for exceptions to foreign sovereign immunity that its indictment plainly does not meet.

For example, the government repeatedly criticizes the notion that a company could be entitled to sovereign immunity from criminal prosecution merely because a foreign state owns a majority of its shares. But Defendants do not advocate that position. Defendants argue, rather, that they are common-law instrumentalities entitled to invoke sovereign immunity because the government did not rebut the prima facie case that they serve a fundamental government function and public purpose. The government does not dispute that this is the applicable standard, just as it failed to do below. Nor does the government defend the district court's incorrect and summary application of that standard.

The government additionally concedes that foreign states themselves are entitled to absolute immunity at common law. It nonetheless insists that this immunity does not extend to foreign instrumentalities for two unpersuasive—and

---

[1]   *Compare* U.S. Br. 16-19, 21-26, 30-31, *Türkiye Halk Bankasi A.S. v. United States*, No. 21-1450 (U.S. Dec. 14, 2022), *with* Br. 12-15, 20-23, 27-28.

inconsistent—reasons. It first wrongly asserts that foreign instrumentalities cannot invoke sovereign immunity simply because they are separate persons from the state. There is no common law authority supporting that position, and several cases and Executive Branch opinions to the contrary. The government ultimately distances itself from that position by instead contending that foreign instrumentalities lack common-law immunity from criminal prosecution only when charged for their commercial conduct. But here too, it cites no precedent, policy, or doctrinal basis supporting this view, and it ignores contrary authority quashing criminal subpoenas directed at foreign instrumentalities. The government is thus reduced to asking this Court to defer to its understanding of common-law immunity, while conceding that this deference is not absolute and without responding to Defendants' arguments as to why any deference is improper.

Even if this Court were to fully endorse the government's position that there is a common-law commercial-activity exception to sovereign immunity in criminal cases against foreign instrumentalities, the district court's order should still be reversed. Like the district court, the government just lists various commercial activities in which Defendants purportedly engaged, but never shows, as it concedes it must, that any of this conduct is the gravamen of its indictment. The indictment's gravamen is economic espionage, because that is the only wrongful activity alleged. By contrast, Defendants' purportedly commercial activity—signing contracts,

2

entering agreements, and so forth—is wrongful only if a jury found them to be in furtherance of espionage. Espionage is plainly not commercial, as this Court already held in *Broidy Capital Management, LLC v. State of Qatar*, 982 F.3d 582 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2704 (2021). The government does not allege that Defendants ever used stolen trade secrets for commercial profit. Such hypothetical accusations, in any case, would only be ancillary to the charges.

The government's unresponsive answering brief thus falls flat. The district court's order should be reversed and the indictment dismissed.

## ARGUMENT

## I. THE GOVERNMENT DOES NOT REBUT DEFENDANTS' SHOWING THAT THEY ARE ENTITLED TO ASSERT SOVEREIGN IMMUNITY

### A. The Government Ignores The Relevant Standard For Foreign-Instrumentality Status

After waiving the issue below only to be bailed out by the district court (*see* 1-ER-12), the government again offers no meaningful rebuttal to Defendants' argument that they are instrumentalities entitled to assert sovereign immunity under common law. *See* Pangang Br. 20-30. The government never responds to Defendants' argument that, regardless of foreign-state ownership, a corporation performing a "fundamental government function serving a public purpose" is entitled to sovereign immunity under the common law. *In re Investigation of World Arrangements with Rel. to Prod., Transp., Ref. & Distribution of Petroleum*, 13

3

F.R.D. 280, 290 (D.D.C 1952); *see id.* at 286, 290-91 (distinguishing *United States v. Deutsches Kalisvndikat Gesellschaft*, 31 F.2d 199 (S.D.N.Y. 1929) (cited in Br. 25-26), and *Coale v. Societe Cooperative Suisse Des Charbons, Basle*, 21 F.2d 180 (S.D.N.Y. 1921) (cited in Br. 14)). The government thus never disputes that common law foreign sovereign "immunity … extends to: … a corporation created under [a foreign state's] laws and exercising functions comparable to those of an agency of the state." Restatement (Second) of Foreign Relations Law § 66(g) (1965); *see* Pangang Br. 20-22, 29 (collecting authorities).

The government instead creates a strawman by characterizing (Br. 2) Defendants as arguing that "foreign state-owned commercial entities" are entitled to immunity. Its brief is thus largely nonresponsive to Defendants' arguments.

Moreover, the government's legal authorities agree with Defendants that if a "'corporation functioned as a public agency or instrumentality or where evidence of corporate separateness from the government was not strong,' the court could disregard the corporate form and grant immunity." William C. Hoffman, *The Separate Entity Rule in International Perspective: Should State Ownership of Corporate Shares Confer Sovereign Status for Immunity Purposes?*, 65 Tul. L. Rev. 535, 546 (1991) (quoting *Et Ve Balik Kurumu v. B.N.S. Int'l Sales Corp.*, 25 Misc. 2d 299, 301 (N.Y. Sup. Ct. 1960), *aff'd*, 17 A.D.2d 927 (N.Y. App. Div. 1962)); *compare Bank of the United States v. Planters' Bank of Georgia*, 22 U.S. 904, 907

4

(1824) (cited in Br. 13) (state-owned corporations are not entitled to Eleventh Amendment immunity), *with N. Ins. Co. of N.Y. v. Chatham Cnty., Ga.*, 547 U.S. 189, 193 (2006) ("arms of the State" are).[2]

All these authorities undermine the government's unsupported assertion (Br. 17) that "separate entit[ies]" and "separate legal persons" are not entitled to immunity at all under the common law. So do the government's international authorities. *See* State Immunity Act, R.S.C., 1985, c. S-18, § 2 (Canada) (extending immunity to "an organ of the foreign state but that is separate from the foreign state"); G.A. Res. 59/38, U.N. Doc. A/RES/59/38 (Dec. 16, 2004), art. 2(1)(b) (defining "State" as "instrumentalities"). And the U.S. State Department did not hestitate to recommend immunity for foreign instrumentalities, even in commercial cases. *See, e.g., F. W. Stone Eng'g Co. v. Petroleos Mexicanos of Mexico, D. F.*, 42 A.2d 57, 60 (1945).

In sum, foreign corporations that perform government functions can invoke sovereign immunity.

---

[2]  The Supreme Court's holding in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), that a company was an "instrumentality of Missouri" because it "was created by the State to further a public purpose" fits within this tradition. *Id.* at 2366 (cited in Br. 13 n.4). And *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), did not "hold[] that corporate status *does*" deprive an instrumentality of immunity (Br. 13 n.4; emphasis in original). There, "Congress [had] eliminate[d]" sovereign immunity by statute. 513 U.S. at 392.

**B.  The Government Does Not Dispute That Defendants Satisfy The Relevant Standard For Foreign-Instrumentality Status**

The government does not meaningfully dispute that Defendants made a prima facie showing that they were instrumentalities entitled to invoke sovereign immunity.  In brief, the indictment alleges: that the People's Republic of China ("PRC") controls and indirectly owns Defendants; that Defendants acted with a public purpose—and indeed, were indicted for carrying out the PRC's strategic goal of developing TiO2; and that corporate separateness was illusory.  *See* Pangang Br. 22-30.  Thus, unlike the company in *Patrickson v. Dole Food Co.*, 251 F.3d 795 (9th Cir. 2001) (cited in Br. 32), the indictment here alleges that Defendants "'engage[] in a public activity on behalf of the foreign government.'"  *EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins.,* 257 F.3d 992, 997 (9th Cir. 2001) (quoting *Patrickson*, 251 F.3d at 807).  All of this goes uncontested in the government's brief, apart from one sentence incorrectly characterizing (Br. 33) these arguments as predicated on state "ownership."

The government wrongly criticizes (Br. 31-32) Defendants for citing cases addressing a FSIA "organ" because "the FSIA does not apply to criminal cases."  Those "organ" cases are relevant because, as Defendants explained (Pangang Br. 21-22) and the government does not contest, courts' understanding of a foreign state "organ" under the FSIA tracks the definition of a common-law instrumentality.  *See, e.g., Matar v. Dichter*, 563 F.3d 9, 13-14 (2d Cir. 2009) (interpreting the FSIA "with

6

a presumption favoring the retention of long-established and familiar principles")
(citation omitted). The government's authorities recognize only that the FSIA's
treatment of corporations generally differs from international law; they do not opine
on this "organ" issue at all. *See* Hoffman, *supra*, at 540; Restatement (Fourth) of
Foreign Relations Law § 452 reporter's note 12 (2018).[3]

Defendants may thus assert common-law sovereign immunity.

## II. THE GOVERNMENT'S ARGUMENTS AGAINST ABSOLUTE IMMUNITY ARE UNPERSUASIVE

The government does not challenge Defendants' arguments that, contrary to
the district court's ruling, the EEA preserves and incorporates whatever immunities
existed at common law, and does not repeal them. *See* Pangang Br. 38-41. It only
disputes the content of that common-law immunity. But just as it did in *Halkbank*,
the government concedes that foreign states are entitled to absolute immunity from
criminal prosecution: "[F]oreign states may not be subject to criminal prosecution.
*That premise is not in dispute*." Br. 28-29 (emphasis added); *see* Pangang Br. 30-
38. The government fails to limit the import of these concessions.

---

[3] The government's suggestion (Br. 32 & n.8) that Defendants should have argued
"organ" status in the prior appeal is plainly incorrect. Defendants did not press that
argument because the government never disputed that they met the FSIA's majority-
ownership standard until oral argument. *See* Pangang Br. 12-13. The district court
accordingly was well within its discretion to allow Defendants to raise this argument
on remand.

## A.    Immunity Extends To Common Law Instrumentalities

The government first wrongly contends (Br. 11) that Defendants are not entitled to sovereign immunity from criminal prosecution because they are "separate legal persons."  This makes no sense:  foreign instrumentalities were entitled to immunity in civil cases.  *Supra*, Part I.A.  While there were no criminal prosecutions of foreign instrumentalities before this case, *infra*, at 10-12, the government has no logical explanation why the same rule would not apply in criminal cases.  The government also cites no authority supporting this argument.  No prior case (or even Executive Branch opinion) suggests that the government cannot prosecute foreign states but retains the ability to prosecute their agents and instrumentalities merely because they are separate legal persons.

The United States has consistently extended sovereign immunity, including in criminal cases, to persons who are separate from the sovereign itself.  For example, the United States proposed that "agencies and instrumentalities of a foreign government [are] entitled to the same immunities as the government itself."  United States: Draft Legislation on the Jurisdictional Immunities of Foreign States (Jan. 26, 1973), *reprinted in* 12 I.L.M. 118, 135 (1973) (cited in Pangang Br. 33).  The United States has also contended that natural persons, such as heads of state, are immune from criminal prosecution, even though they are separate persons.  *See Commission on the Responsibility of the Authors of the War and on Enforcement of Penalties*, 14

8

Am. J. Int'l L. 95, 148 (1920) ("The American representatives ... expressed themselves unable to see how any member of the Commission could claim that the head of a state exercising sovereign rights is responsible to any but" his own country.). Federal courts extended this immunity to a "foreign minister," *Bergman v. DeSieyes*, 71 F. Supp. 334, 335 (S.D.N.Y. 1946), "troops of a foreign prince," and an "armed vessel of war," all of which are separate persons, *Coleman v. State of Tennessee*, 97 U.S. 509, 515-16 & n.1 (1878). And the government long advocated granting immunity, "whether the process be criminal or civil," to low-level officials "act[ing] under public authority." Letter from Secretary of State Daniel Webster to Attorney General John J. Crittenden, Mar. 15, 1841 (immunity of a British soldier), *in* 23 Foreign Relations of the United States 24, 25 (1841); *see* 2 John Bassett Moore, Digest of International Law, § 179, at 26 (1906) (collecting authorities).

Thus, U.S. practice confirms the view of the Restatement (Second) of Foreign Relations Law that many legal persons, including corporations exercising state functions, are entitled to the same immunities as foreign states. *Id.* § 66. The government suggests (Br. 29) that the Restatement is not an accurate reflection of the pre-FSIA common law, but this Court held it is in *Doğan v. Barak*, 932 F.3d 888, 893-94 (9th Cir. 2019); *see* Pangang Br. 20.

The government then missreads (Br. 29) the Restatement (Third) of Foreign Relations Law § 461 cmts. a & c (1987) as "mak[ing] clear that ... 'the state's

responsibility does not immunize the agent' [] and any other 'juridicial person[]' is subject to criminal process." Comment c says that a state's agent lacks immunity *when the agent commits* "*terrorist acts*." *Id.* § 461 cmt. c (emphasis added). This is just an application of the principle that "offenders against the law of war" are not entitled to the privileges and immunities of belligerency. *Ex parte Quirin*, 317 U.S. 1, 31 (1942). The general rule for agency outside this exception was that a sovereign should not be forced to "stoop to appear at the bar of other nations to defend the acts of his commissioned agents." *L'Invincible*, 14 U.S. 238, 254-55 (1816) (extending sovereign immunity to foreign privateer). And Comment a of the Third Restatement says only that "[a] foreign state .... would not be prosecuted under normal criminal process applicable to ... juridical persons," and it does not imply instrumentalities can be. Restatement (Third) of Foreign Relations Law § 461 cmt. a.

The government next incorrectly asserts (Br. 29) that Defendants fail to cite "a single case" extending immunity to foreign instrumentalities. To recap (*see* Pangang Br. 35), there were only two instances before the FSIA's enactment in which a foreign instrumentality was subjected to *any* criminal process (specifically, grand jury subpoenas—not indictments). In one, the court quashed the subpoena. *World Arrangements*, 13 F.R.D. at 291. In the other, the court suggested it would quash the subpoena if the information sought could be used "to indict" the instrumentality, and it declined to defer to the Executive Branch's suggestion against

10

immunity. *In re Grand Jury Investigation of Shipping Indus.*, 186 F. Supp. 298, 319-20 (D.D.C 1960). Neither case supports the government's claim (Br. 26) that "the federal government has been applying federal criminal jurisdiction ... to foreign-government-owned corporations, *without any indication that these entities would be immune*" (emphasis added). And no case has permitted a criminal prosecution of a foreign instrumentality that raised a sovereign immunity defense.

The reason there are no other cases extending immunity to foreign instrumentalies in criminal prosecutions is because, until now, there have been no such prosecutions, given the United States' longstanding view that foreign instrumentalities are entitled to immunity. *See, e.g.*, 6 Marjorie M. Whiteman, Digest of International Law § 21, at 592 (1968); *see also* Pangang Br. 37-38 & n.7. All the government's examples (Br. 26-27) of supposed government "appl[ications of] federal criminal jurisdiction … to foreign-government-owned corporations" are inapposite for the reasons Defendants explained in their opening brief, which—critically—the government fails to address. *See* Pangang Br. 44 n.8. Thus, this is not a circumstance where there were any, much less numerous, prosecutions of private companies acting on behalf of foreign states yet no "documented instance of the State Department recommending conduct-based immunity for a foreign private corporation,'" *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 17 F.4th 930, 940 n.8 (9th Cir. 2021) (quoted in Br. 29), *cert. denied*, 143 S. Ct. 562 (2023).

11

The government's list (Br. 23-24) of "federal government[] criminal prosecutions of non-diplomatic foreign officials" only undermines its argument. In one, the Secretary of State directed the U.S. District Attorney "to cause to be discontinued the prosecution" against the Chancellor of the French Consulate in Boston. Letter from Secretary of State Edmund Randolph to Christopher Gore, May 21, 1794, *in* 6 American State Papers: Foreign Relations 60 (1998). In another, the United States brought drug charges against a former Panamanian leader who was not entitled to head-of-state immunity "because the United States government never recognized [him] as Panama's legitimate, constitutional ruler." *United States v. Noriega*, 117 F.3d 1206, 1211 (11th Cir. 1997). The final example, a prosecution of a consul for libel, *United States v. Ravara*, 27 F. Cas. 714715 (C.C.D. Pa. 1794), merely reflects that "[c]onsular officials, unlike diplomatic agents, are not immune from the jurisdiction of local courts, *civil or criminal*." 7 Marjorie M. Whiteman, Digest of International Law § 17, at 785 (1970) (emphasis added; citation omitted).

## B. Immunity Extends To Commercial Cases

Unable to overcome these problems with its theory of foreign sovereign immunity, the government pivots to arguing (Br. 12, 14) that, at common law, corporations "lack[] immunity" only for their "commercial activities" but have immunity for their "sovereign acts." This argument, of course, deviates from its "separate persons" argument. And it is wrong: foreign instrumentalities have the

same absolute immunity from criminal prosecution at common law as foreign governments, commercial activity allegations notwithstanding.

The government does not identify a single case supporting its proposed commercial-activity test in criminal cases. It instead cites (Br. 14-15) only cases where courts denied immunity to state-owned instrumentalities in *civil* cases. *See, e.g.*, *Coale*, 21 F.2d at 181; *Molina v. Comision Reguladora del Mercado de Henequen*, 103 A. 397, 398-99 (N.J. 1918); *Moodalay v. Morton*, 28 Eng. Rep. 1245, 1246 (Ch. 1785); *Skinner v. East-India Co.*, 6 State Trials 710, 724 (1666).[4] Even the secondary sources it cites identify no international cases where a foreign state instrumentality has been criminally prosecuted for its commercial acts. *See, e.g.*, Chimène I. Keitner, *Prosecuting Foreign States*, 61 Va. J. Int'l L. 221 (2021). That is because there were no such prosecutions of foreign instrumentalities for their purported commercial acts before this case. *See* Pangang Br. 34. The government appears to have invented this argument only within the last few years while prosecuting Defendants and Halkbank. That sinks the government's argument under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), given that courts are no longer empowered to "develop federal common law." *Türkiye Halk Bankasi A.S. v. United*

---

[4] The East India Company cases are also inapposite because they present immunity of a British company in British courts, not foreign sovereign immunity, and the East India Company was a joint-stock company "funded and directed by … individuals," not the state. Philip J. Stern, Empire, Incorporated 44 (2023). Parliament did not assert any control over the company until 1773, after *Skinner*. *See id.* at 177.

*States*, 143 S. Ct. 940, 955 (2023) ("*Halkbank*") (Gorsuch, J., concurring in part, dissenting in part). Rather, "the general practice has been to look for legislative guidance before exercising innovative authority over substantive law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 726 (2004).

The government's argument for a commercial-activity exception in criminal cases is thus no more persuasive than the Second Circuit's analysis in *United States v. Türkiye Halk Bankasi A.S.*, 16 F.4th 336, 351 & n.70 (2d Cir. 2021), that the Supreme Court vacated as incomplete. *Halkbank*, 143 S. Ct. at 951-52. Both just rest on the assumption that because there was such an exception for civil cases, it must have applied in criminal cases too, despite the lack of precedent. But this assumption does not hold for criminal cases because international law prohibits "the application of the penal code of one State to another" and extending "the legislative jurisdiction of the territorial State on public law matters to the foreign State." Hazel Fox & Philippa Webb, The Law of State Immunity 91 (3d ed. 2015); *see generally* Br. for Amicus Curiae Lord Daniel Brennan KC, *United States v. Zarrab*, No. 20-3499 (2d Cir. Aug. 7, 2023); Br. for Amicus Curiae Professor Roger O'Keefe, *United States v. Zarrab*, No. 20-3499 (2d Cir. Aug. 7, 2023).

The government also never grapples with three additional threshold problems with applying a common law commercial-activity exception in criminal cases.

14

*First*, it offers no explanation why the common law should recognize a commercial-activity exception for foreign instrumentalities when, as the government has conceded, foreign states have absolute immunity. The government's implicit justification—that courts denied immunity to foreign instrumentalities in civil commercial cases—is insufficient, because courts also denied immunity in civil "cases 'arising out of a *foreign state's* strictly commercial acts.'" *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1320 (2017) (emphasis added; citations omitted). There is thus no reason to recognize a common law commercial-activity exception for foreign instrumentalities in criminal cases, when there is no such exception for foreign states.

*Second*, a commercial-activity exception for instrumentalities would be a poor fit for the criminal code and international law. Governments have a greater interest in prosecution of morally opprobrious crimes like murder and human rights abuses than they do in prosecuting commercial and labor violations. *See* Pangang Br. 52. The government's commercial-activity rule would thus leave un-prosecutable the threats to "national security" the government invokes (Br. 27-28). Nor does the government dispute that it has never needed the power to prosecute foreign instrumentalities before this case. *See* Pangang Br. 48-49.

15

*Third*, if immunity in criminal cases is not absolute, then state prosecutors would be free to prosecute foreign instrumentalities, policed only by state courts. This would be dangerous, even if states were limited to defining the scope of a commercial-activity exception. *See* Pangang Br. 52-53. The government claims (Br. 33) there is "no history of" such prosecutions, overlooking that New York in the 1840s did prosecute a British soldier and declined to respect a "suggestion of immunity" filed by the Secretary of State. *People v. McLeod*, 1 Hill 377, 433 (N.Y. Sup. Ct. 1841); *see* Pangang Br. 47. This issue did not come up more often in part because Congress remedied the problem by granting foreign officials the right to seek habeas relief from state and federal prosecutions. *See* 28 U.S.C. § 2241(c)(4); David J. Bederman, *The Cautionary Tale of Alexander Mcleod: Superior Orders and the American Writ of Habeas Corpus*, 41 Emory L.J. 515, 526-30 (1992). The fact that such a prosecution "*might* be preempted," as the government maintains (Br. 33; emphasis added; citation omitted), is cold comfort—and shows the uncertainties that would arise if courts determined the scope of a commercial-activity exception on a case-by-case basis.

## C. Immunity Is Not Subject To Executive Veto Or Deference

The government does not engage with Defendants' arguments showing the district court erred in deferring to the governnment's decision to prosecute this case. *See* Pangang Br. 41-49. And it does not deny that the Executive Branch may

determine foreign sovereign immunity only if a statute or Constitutional provision grants it that authority. *See Medellin v. Texas*, 552 U.S. 491, 524 (2008). Nor does it dispute that neither Congress nor the Constitution has granted the Executive Branch that power. *See* Pangang Br. 42-43.

Recognizing this problem, the government disclaims (Br. 21 n.7) the argument that "courts owe absolute deference to Executive Branch immunity determinations in these circumstances." The government instead requestst (*id.*) that this Court afford its views "significant weight," effectively conceding that executive deference is not an independent grounds for affirmance.

But the Executive Branch's views here deserve no weight because they are unpersuasive. Absent a constitutional or statutory power, courts defer to the Executive Branch's view of the law only when it has "specialized experience and broader ... information" about the subject at hand. *United States v. Mead*, 533 U.S. 218, 234 (2001) (citation omitted). That was courts' rationale for deferring to the State Department's interpretation of the restrictive theory in civil cases before the FSIA's enactment. *Helmerich & Payne*, 137 S. Ct. at 1320; *see* Pangang Br. 7. But here, the State Department has not opined that the prosecution of Defendants would be consistent with the restrictive theory. And the government's rationale for why immunity does not apply (*supra*, Parts II.A-B), lacks any "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Its proposed separate-persons

17

and commercial-activity exceptions do not suggest any "thoroughness evident in [the Executive Branch's] consideration," "valid[] ... reasoning," or "consistency with earlier ... pronouncements." *Id.*

Instead of engaging with Defendants' arguments, the government urges (Br. 21 n.7) the Court to endorse its separate-persons or commercial-activity arguments because courts have "historically" deferred to its views on "the common law of foreign sovereign immunity." There are at least four problems with this argument.

*First*, there is no history of any deference to the Executive Branch's views in criminal cases. *Supra*, at 10-12; Pangang Br. 43-45.

*Second*, such deference conflicts with the separation of powers. *See* Pangang Br. 45-46. Courts are not "potted plants" that automatically defer to the Executive Branch's views on federal common law precisely because such deference risks politicizing the judiciary. *Halkbank*, 143 S. Ct. at 954-55 (Gorsuch, J., concurring in part and dissenting in part). The government offers no response.

*Third*, whatever history may have once supported this argument, Congress (with the Executive Branch's consent) has consciously stripped the Executive Branch of this power when it enacted the FSIA because both political branches recognized that a deference regime was harmful. *See* Pangang Br. 46-47.

*Finally*, even in civil cases, the government is simply wrong when it asserts (Br. 21) that courts going back to the *Schooner Exchange v. McFaddon*, 11 U.S. 116

18

(1812), granted immunity in civil cases because the Executive Branch told it to. Courts would defer only to findings of fact as to whether a government was sovereign and entitled to recognition, but courts would then determine recognition's "legal consequences" for themselves. *Guar. Tr. of New York v. United States*, 304 U.S. 126, 137-38 (1938); *see* Pangang Br. 5-6, 44-45. As late as the Tate Letter and even the 1970s, the State Department admitted that its "policy" on sovereign immunity "cannot control the courts." Jack B. Tate, *Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments*, 26 Dep't State Bull. 984, 986 (May 19, 1952); Letter from Attorney General Richard G. Kleindienst & Secretary of State William P. Rogers to President of Senate, Jan. 22, 1973, *reprinted in* 12 I.L.M. 118, 118 (1973).

*Schooner Exchange* itself states that its reasoning in granting immunity to a French public ship was predicated "on general principles, and on a train of reasoning founded on cases." 11 U.S. at 136. The Court did not even mention "the suggestion of the Attorney of the United States" until the second-to-last sentence of its opinion, and even then, only "admit[ted]" that suggestion to establish "the fact" that the ship belonged to the French government. *Id.* at 147. And a decade later, *The Santissima Trinidad*, 20 U.S. 283 (1822), made clear that sovereign immunity "must be recognized by our Courts of justice, until Congress shall prescribe a different rule." *Id.* at 337. The government's own sources thus note that "the U.S. Executive …

19

repeatedly" contended that it was unable "to intervene" to demand dismissal of "civil suits brought by private individuals against current or former officials for conduct performed under the authority of a foreign sovereign." Chimène I. Keitner, *The Forgotten History of Foreign Official Immunity*, 87 N.Y.U. L. Rev. 704, 748 (2012) (cited in Br. 24).

For its historical argument, by contrast, the government relies (Br. 21) entirely on passing dicta in cases like *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020), that merely summarize early Supreme Court practice. This sort of "drive-by" dicta lacks any "precedential effect," and certainly does not bear on actual historical practice. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 91 (1998).

The government also misplaces reliance (Br. 22-23) on the statement in *Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945), that courts should not "deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize." *Id.* at 35. This language too was "dictum," *Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354, 358 (2d Cir. 1964); only Justices Frankfurter and Black advocated absolute deference to the Executive Branch. *See* 324 U.S. at 40-42 (Frankfurter, J., concurring). By contrast, the majority held, after several pages of analysis of precedent, that sovereign immunity should be denied to a ship that a foreign government had "title" to but not "possession." *Id.* at 37-38.

20

This general rule for all admiralty cases has nothing to do with executive deference or executive power. *See, e.g.*, *California v. Deep Sea Rsch., Inc.*, 523 U.S. 491, 507 (1998) (extending same rule to federal and state sovereign immunity). Indeed, *Hoffman*'s deference dicta is what "embarrassed" the State Department to disclaim any power to control the courts in the Tate Letter. Edward D. Dickinson, *The Law of Nations As National Law: "Political Questions,"* 104 U. Pa. L. Rev. 451, 477 (1956); *see also* Br. for Amici Curiae Ingrid (Wuerth) Brunk and William S. Dodge, *United States v. Zarrab*, No. 20-3499, at 15-21 (2d Cir. Aug. 7, 2023).[5]

## III. THE GOVERNMENT FAILS TO SHOW THAT ANY PURPORTED SOVEREIGN IMMUNITY EXCEPTION WOULD APPLY HERE

The government rightly does not contend that the district court's FSIA waiver analysis would support a finding that Defendants waived their common-law immunity. *See* Pangang Br. 57-60. Thus, the only possible exception to sovereign immunity here would be a commercial-activity exception that is inapplicable at common law in criminal cases. *Supra*, Part II.B. In any case, the gravamen of this

---

[5] One other case suggests that courts should dismiss suits against foreign public ships when the government chooses to resolve the underlying dispute "through diplomatic negotiations." *Ex parte Republic of Peru*, 318 U.S. 578, 588 (1943). This dictum refers to the President's "narrow" authority to make "executive agreements to settle civil claims between American citizens and foreign governments or foreign nationals," which courts have "strictly limited." *Medellín*, 552 U.S. at 531-32.

21

case is economic espionage, which does not qualify as commercial activity. *Infra*, Part III.A-B.

### A. The Gravamen Of This Case Is Economic Espionage

The government agrees (Br. 19 n.6) with Defendants that cases interpreting the FSIA's commercial-activity exception "bear[] on the common law question here" because the FSIA incorporates the common-law rule. *See* Pangang Br. 53-54 & n.10. The government does not challenge (Br. 30) Defendants' argument (Pangang Br. 54-57) that the district court was required to find that the "'gravamen'" of the indictment was commercial conduct, meaning the commercial conduct "itself [has to be] wrongful." *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 (D.C. Cir. 2022) (quoting *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015)). Indeed, the government itself advocates (Br. 30) focusing on "the core or gravamen of the case." Otherwise, the indictment would not "aris[e] out of" Defendants' commercial activities. Restatement (Second) of Foreign Relations Law § 69.

The government, however, does not even try to show that the gravamen of this case is commercial activity. Like the district court (*see* 1-ER-37), it just lists (Br. 19-20) various commercial activities in which Defendants allegedly engaged. But "entering contracts, holding meetings, and planning and building a chemical manufacturing plant" (Br. 30) is not the indictment's gravamen because this conduct is not "itself wrongful." *Rodriguez*, 29 F.4th at 716; *see Jam v. Int'l Fin. Corp.*, 3

22

F.4th 405, 412 (D.C. Cir. 2021) (Randolph, J., concurring) ("'allegations of general corporate activity'" are "not enough") (citation omitted). If the government presented solely this evidence to a jury, it could not obtain a conviction. *See Rodriguez*, 29 F.4th at 716 (focusing on "those elements … that, if proven, would entitle a [party] to relief") (citation omitted); 18 U.S.C. § 1831(a)(5) (requiring a conspiracy "to commit any offense" in the statute). Rather, economic espionage is the gravamen of the indictment. This is so for no fewer than four reasons.

*First*, espionage is the "element[]" of the government's case that "would entitle" it "to relief" at trial. *Broidy*, 982 F.3d at 593 (citation omitted). The espionage allegations are "the facts ... most important to proving the claim" because the government's case "would not survive" without it. *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1142 (9th Cir. 2022) (applying *Sachs'* gravamen test to a different statute). The government all but concedes as much (Br. 3): "The grand jury charged the Pangang Defendants ... with violations of the [EEA] ... *based on their misappropriation* of ... *trade secrets*" (emphasis added). It later characterizes (Br. 30) this case as being "about ... steal[ing]." And rightly so: The first count "alleges that [Defendants] conspired with ... others ... to steal DuPont's trade secrets … ; to copy and convey such trade secrets … ; and to receive, buy, and possess such trade secrets, knowing they had been obtained without authorization …." *United States v. Pangang Grp. Co.*, 6 F.4th 946, 951 (9th Cir. 2021). The second count is literally

23

"Attempted Economic Espionage." 2-ER-88. Espionage thus "cannot be divorced from" the rest of the indictment. *Merlini v. Canada*, 926 F.3d 21, 31 (1st Cir. 2019).

*Second*, the indictment's gravamen is the object of the conspiracy—theft of secrets—because that is the conduct that, by definition, "is itself wrongful." *Rodriguez*, 29 F.4th at 716; *see, e.g.*, *United States v. Chung*, 659 F.3d 815, 828 (9th Cir. 2016) (conspiracy's elements are "'(1) an agreement *to engage in criminal activity*, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime'") (emphasis added; citation omitted). The overt acts in furtherance of a conspiracy, by contrast, are "wrongful based only on" the object of the conspiracy and not themselves wrongful. *Rodriguez*, 29 F.4th at 716; *see, e.g.*, *United States v. Buckner*, 610 F.2d 570, 573 (9th Cir. 1979) ("An overt act need not itself be a criminal act …."). "Otherwise, any act directed by a foreign government and carried out by irregular operatives in whatever circumstances could be thought commercial including isolated acts of assassination, extortion, blackmail, and kidnapping .... That can hardly be ... typical acts of market participants." *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994).

*Third*, espionage is also the core of the case because that is the conduct that allegedly caused actual injury. *See Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1223 (11th Cir. 2018); *France.com, Inc. v. French*

*Republic*, 992 F.3d 248, 253 (4th Cir.), *cert. denied*, 142 S. Ct. 712 (2021); *Consultants 1, Inc. v. Republic of Peru*, 719 F. App'x 47, 52 (2d Cir. 2017). "[C]ontracts ... to engage in the production of titanimum dioxide," "attempt[ing] to build a titanium dioxide plant" and "manufactur[e] [] titanium dioxide," "putting out a request for proposal," "hiring design consultants," and "holding meetings" (Br. 19-20), by contrast, harmed no one.

The only alleged conduct by Defendants that could cause injury is that Defendants allegedly stated they would "work with" third parties if they obtained "blueprints for DuPont's TiO2 plants." 2-ER-98. But in *Broidy*, this Court held that the gravamen of a case alleging that a foreign state hired people to steal "trade secrets" is the theft of secrets, not the contracts the government signed. 982 F.3d at 594; *see id.* at 588 (*Broidy* plaintiff brought private cause of action under EEA). The government ignores (Br. 30) the gravamen part of *Broidy*'s holding.

*Fourth*, the government misapprehends the law when it asserts (Br. 30) that "what the Pangang Defendants allegedly did—not what they hoped to achieve or were motivated to achieve—reveals the core or gravamen of the case." This argument incorrectly assumes that *Defendants'* conduct, and not that of their alleged co-conspirators, has to be the indictment's gravamen. *See, e.g.*, *Jam*, 3 F.4th at 410 (rejecting notion that gravamen "examination is restricted to the sovereign's conduct"). Indeed, the government need not prove that *Defendants* engaged in any

25

overt acts, just that Defendants entered the conspiracy and that *someone* in the conspiracy performed at least one overt act. *See, e.g.*, *Salinas v. United States*, 522 U.S. 52, 64 (1997).

*Broidy* thus held the gravamen of that case was "(1) the surreptitious intrusion into Plaintiffs' servers and email accounts ... and (2) the dissemination of such information to others," all of which was performed by third-party hackers, not the fact that "Qatar entered into various contracts." 982 F.3d at 594; *see, e.g.*, *Cicippio*, 30 F.3d at 168 (focusing on the "kidnapping *by itself*," even though "the kidnappers are not alleged to have been officials of the Iranian government") (emphasis in original). So too with the government's allegations here that Defendants hired peple to steal trade secrets and "computer hackers" to "remotely access[] DuPont computers." 2-ER-95. The core of this case is thus espionage.

But even if the government has properly characterized the indictment's gravamen, most of the conduct it lists is irrelevant to any commercial-activity exception. The common law recognizes a sovereign immunity exception in civil cases only if the "proceeding aris[es] out of commercial activity *outside* [*the instrumentality's*] *territory*." Restatement (Second) of Foreign Relations Law § 69 (emphasis added); *see, e.g.*, *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) (recognizing "[t]he immunity of individuals from suits brought in foreign tribunals *for acts done within their own states*, in the exercise of governmental authority")

(emphasis added). The indictment's alleged U.S.-based commercial conduct was committed by other members of the alleged conspiracy, not Defendants. *See* 2-ER-94-99. The only exception, that several Defendants "had a series of meetings in San Francisco," is not even listed as an overt act in furtherance of the conspiracy, and thus cannot be the gravamen of the indictment. 2-ER-96; *see* 2-ER-97-99.

### B. Economic Espionage Is Not Commercial Activity

The government appears to incorrectly contend (Br. 30) that even if the gravamen of this case is economic espionage, that conduct is commercial because the case does not "involv[e] secret agents or international intrigue," just "businesses trying to steal a competitor's technology." But theft of trade secrets is illegal and not an activity in which "'commercial actors *typically* engage.'" *Broidy*, 982 F.3d at 594 (emphasis added) (quoting *Cicippio*, 30 F.3d at 167).[6] Companies do not typically hire people to hack into other companies' computers. 2-ER-95. And the government does not charge Defendants with "Theft of trade secrets," 18 U.S.C. § 1832, but with "Economic espionage," which must be performed for the "benefit [of] [a] foreign government," *id.* § 1831(a); *see* Pangang Br. 55.

In *Broidy*, this Court had "little difficulty in concluding that ... a foreign government's conduct of clandestine surveillance and espionage against a national

---

[6] The government does not dispute that the district court misapprehended *Adler v. Federal Republic of Nigeria*, 219 F.3d 869 (9th Cir. 2000), the primary case on which the court relied below, 1-ER-36-37. *See* Pangang Br. 56.

of another nation in that other nation is not" commercial activity. 982 F.3d at 594. It also held that "'[t]ransnational cyberattacks,'" like those alleged here, "'are not the type of actions by which a private party engages in trade and traffic or commerce.'" *Id.* (quoting *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 429 (S.D.N.Y. 2019)). The fact that "bad actors in the commercial sphere [] employ similar tactics" does not mean that this conduct is commercial. *Id.* "[A] foreign government's deployment of clandestine agents to collect foreign intelligence on its behalf, without more, is the sort of peculiarly sovereign conduct that all national governments (including our own) assert the distinctive power to perform." *Id.* at 595.

The government also ignores *Broidy*'s actual holding. It instead latches (Br. 30) onto dicta suggesting that "deploying [trade secrets] against [a commercial] rival" could be commercial activity. 982 F.3d at 585. But the government *never* alleges that Defendants used any stolen trade secrets or even built the proposed TiO2 plant—because they never did. *See* 2-ER-82-101. "[T]he *reason* why" Defendants allegedly engaged in the purported conspiracy and their identity as purported DuPont competitors are thus irrelevant. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 617 (1992) (emphasis in original). What matters is the "'outward form of the conduct that [Defendants] perform[].'" *Broidy*, 982 F.3d at 595 (quoting *Weltover*,

28

504 U.S. at 617). And just like in *Broidy*, the government alleges no actual use of trade secrets by Defendants.

But even if the government did make that allegation, it still would not matter, because use of trade secrets is not even an element, let alone the gravamen, of 18 U.S.C. § 1831. Indeed, to obtain a conviction under the EEA, "the government need not [even] prove the existence of actual trade secrets," let alone commercialization of trade secrets. *United States v. Nosal*, 844 F.3d 1024, 1044 (9th Cir. 2016). The *Broidy* dicta instead is best understood as suggesting that civil remedies should exist against foreign instrumentalities that use trade secrets, the actual injury—and thus the gravamen—of a civil trade secret theft claim generally results from the competitor using the trade secrets. *See, e.g.*, 18 U.S.C. § 1836(b)(3)(B)(i) (civil cause of action allows recovery of "damages for actual loss" and "for any unjust enrichment caused by the misappropriation of the trade secret").

Finally, the government's suggestion (Br. 31) that the district court made "findings that their conduct was commercial" subject to "clear error" review is plainly incorrect. The court ruled based on the indictment's allegations, 1-ER-36-37, not any "factual findings," *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020) (cited in Br. 31). Every circuit, including this one, reviews de novo a district court's application of the commercial-activity test to a pleading's

allegations. *See, e.g.*, *Broidy*, 982 F.3d at 586; *France.com*, 992 F.3d at 251; *Devengoechea*, 889 F.3d at 1220.

Thus, even if there were a commercial-activity exception in criminal cases, it would not apply here.

## **CONCLUSION**

The district court's order should be reversed, and the indictment should be dismissed.

Dated:  August 11, 2023                     Respectfully submitted,

                                        s/ Robert P. Feldman

William B. Adams                     Robert P. Feldman
QUINN EMANUEL URQUHART         Joseph E. Reed
  & SULLIVAN, LLP               QUINN EMANUEL URQUHART
51 Madison Avenue, 22nd Floor      & SULLIVAN, LLP
New York, NY  10010             555 Twin Dolphin Drive, 5th Floor
(212) 849-7000                  Redwood Shores, CA  94065
                                (650) 801-5000

Michael T. Packard              John M. Potter
Alex H. Loomis                  QUINN EMANUEL URQUHART
QUINN EMANUEL URQUHART            & SULLIVAN, LLP
  & SULLIVAN, LLP               50 California Street, 22nd Floor
111 Huntington Ave, Suite 520   San Francisco, CA  94111
Boston, MA 02199                (415) 875-6600
(617) 712-7100

*Counsel for Defendants-Appellants*

30

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule

32-1, the foregoing opening brief is in 14-point, proportionally spaced Times New

Roman type and contains 6,983 words, excluding the items exempted by Fed. R.

App. P. 32(f).

Dated: August 11, 2023          s/ Robert P. Feldman
                                Robert P. Feldman

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Reply Brief for Appellants with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  August 11, 2023          s/ Robert P. Feldman
                                 Robert P. Feldman