**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-10058 |
| *Plaintiff-Appellee*, | |
| v. | D.C. Nos. 4:11-cr-00573-JSW-7 4:11-cr-00573-JSW-8 4:11-cr-00573-JSW-9 4:11-cr-00573-JSW-10 |
| PANGANG GROUP COMPANY, LTD.; PANGANG GROUP STEEL VANADIUM & TITANIUM COMPANY, LTD.; PANGANG GROUP TITANIUM INDUSTRY COMPANY, LTD.; PANGANG GROUP INTERNATIONAL ECONOMIC & TRADING COMPANY, | |
| | OPINION |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted January 26, 2024
Pasadena, California

Filed April 28, 2025

2 USA v. PANGANG GROUP COMPANY, LTD.

Before: Kim McLane Wardlaw, Daniel P. Collins, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Collins

## SUMMARY[*]

### Criminal Law / Foreign Sovereign Immunity

The panel affirmed the district court's denial of a motion to dismiss an indictment charging four affiliated companies ("the Pangang Companies") with economic espionage in connection with their alleged efforts to steal from E.I. du Pont de Nemours & Company trade secrets relating to the production of titanium dioxide.

The Pangang Companies maintained that they enjoy foreign sovereign immunity from criminal prosecution in the United States because they are ultimately owned and controlled by the government of the People's Republic of China ("PRC"). In a prior appeal, this court held that the Pangang Companies failed in their effort to invoke the immunity conferred by the Foreign Sovereign Immunities Act ("FSIA") because they had not made the requisite prima facie showing that they fall within the FSIA's domain of covered entities.

After the district court on remand again rejected the Pangang Companies' remaining claims of foreign sovereign immunity, including their claims based on federal common

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

law, the Pangang Companies again appealed. While this appeal was pending, the Supreme Court held in *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023), that the common law, not the FSIA, governs whether foreign states and their instrumentalities are entitled to foreign sovereign immunity from criminal prosecution in U.S. courts.

Under federal common law, an entity must satisfy, at minimum, two conditions to enjoy foreign sovereign immunity from suit. First, it must be the kind of entity that is eligible for any immunity at all—that is, it must fall within the *domain* of foreign sovereign immunity. Second, its immunity must extend to the conduct at issue in the suit—that is, the entity's conduct must fall within the *scope* of the immunity conferred on such entities. The panel held that the Pangang Companies did not make a prima facie showing that they exercise functions comparable to those of an agency of the PRC, and they therefore are not the kinds of entities eligible for foreign sovereign immunity from criminal prosecution. The panel did not reach the subsequent question of scope.

The panel noted that principles of deference to the political branches on matters touching on foreign relations reinforce the conclusion that, under federal common law, the Pangang Companies are not entitled to immunity.

## COUNSEL

Matthew M. Yelovich (argued), Chief, Appellate Section, Criminal Division; Colin C. Sampson, Merry J. Chan, and Ross D. Mazer, Assistant United States Attorneys; Ismail J. Ramsey, United States Attorney; Office of the United States

Attorney, United States Department of Justice, San Francisco, California; for Plaintiff-Appellee.

Robert P. Feldman (argued) and Joseph E. Reed, Quinn Emanuel Urquhart & Sullivan LLP, Redwood Shores, California; John M. Potter, Quinn Emanuel Urquhart & Sullivan LLP, San Francisco, California; William B. Adams, Quinn Emanuel Urquhart & Sullivan LLP, New York, New York; Alexander H. Loomis and Michael T. Packard, Quinn Emanuel Urquhart & Sullivan LLP, Boston, Massachusetts; for Defendants-Appellants.

## OPINION

COLLINS, Circuit Judge:

Defendants-Appellants Pangang Group Company, Ltd. ("PGC"); Pangang Group Steel Vanadium & Titanium Company, Ltd. ("PGSVTC"); Pangang Group Titanium Industry Company, Ltd. ("PGTIC"); and Pangang Group International Economic & Trading Company ("PGIETC") (collectively, "the Pangang Companies") are four affiliated companies that have been indicted for economic espionage in connection with their alleged efforts to steal trade secrets from E.I. du Pont de Nemours & Company ("DuPont") relating to the production of titanium dioxide ("$TiO_2$"). They maintain that they enjoy foreign sovereign immunity from criminal prosecution in the United States because they are ultimately owned and controlled by the government of the People's Republic of China ("PRC"). In a prior appeal, we held that the Pangang Companies failed in their effort to invoke the immunity conferred by the Foreign Sovereign

Immunities Act ("FSIA") because they had not made the requisite prima facie showing that they fall within the FSIA's domain of covered entities. *See United States v. Pangang Grp. Co.*, 6 F.4th 946 (9th Cir. 2021) ("*Pangang*").

After the district court on remand again rejected the Pangang Companies' remaining claims of foreign sovereign immunity, including their claims based on federal common law, the Pangang Companies have again appealed. While this appeal was pending, the Supreme Court held in *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023) ("*Halkbank II*") (affirming in part and vacating and remanding in part *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021) ("*Halkbank I*")), that the common law, not the FSIA, governs whether foreign states and their instrumentalities are entitled to foreign sovereign immunity from criminal prosecution in U.S. courts. *Id*. at 280. In light of *Halkbank II*, this appeal was rebriefed to focus on the now-controlling issues concerning the extent to which the Pangang Companies enjoy foreign sovereign immunity under federal common law.

We hold that the Pangang Companies lack foreign sovereign immunity from criminal prosecution and therefore affirm the district court's denial of the Pangang Companies' motion to dismiss the indictment.

## I

We begin by setting out the relevant factual and procedural history. *See also Pangang*, 6 F.4th at 950–52. On January 5, 2016, the Government filed the operative Third Superseding Indictment, which charges the Pangang Companies under the Economic Espionage Act ("EEA") with one count of conspiracy to commit economic espionage under 18 U.S.C. § 1831(a)(5) and one count of attempted

economic espionage under 18 U.S.C. § 1831(a)(1)–(4). "We presume the allegations of an indictment to be true for purposes of reviewing a district court's ruling on a motion to dismiss." *United States v. Fiander*, 547 F.3d 1036, 1041 n.3 (9th Cir. 2008) (citation omitted).

### A

In the 1990s, the Chinese government "publicly identified the development of chloride-route titanium dioxide ($TiO_2$) production technology as a scientific and economic priority." $TiO_2$ is a "commercially valuable white pigment" used in producing materials "ranging from paints to plastics to paper." While there was substantial demand for $TiO_2$ in China, the country was a net importer of the compound "because PRC companies had not been able to develop clean, efficient $TiO_2$ production technology." "Chloride-route $TiO_2$ production technology" was sufficiently clean and efficient, but it "was closely held by western companies, including [DuPont], which . . . was not willing to sell or license its proprietary technology to PRC companies." DuPont was the largest $TiO_2$ producer in the world, and its proprietary chloride-route $TiO_2$ production technology included several trade secrets that the company took care to protect.

"In order to develop chloride-route $TiO_2$ production capabilities . . . , companies owned and controlled by the PRC government and employees of those companies, including [the Pangang Companies] . . . , attempted to illegally obtain technology that had been developed by DuPont." The Pangang Companies conspired with certain individuals to steal DuPont's $TiO_2$ trade secrets and use them

in the design and operation of a chloride-route production plant that the Pangang Companies were building in China.**[1]**

In describing the defendants engaged in this conspiracy, the indictment alleges that PGC, based in China's Sichuan Province, is a "state-owned enterprise controlled by" the State-Owned Assets Supervision and Administration Commission of the State Council ("SASAC"). The SASAC is alleged to be "a special government agency of the PRC" and "under the direct control of the State Council, the PRC's highest government authority." The SASAC appoints the executives of the entities it controls, and the government provides strategic guidance to state-owned entities through five-year plans that aim to provide overall coordination for the national economy. The chairman and certain senior managers of PGC are Chinese Communist Party officials.

The remaining Pangang Companies—PGSVTC, PGTIC, and PGIETC—are alleged to be direct or indirect subsidiaries of PGC and thus also controlled by the SASAC. Specifically, PGC "controlled" and "shared senior management with" its subsidiary PGSVTC, and PGTIC and PGIETC are "subsidiaries" that "w[ere] owned and controlled by" PGC and PGSVTC. In charging the Pangang Companies with both conspiracy and attempt to commit economic espionage, the indictment alleges that the Pangang Companies stole and received DuPont's trade secrets (and attempted to do so) while "intending and knowing that the offenses would benefit a foreign government, namely the

---

[1] Several individuals were indicted as the Pangang Companies' co-conspirators, and most of them pleaded guilty or were convicted by a jury. *See In re Pangang Grp. Co.*, 901 F.3d 1046, 1049 n.1 (9th Cir. 2018).

PRC, and foreign instrumentalities, namely [the Pangang Companies]."

**B**

On July 9, 2019, the Pangang Companies moved to dismiss the indictment for failure to state an offense under the EEA and for lack of jurisdiction under the FSIA.[2] Enacted in 1976, the FSIA "codifies a baseline principle of immunity for foreign states and their instrumentalities" and delineates exceptions to that immunity. *Halkbank II*, 598 U.S. at 272; *see also* 28 U.S.C. § 1604. The FSIA defines a covered "foreign state" to "include[] a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." 28 U.S.C. § 1603(a). Subsection (b) states, in relevant part, that an agency or instrumentality of a foreign state is any entity "which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." *Id*. § 1603(b).

In arguing that the district court lacked jurisdiction, the Pangang Companies asserted that the FSIA was the "sole basis" for the jurisdiction of U.S. courts over a foreign state and that "the FSIA grants immunity to foreign sovereigns from criminal prosecution, absent an international agreement stating otherwise." The Pangang Companies maintained that "[e]ven if the government were to contend

---

[2] Before moving to dismiss the indictment in July 2019, the Pangang Companies "repeatedly and successfully argued that the Government's efforts to serve summonses on the indictment were inadequate under Federal Rule of Criminal Procedure 4," until that rule was formally amended and we affirmed the district court's ruling that the Government's subsequent service attempt was valid. *Pangang*, 6 F.4th at 951.

that federal common law applies, the result would be the same" because "[u]nder common law, foreign states are 'absolutely immune' from the jurisdiction of United States courts."  The Pangang Companies argued that this "exact same immunity" applied to "instrumentalities" of a foreign state under the FSIA and the common law.  At the hearing on the motion to dismiss, the Pangang Companies' counsel stated that, for purposes of that motion, "Defendants will accept as true the [indictment's] allegation that they are foreign instrumentalities" within the meaning of the EEA. The Pangang Companies argued that this allegation was sufficient to establish that they were also foreign instrumentalities within the meaning of the FSIA and therefore entitled to immunity under that statute.  *See* 28 U.S.C. §§ 1603, 1604.  The Pangang Companies claimed that the FSIA's exceptions to foreign sovereign immunity apply only in *civil* actions and that, even if they apply to criminal prosecutions, the Government could not show any such exception here.

On August 26, 2019, the district court denied the Pangang Companies' motion to dismiss the indictment, holding that it had subject matter jurisdiction over the case and that the Pangang Companies lacked immunity from suit under the FSIA.  *See Pangang*, 6 F.4th at 951–52. Concluding that any differences between the definitions of "foreign instrumentality" in the EEA and FSIA were immaterial to the motion to dismiss, the court assumed, without deciding, that the Pangang Companies also qualified as foreign instrumentalities under the FSIA.  The court further stated "that it did not need to definitively resolve" "whether the FSIA applies to criminal cases" because, "[e]ven 'assuming the FSIA applies in criminal cases,' . . . 'its exceptions apply as well.'"  *Id*. at 951.  Against this

backdrop, the court denied the Pangang Companies immunity under the FSIA on two grounds. First, the court held that the commercial activity exception to the FSIA applied, *see* 28 U.S.C. § 1605(a)(2), because, as part of the alleged conspiracy and attempt to commit economic espionage, the Pangang Companies allegedly executed commercial contracts with co-conspirators and held meetings in the United States in connection with their $TiO_2$ production projects, activities in which private actors could engage. Second, the court held that the Pangang Companies' multiyear participation in the case amounted to an implied waiver of sovereign immunity under the FSIA, *see* 28 U.S.C. § 1605(a)(1). The court also rejected the Pangang Companies' alternative theory that the indictment failed to state an offense under the EEA. The Pangang Companies timely appealed.

On July 26, 2021, we affirmed the district court's order on different grounds, namely, that the Pangang Companies had not shown they were foreign instrumentalities eligible for immunity under the FSIA in the first place. *See Pangang*, 6 F.4th at 960. Contrary to the Pangang Companies' argument and the district court's assumption, we held that, because the definition of foreign instrumentality is "much broader" under the EEA than under the FSIA, "the indictment's allegation that the Pangang Companies satisfy the former is insufficient to establish a prima facie case that they meet the latter." *Id*. We therefore applied the FSIA's definition of foreign instrumentality directly, *see* 28 U.S.C. § 1603(b), and concluded that the Pangang Companies failed to satisfy § 1603(b)(2). *See Pangang*, 6 F.4th at 955–60. That provision of the FSIA limits foreign instrumentalities to entities that are either "organs" of or majority-owned by a foreign state. *See* 28

U.S.C. § 1603(b)(2). Because the Pangang Companies did not contend that they were "organ[s] of a foreign state or political subdivision thereof," the "only question" was whether "a majority of [each of the Pangang Companies'] shares or other ownership interest is owned by a foreign state or political subdivision thereof." *Pangang*, 6 F.4th at 955 (alterations in original) (quoting 28 U.S.C. § 1603(b)(2)). We held that the allegations in the indictment alone did not establish that the Pangang Companies were directly majority-owned by the PRC. *Id*. at 957–59; *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) (holding that "only *direct* ownership of a majority of shares by the foreign state satisfies" the ownership condition of § 1603(b)(2) (emphasis added)). "Because the Pangang Companies relied solely upon the indictment's allegations, and presented no evidence to support their motion to dismiss, they necessarily failed to establish a prima facie case that they were 'foreign state[s]' entitled to immunity under § 1604 of the FSIA." *Pangang*, 6 F.4th at 960 (alteration in original).

## C

On November 30, 2021, the Pangang Companies again moved to dismiss the indictment on foreign sovereign immunity grounds. The Pangang Companies argued that, despite our ruling, they were nonetheless foreign instrumentalities entitled to immunity under the FSIA inasmuch as (1) they had "submitted evidence in connection with this [motion to dismiss] that fills the gap that the Ninth Circuit identified as to the PRC's majority-ownership of Defendant [PGC]," and (2) "the Government's own submissions ma[de] a *prima facie* showing that Defendants are *organs* of the PRC." *See* 28 U.S.C. § 1603(b)(2). Additionally, the Pangang Companies asserted that, if the

Government was correct that the common law of foreign sovereign immunity and not the FSIA applied to criminal proceedings, they had absolute immunity as common-law foreign instrumentalities.

On February 25, 2022, the district court again denied the Pangang Companies' motion to dismiss. The court noted that PGC, the only defendant to claim direct majority ownership by the SASAC at the time of indictment, failed to make a prima facie showing on this point because a declaration from the Government's expert attested that PGC was only indirectly owned by the SASAC when indicted. The court also rejected the Pangang Companies' theory that they were "organs" of the PRC entitled to immunity under the FSIA. Noting that it would ordinarily treat the "organ" argument as conceded because the Government did not directly respond to it in opposing the motion to dismiss, the court nonetheless stated that it "independently evaluated the record" on this score "given the importance of the issues."

In finding that the Pangang Companies failed to make a prima facie showing of organ status, the district court relied on caselaw holding that a foreign "organ" is an "entity [that] engages in a public activity on behalf of the foreign government." *EIE Guam Corp. v. Long Term Credit Bank of Japan*, 322 F.3d 635, 640 (9th Cir. 2003) (citation omitted). "In making this determination, courts examine the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law." *Id*. (citation omitted). The district court noted that the allegations in the operative indictment "focus on [the Pangang Companies'] allegedly criminal conduct and do not specifically address these factors." The court found that the

Government expert's declaration and other exhibits likewise "do not address several of the relevant factors." The court therefore held that the record was insufficient to establish a prima facie case of organ status for any of the Pangang Companies.

In addition to rejecting the Pangang Companies' FSIA-based arguments on the ground that they were not foreign instrumentalities under the FSIA, the district court supported its denial of immunity on several alternative bases. Even assuming *arguendo* that the Pangang Companies were foreign instrumentalities under the FSIA, the court held that the FSIA does not apply to criminal prosecutions. The court also held that even if the FSIA applied to criminal prosecutions, its exceptions to foreign sovereign immunity would apply as well, and the court incorporated by reference its previous conclusion that the charged acts fell within the commercial activity and waiver exceptions.[3]

Further, the district court rejected the Pangang Companies' argument that they "can be considered foreign states under the common law." The district court noted that the Pangang Companies relied on the same factual record to support both their common-law and FSIA arguments and

---

[3] The district court addressed, in a footnote, our decision in *Broidy Capital Management, LLC v. State of Qatar*, 982 F.3d 582 (9th Cir. 2020). The district court acknowledged *Broidy*'s holding that the espionage at issue in that case did not fall within the commercial activity exception because "a foreign government's deployment of clandestine agents to collect foreign intelligence on its behalf, without more, is the sort of peculiarly sovereign conduct that all national governments (including our own) assert the distinctive power to perform." *Id*. at 595. The district court concluded that "[t]he Ninth Circuit's opinion in *Broidy* supports this Court's prior conclusion that *Broidy* was distinguishable from the facts of this case because the defendant's activities [in *Broidy*] were 'devoid of a commercial component.'"

that this record was "not sufficient to establish that they are entitled to assert sovereign immunity under the common law." But even assuming that the Pangang Companies were entitled to assert common-law immunity, the district court concluded that any such immunity would not extend to the instant prosecution. Citing the Second Circuit's analysis of common-law immunity in *Halkbank I*, the district court stated that "'customary international law' recognizes the restrictive theory of sovereign immunity, which would not protect commercial activity." The district court concluded that, because it had determined that the Pangang Companies' charged acts were commercial, the Pangang Companies were not entitled to common-law foreign sovereign immunity. On March 4, 2022, the Pangang Companies appealed the district court's decision.

## II

While this appeal was pending, the Supreme Court issued its decision in *Halkbank II*, which clarified several important points relevant to this case. First, *Halkbank II* confirmed that district courts have jurisdiction over criminal prosecutions under 18 U.S.C. § 3231 even when the defendants are "foreign states or their instrumentalities." *See Halkbank II*, 598 U.S. at 268–71. Second, *Halkbank II* held that "the FSIA does not grant immunity to foreign states or their instrumentalities in criminal proceedings." *Id.* at 272. But the Court left open the possibility that foreign states and their instrumentalities in criminal proceedings may still have immunity under federal common law, and the

Court directed the court of appeals on remand to consider the contours of any such immunity. *See id*. at 280–81.**[4]**

In light of *Halkbank II*, the district court had subject matter jurisdiction under 18 U.S.C. § 3231 notwithstanding the Pangang Companies' assertion of foreign sovereign immunity. *See id*. at 270–71. We have jurisdiction under 28 U.S.C. § 1291 to review the interlocutory appeal of the district court's order denying immunity. *See Pangang*, 6 F.4th at 952–53.

Because *Halkbank II* disposes of the parties' FSIA-based arguments, the sole remaining issue on appeal is whether, under federal common law, the Pangang Companies possess foreign sovereign immunity from criminal prosecution.**[5]** We review issues of sovereign immunity de novo. *See Miller v. Wright*, 705 F.3d 919, 923 (9th Cir. 2013). Under the common law, the "burden of proving sovereign immunity is necessarily laid on the party who asserts it." *Bradford v. Chase Nat'l Bank of New York*, 24 F. Supp. 28, 36 (S.D.N.Y. 1938). A defendant need only make a "prima facie case"

---

[4] "There is, of course, 'no federal general common law.'" *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). "Nevertheless, the Court has recognized the need and authority in some limited areas to formulate what has come to be known as 'federal common law.'" *Id*. (citation omitted).

[5] The district court's finding that the Pangang Companies impliedly waived sovereign immunity by participating in these years-long proceedings relied on the waiver exception within the FSIA. *See* 28 U.S.C. § 1605(a)(1). This waiver exception no longer applies to this case because the Supreme Court held in *Halkbank II* that the FSIA does not govern criminal prosecutions. *See Halkbank II*, 598 U.S. at 272–73. Because the Government does not argue that the Pangang Companies waived foreign sovereign immunity under the common law, we consider the merits of the Pangang Companies' immunity claim.

that it is entitled to sovereign immunity. *See Pan Am. Tankers Corp. v. Republic of Vietnam*, 291 F. Supp. 49, 53 (S.D.N.Y. 1968). The Pangang Companies continue to rely on the allegations in the operative indictment to establish a prima facie case of immunity. *See Pangang*, 6 F.4th at 954.

### III

Under federal common law, an entity must satisfy, at minimum, two conditions to enjoy foreign sovereign immunity from suit. First, it must be the kind of entity that is eligible for any immunity at all—that is, it must fall within the *domain* of foreign sovereign immunity. Second, its immunity must extend to the conduct at issue in the suit— that is, the entity's conduct must fall within the *scope* of the immunity conferred on such entities. We conclude that the Pangang Companies do not fall within the domain of foreign sovereign immunity. *See infra* Part IV. We therefore do not reach the subsequent question of scope.**[6]**

In assessing the domain of foreign sovereign immunity from *criminal prosecution* under federal common law, we are immediately confronted by the near-total lack of directly applicable precedent. *See* Chimene Keitner, *Prosecuting*

---

[6] On remand from the Supreme Court's decision in *Halkbank II*, the Second Circuit also held that the foreign state-owned defendant in that case was not entitled to foreign sovereign immunity under the common law, but it reached that conclusion on different grounds. *See United States v. Turkiye Halk Bankasi A.S.*, 120 F.4th 41 (2d Cir. 2024) ("*Halkbank III*"). It held that the state-owned commercial bank indicted there did not enjoy foreign sovereign immunity because the particular conduct for which it was indicted was commercial and therefore did not fall within the *scope* of such immunity. *See id.* at 58 ("Because the indictment concerns Halkbank's commercial activity, the Executive's position that Halkbank is not immune from prosecution based on that activity is consistent with the scope of foreign sovereign immunity recognized at common law.").

*Foreign States*, 61 VA. J. INT'L L. 221, 240, 261 (2021)
(noting that "[t]he case law on foreign state immunity from
criminal proceedings remains relatively sparse" and that,
because prosecutions of foreign state-owned corporations by
the United States "post-dated the FSIA's enactment,"
"Congress did not have criminal jurisdiction in mind" when
it enacted the FSIA). We agree with the Second Circuit that
this absence of directly applicable precedent should not be
taken as a point in *favor* of the view that foreign state-owned
entities must have been understood as categorically enjoying
foreign sovereign immunity from criminal prosecution
under the common law. *See United States v. Turkiye Halk
Bankasi A.S.*, 120 F.4th 41, 55 n.11 (2d Cir. 2024)
("*Halkbank III*") (citing *In re Grand Jury Subpoena*, 912
F.3d 623, 630 (D.C. Cir. 2019) (characterizing such an
inference as "highly speculative" in light of other plausible
explanations for the absence of such caselaw)).

But despite the lack of directly controlling precedent, we
find relevant and helpful guidance in the available civil,
government-enforcement, and quasi-criminal precedents
addressing foreign sovereign immunity under the common
law. Because we perceive no basis to believe, and neither
side has given any reason to conclude, that the domain of
immunity from criminal liability would extend more broadly
than the domain of immunity from liability in these other
contexts, we draw upon precedents arising in the latter
contexts in considering the domain issue here. *See Halkbank
III*, 120 F.4th at 51 n.7 ("[T]he Supreme Court has indicated
that grand jury cases are relevant to the foreign sovereign
immunity analysis in criminal proceedings overall."); *id*. at
54 (stating that courts have applied comparable common-
law immunity principles in both criminal and civil
proceedings). We examine cases from both state and federal

courts. *See United States v. Ellis*, 714 F.2d 953, 955 (9th Cir. 1983) ("[F]ederal courts may look to other sources in developing federal common law, including the law of the states.").

## A

Traditionally, the common law conferred absolute immunity on foreign sovereigns. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983); *see also Federal Republic of Germany v. Philipp*, 592 U.S. 169, 182 (2021). The domain of immunity under this traditional rule included the persons of foreign sovereigns and ambassadors and certain public property, such as ships. *See*, *e.g.*, *The Schooner Exchange v. McFaddon*, 11 U.S. 116, 137–38 (1812); *The Navemar*, 303 U.S. 68, 74 (1938); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 33–36 (1945).

As foreign state-owned entities started increasingly to engage in ordinary commercial activities in the United States, courts began to face the question whether these entities likewise enjoyed foreign sovereign immunity. Cases in the first half of the 20th century generally held that they did not. As we shall explain, the early caselaw generally concluded that foreign state-owned entities that engaged in ordinary commercial activities did not fall within the domain of foreign sovereign immunity, even if they were owned by a foreign sovereign and even if their commercial activities furthered the public interests of the foreign sovereign. Only if a foreign state-owned entity performed fundamental government functions could it fall within the domain of immunity. *Accord Halkbank III*, 120 F.4th at 53 ("Given the focus on government function, in certain cases involving state-owned corporations, courts declined to extend

immunity primarily *because of* the corporations' separate juridical status.").

Courts generally gave three justifications for excluding foreign state-owned entities engaged in ordinary commercial activities from the domain of foreign sovereign immunity. First, a corporation is distinct from its stockholders, and therefore an action against the former (the foreign state-owned corporation) is not an action against the latter (the foreign state). *See United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199, 202 (S.D.N.Y. 1929); *Hannes v. Kingdom of Roumania Monopolies Inst.*, 20 N.Y.S.2d 825, 832–33 (N.Y. App. Div. 1940); *Ulen & Co. v. Bank Gospodarstwa Krajowego*, 24 N.Y.S.2d 201, 206–07 (N.Y. App. Div. 1940). Second, none of the reasons for granting immunity to the sovereign apply with equal force to a mere corporation. *See Molina v. Comision Reguladora del Mercado de Henequen*, 103 A. 397, 399 (N.J. 1918). That is, asserting jurisdiction over a foreign corporation engaged in ordinary commercial activities, even if state-owned, does not comparably implicate "the independence of states, the obligation of a sovereign not to degrade the dignity of his nation by placing himself or its sovereign rights within the jurisdiction of another, the perfect equality and absolute independence of sovereigns, the common interest impelling them to mutual intercourse and an interchange of good offices with each other." *Id*.; *see also Ulen*, 24 N.Y.S.2d at 204–05. Third, granting immunity to foreign state-owned corporations engaged in ordinary commercial activities would put domestic businesses at a potentially significant and unfair competitive disadvantage. *See Molina*, 103 A. at 399.

Cases from this era denied foreign sovereign immunity to foreign state-owned commercial entities across a range of

jurisdictions and types of actions. *See*, *e.g.*, *Deutsches*, 31
F.2d 199; *Coale v. Societe Co-op. Suisse des Charbons,
Basle*, 21 F.2d 180 (S.D.N.Y. 1921); *Hannes*, 20 N.Y.S.2d
825; *Molina*, 103 A. 397; *Ulen*, 24 N.Y.S.2d 201. For
example, in *Deutsches*, a government action to enjoin
violations of antitrust laws, the ambassador of France
asserted that the defendant corporation was entitled to
foreign sovereign immunity because it was "created and
controlled by the Republic of France for the purpose of
administering potash mines," the proceeds from the potash
it sold were "applied to governmental purposes," and the
French government considered it to be an instrumentality of
government. 31 F.2d at 200. The district court disagreed,
holding that "[n]either principle nor precedent requires that
[foreign sovereign] immunity . . . should be extended to a
foreign corporation merely because some of its stock is held
by a foreign state, or because it is carrying on a commercial
pursuit, which the foreign government regards [as]
governmental or public." *Id*. at 203.

*Coale* concerned "an action for failure to take and pay
for coal sold . . . under a written contract." 21 F.2d at 180.
The defendant was a corporation chartered by the Swiss
government to purchase and import coal. *See id*. at 180–81.
Swiss nationals could contribute capital to the corporation in
exchange for six percent interest. *See id*. at 181. "[T]he
further net earnings, if any, were to pass to the government,
in order to reduce the price of coal for home consumption."
*Id*. The government also retained some control over the
corporation: the government appointed seven of the 17
directors, and the corporation's governing charter and rules
were subject to the government's approval. *See id*. The
contract at issue in the case "was signed by the Swiss
[Finance] [M]inister on behalf of the [corporation] and the

Swiss Federation." *Id*.; *see also Rex v. Cia. Pervana de Vapores, S.A.*, 660 F.2d 61, 72 (3d Cir. 1981) (Sloviter, J., dissenting). Nonetheless, the district court held that "[i]f the Swiss government chose to do its business by means of the [corporation], the latter, as a corporate entity, was liable for its corporate obligations." *Coale*, 21 F.2d at 181.

In *Hannes*, the defendant was "an autonomous corporate entity" "wholly owned, operated and controlled by the Kingdom of Roumania." 20 N.Y.S.2d at 828. It was "formed pursuant to the Laws of Roumania for the purpose of exploiting certain monopolies, and of issuing bonds and obtaining monies from investors by the sale of such bonds." *Id*. Roumanian law "provided that the operations of the defendant were to be deemed commercial, and [that the] defendant was to enjoy all the privileges and powers of commercial companies." *Id*. at 830. Though "legally independent," the corporation benefited from several government "concessions": the government granted it "the exclusive right to exploit specified commercial monopolies" for a price, and endowed its bonds with "all the benefits of public loans of the government . . . , including exemption from taxation." *Id*. The corporation was managed by a council "consisting mainly of public officers of Roumania, or their appointees." *Id*. Despite the Kingdom of Roumania's assertion that the corporation was entitled to foreign sovereign immunity as a state instrumentality, *see id*. at 832, the New York appellate court remanded the case to more "definitely establish[]" "all of the essential facts surrounding [the] defendant's powers, liabilities, and its relation to the Roumanian government," *id*. at 834. In doing so, the court held that foreign sovereign immunity does not automatically extend to "a corporation . . . owned by [a foreign] government, especially when such corporation is

engaged in commercial activities." *Id*. at 832. On the contrary, government-owned "[f]oreign corporations as such are not entitled to immunity, even though their functions may include to some extent the performance of public duties." *Id*. at 833.

In *Molina*, the defendant was "a corporation created by the state of Yucatan[,] [Mexico] to carry out, or assist in carrying out certain policies of that government with reference to the growth and sale of sisal hemp, the most important product of Yucatan." 103 A. at 398. It submitted a motion to dissolve, on foreign sovereign immunity grounds, an attachment on sisal hemp that it had purchased from the national government of Mexico. *See id*. The Supreme Court of New Jersey rejected as "startling" the "suggestion . . . that [foreign sovereign] immunity extends to a foreign corporation if it is a governmental agency of a political subdivision of a foreign government, or if a foreign government is indirectly interested in the corporation because its work contributes to the prosperity of the foreign country." *Id*. at 399. The court therefore denied the corporation's motion. *See id*. at 401.

In *Ulen*, the defendant was a bank chartered by "decree of the President" of the Republic of Poland. 24 N.Y.S.2d at 202. Its charter mandated that the majority of the bank's shares be owned by the state treasury and state enterprises, with the remaining shares owned by municipalities and municipal enterprises. *See id*. at 203. "The objects of the Bank were stated, in [its charter], to be the granting of long-term credits through the issuance of bonds; the support of savings institutions; the reconstruction of devastated lands; and the conduct of all banking activities with particular consideration for the needs of the State, State enterprises and municipalities." *Id*. The Minister of Finance had ultimate

control of the bank, and the bank was exempted from certain state taxes. *See id*. In rejecting the bank's claim to sovereign immunity, the New York appellate court held that "a corporation organized by either a domestic or foreign government for commercial objects in which the government is interested, does not share the immunity of the sovereign." *Id*. at 206.

By contrast, *In re Investigation of World Arrangements with Relation to the Production, Transportation, Refining & Distribution of Petroleum*, 13 F.R.D. 280 (D.D.C. 1952) ("*World Arrangements*"), offers one example of a state-owned corporation, the Anglo-Iranian Oil Company, that did enjoy foreign sovereign immunity under the traditional common-law rule. The Anglo-Iranian Oil Company was formed by the British government for the express purpose of ensuring an adequate supply of oil to the British fleet. *See id*. at 290. The district court held that the company was entitled to immunity from a grand jury subpoena because the company was performing "a fundamental government function serving a public purpose"—namely, "insur[ing] the maintenance and operation of" "one of the island-kingdom's main bulwarks of defense against aggression." *Id*. In doing so, the district court distinguished the company from foreign state-owned corporations engaged in ordinary commercial activities, which were not entitled to foreign sovereign immunity: "There is a vast distinction between a seafaring island-nation maintaining a constant supply of maritime fuel and a government seeking additional revenue in the American markets." *Id*. at 291. Some courts have likewise held that foreign state-owned railways enjoyed foreign sovereign immunity, but only after concluding that they performed fundamental government functions, not merely commercial ones, or that the railways were an actual agency

24          USA v. PANGANG GROUP COMPANY, LTD.

of government rather than a separate corporation. *See*, *e.g.*, *Oliver Am. Trading Co. v. Government of the U.S. of Mexico*, 5 F.2d 659, 661, 665–67 (2d Cir. 1924) (holding that a suit that was "nominally against both the government of Mexico and the National Railways in Mexico" was "in reality a suit only against the Mexican government" and that, because the operation of railways was in many countries, including Mexico, "regarded . . . as the performance of a fundamental governmental function," foreign sovereign immunity required dismissal); *Bradford v. Director Gen. of R.Rs. of Mexico*, 278 S.W. 251, 251–52 (Tex. Civ. App. 1925) (affirming dismissal of suit against the "Director General of Railroads of Mexico" on the grounds that the Mexican railway was "not a corporation" and that the suit was "against the government of Mexico" itself); *Mason v. Intercolonial Ry. of Canada*, 83 N.E. 876, 876–77 (Mass. 1908) (affirming dismissal of suit against the Intercolonial Railway of Canada, concluding that it was "not a corporation" and that the suit was "virtually against the [sovereign] of a foreign country"). Without expressing any view as to the correctness of those decisions on their specific facts, we note that their analysis is consistent with the general rule that a separate corporation that does not perform fundamental governmental functions does not partake of foreign sovereign immunity.

In sum, the traditional common-law formulation of foreign sovereign immunity that emerges from these cases is one in which that immunity had broad scope but limited domain—absolute immunity, but only for a limited set of eligible persons and entities.[7]  *Cf. Halkbank III*, 120 F.4th at

---

[7] Notably, this accorded with the traditional common-law formulation of *domestic* sovereign immunity.  *See*, *e.g.*, *Bank of the U.S. v. Planters'*

USA v. PANGANG GROUP COMPANY, LTD.          25

52 ("Courts applying the common law have long distinguished between the immunity afforded to a foreign state and to the entities that it owns.").

## B

The traditional common-law formulation of foreign sovereign immunity underwent significant development starting in 1952. *See Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208 (2018). That year, the Department of State issued the "Tate Letter," in which it announced that it would adopt a "restrictive theory" of foreign sovereign immunity. *See* Letter from Jack B. Tate, Acting Legal Adviser, U.S. Dept. of State, to Acting U.S. Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 DEPT. STATE BULL. 984–85 (1952). Under the restrictive theory, "the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*)." *Id*. at 984. Notably, this restriction on foreign sovereign immunity was based solely on the nature of the activity at issue, and it applied to all entities within the domain of foreign sovereign immunity, even the sovereign itself. *See id*. The restrictive theory therefore narrowed the *scope* of foreign sovereign

---

*Bank of Georgia*, 22 U.S. 904, 907 (1824) ("[W]hen a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen."); *Briscoe v. Bank of Kentucky*, 36 U.S. 257, 325–26 (1837) ("[A] state, when it becomes a stockholder in a bank, imparts none of its attributes of sovereignty to the institution; and . . . this is equally the case, whether it own a whole or a part of the stock of the bank."); *Sloan Shipyards Corp. v. United States Shipping Bd. Emergency Fleet Corp.*, 258 U.S. 549, 567–68 (1922) ("The plaintiffs are not suing the United States but the Fleet Corporation, and if its act was unlawful, even if they might have sued the United States, they are not cut off from a remedy against the agent that did the wrongful act.").

immunity—from absolute immunity, to immunity only when the challenged conduct was a sovereign or public act of the state—without necessarily altering the domain.

The influence of the Tate Letter is reflected in two subsequent assessments of the state of the common law. One was an analysis undertaken by the Department of Justice and the Department of State in a joint submission to Congress related to its consideration of an early draft of the FSIA. *See A Bill to Define the Circumstances in Which Foreign States Are Immune from the Jurisdiction of the United States Courts and in Which Execution May Not Be Levied on Their Assets, and For Other Purposes: Hearing on H.R. 3493 Before the Subcomm. on Claims and Governmental Rels. of the H. Comm. on the Judiciary*, 93d Cong. 33–48 (1973). In their analysis, the Departments first noted that, before the Tate Letter was issued, the doctrine of foreign sovereign immunity was broad in scope and limited in domain. *See id*. at 39 ("When the principle of the absolute immunity of foreign governments was still dominant, the idea of the separability of certain governmental agencies or instrumentalities was used to exempt certain governmental activities from the rule of absolute immunity."). After the Tate Letter was issued, the Departments noted, courts began to restrict the scope of foreign sovereign immunity, while sometimes retaining the traditional limits on the domain of foreign sovereign immunity as either an alternative or a complement to the newer restrictions on scope. *See id*. ("When the trend shifted toward restricted immunity, some courts retained the old distinction as well, thus applying a double standard, namely that there is no immunity if an activity is commercial *or* if it is conducted by a separate entity. In [other] instances, immunity was abolished only

when the transaction was commercial and the entity was a separate one.").

The Restatement (Second) of Foreign Relations Law (1965) ("RESTATEMENT") also reflected the influence of the Tate Letter's restrictive theory of foreign sovereign immunity. According to its assessment of the state of the common law at the time, both the domain and the scope of foreign sovereign immunity were circumscribed. According to § 66(g), a corporation fell within the domain of foreign sovereign immunity only if it was "created under [a foreign state's] laws and exercis[ed] functions comparable to those of an agency of the [foreign] state." RESTATEMENT, *supra*, § 66(g); *cf. Halkbank III*, 120 F.4th at 54 ("[T]he few courts that did extend immunity to state-owned corporations emphasized those entities' performance of governmental functions."). And, according to § 69, the scope of an eligible entity's immunity did not extend to "proceeding[s] arising out of commercial activity outside [the foreign state's] territory." RESTATEMENT, *supra*, § 69.

**C**

Enacted in 1976, the FSIA expanded on the Tate Letter's approach of limiting foreign sovereign immunity based principally on scope. *See Verlinden*, 461 U.S. at 488 ("For the most part, the [FSIA] codifies . . . the restrictive theory of sovereign immunity."). In particular, the FSIA established, among several enumerated exceptions to foreign sovereign immunity, that an entity's immunity does not extend to actions that are sufficiently connected to commercial activity. *See* 28 U.S.C. § 1605(a)(2). But the statute goes a step further than the Tate Letter by *broadening* the domain of foreign sovereign immunity beyond its common-law boundaries: it confers immunity on any foreign

corporation in which a foreign state directly has majority
ownership, even if the corporation is engaged in ordinary
commercial activities. *See* 28 U.S.C. §§ 1603, 1604. The
FSIA thus inverted the traditional common-law rule that
existed before the Tate Letter—from immunity with broad
scope and limited domain, to immunity with a broader
domain and a more limited scope.

We discern no support for transposing the FSIA's
legislative expansion of the domain of foreign sovereign
immunity into the common law—especially as it pertains to
criminal immunity, which *Halkbank II* confirmed the FSIA
"does not cover." *Halkbank II*, 598 U.S. at 272–73; *see also
id*. at 273–75. Nor does either side in this case advocate that
we do so. On the contrary, both sides agreed at oral
argument that § 66(g) of the Restatement best states the
common-law standard for assessing the domain of foreign
sovereign immunity in the criminal context. That position is
sensible. Because the FSIA's enactment in 1976 effectively
froze the application, and thus the development, of the
common law with respect to state-owned entities until
*Halkbank II* clarified that the common law remains
applicable in criminal cases, the Restatement's account of
the common law, to the extent it accurately summarizes the
then-existing body of caselaw, is instructive. *See*, *e.g.*,
*Doğan v. Barak*, 932 F.3d 888, 893–94 (9th Cir. 2019)
(citing the Restatement to ascertain the common law on the
sovereign immunity of individual foreign officials after the
Supreme Court held that the FSIA did not govern the
matter). We therefore turn to § 66(g) of the Restatement in
determining whether foreign state-owned entities fall within
the common-law domain of foreign sovereign immunity.

In doing so, we note that the § 66(g) test of whether an
entity "exercis[es] functions comparable to those of an

agency of the state" bears some resemblance to our test of
whether an entity constitutes an "organ of a foreign state"
under the FSIA, 28 U.S.C. § 1603(b)(2). *See California
Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098
(9th Cir. 2008) ("An entity is an organ of a foreign state (or
political subdivision thereof) if it 'engages in a public
activity on behalf of the foreign government.'" (quoting
*Patrickson v. Dole Food Co.*, 251 F.3d 795, 807 (9th Cir.
2001))). The Government's view is that the two tests share
the same core inquiry but are not coextensive. We need not
decide that point here. Nonetheless, as our application of the
§ 66(g) test will show, we find caselaw construing the
FSIA's concept of an "organ of a foreign state" to be
instructive.

## IV

Section 66(g) of the Restatement extends "[t]he
immunity of a foreign state" to "a corporation created under
its laws and exercising functions comparable to those of an
agency of the state." RESTATEMENT, *supra*, § 66(g). "The
term 'agency' as used in this Section means a body having
the nature of a government department or ministry."
RESTATEMENT, *supra*, § 66 cmt. a.

We hold that the Pangang Companies have not made a
prima facie showing that they exercise functions comparable
to those of an agency of the PRC. They therefore are not the
kinds of entities eligible for foreign sovereign immunity
from criminal prosecution.

Neither the allegations in the indictment nor anything
else in the record establishes a prima facie claim that the
Pangang Companies exercise functions comparable to those
of an agency of the PRC. The documents in the record
primarily address the Pangang Companies' ownership

structure and the specific actions they allegedly took in
violation of the EEA. They paint a portrait of an ordinary
commercial enterprise engaged in the production of steel and
non-ferrous metals. But that sort of conventional corporate
entity is not one that "exercis[es] functions comparable to
those of an agency of the state." RESTATEMENT, *supra*,
§ 66(g).

The Pangang Companies' arguments to the contrary are
unpersuasive. First, the Pangang Companies point to the fact
that they were controlled by the PRC through the SASAC.
But immunity under § 66(g) turns on the *functions* the
corporation exercises, not on the corporation's ownership or
control. The mere fact that a foreign state owns and controls
a corporation is not sufficient to bring the corporation within
the ambit of § 66(g). *See*, *e.g.*, *Hannes*, 20 N.Y.S.2d at 828
(holding that the defendant corporation had not established
foreign sovereign immunity notwithstanding that it
"appear[ed] to be wholly owned, operated and controlled by
the Kingdom of Roumania"). Nor does the fact that the PRC
directs state-owned entities with an eye toward coordinating
the national economy imply that any individual state-owned
entity exercises functions comparable to those of a state
agency. *See*, *e.g.*, *Ulen*, 24 N.Y.S.2d at 203 (denying
immunity to a bank created by foreign sovereign to provide
structural support to the national economy). The Pangang
Companies' allegations of SASAC control therefore do not
establish a prima facie case.

The Pangang Companies also argue that their theft of
DuPont's $TiO_2$ trade secrets involved sovereign
techniques—namely, espionage—and accomplished the
PRC's public objective of developing chloride-route $TiO_2$
production technology. But the commercial espionage
alleged here is not a function comparable to that of an agency

of the state and therefore does not qualify the Pangang
Companies for immunity under § 66(g). Not all acts of
espionage are necessarily sovereign in nature. In *Broidy
Capital Management, LLC v. State of Qatar*, 982 F.3d 582
(9th Cir. 2020), we held that a foreign state's clandestine
cyberattacks to obtain and disseminate compromising
private information about critics of the state were an exercise
of "powers that . . . are 'peculiar to sovereigns.'" *Id*. at 594
(quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993)).
We found that the absence of any allegation that the foreign
state used the stolen information commercially supported
our conclusion in that case. *See id*. at 595; *see also id*.
(recognizing that "what a foreign sovereign does with
covertly obtained intelligence" informs whether the
espionage conducted was commercial or sovereign in
nature). By contrast, we recognized, "stealing the trade
secrets of a 'commercial rival' and deploying them against
that rival," though also an act of espionage involving the
theft of private information, would be an "objective[ly]
differen[t]" kind of action that is *not* peculiar to sovereigns.
*Id*.; *see also Cicippio v. Islamic Republic of Iran*, 30 F.3d
164, 168 (D.C. Cir. 1994) (distinguishing a kidnapping of
another country's national for leverage in international
negotiations from a kidnapping of a commercial rival). The
commercial espionage alleged here more closely resembles
this latter kind of theft: the indictment and other documents
filed in this case, on their face, indicate that the stolen
information was sought and subsequently used for
commercial gain.

At most, the Pangang Companies can point to the fact
that the commercial gains that flowed from the stolen trade
secrets helped to achieve the PRC's publicly identified
priority of developing chloride-route $TiO_2$ production

technology. But this priority was alleged to be merely "scientific and economic" in character. In any event, a generalized public benefit from a commercial enterprise's economic exploitation of stolen trade secrets is not enough to transform that industrial espionage into the exercise of a function comparable to that of a state agency. *See Deutsches*, 31 F.2d at 203 (rejecting the theory that immunity extends to a corporation merely "because it is carrying on a commercial pursuit, which the foreign government regards governmental or public"); *Halkbank III*, 120 F.4th at 57–58 ("[I]t is well established that a motivation to advance the national economy is insufficient to confer immunity to otherwise commercial conduct."); *cf. World Arrangements*, 13 F.R.D. at 290 (recognizing functions essential to national defense to be comparable to those of a state agency).

In arguing for a contrary conclusion, the Pangang Companies rely heavily on *World Arrangements* and *Powerex*—but those cases are distinguishable because the defendants there exercised functions comparable to those of a state agency. As discussed previously, *World Arrangements* granted immunity because the defendant's "supplying of oil to insure the maintenance and operation of a naval force . . . [was] certainly a *fundamental government function* serving a public purpose." 13 F.R.D. at 290 (emphasis added). Likewise, in *Powerex*, we held that a Canadian corporation that marketed and distributed electric power for an entire province was "engage[d] in a *public* activity on behalf of the foreign government," 533 F.3d at 1098 (emphasis added) (quoting *Patrickson*, 251 F.3d at 807), and hence qualified as an organ of a foreign state within the meaning of the FSIA, *see id*. at 1098–102. We reached this conclusion because the corporation performed

sovereign functions "in furtherance of policies adopted by the *Province* [*of British Columbia*]," including "suppl[ying] power on favorable terms to expanding businesses in British Columbia," "negotiat[ing] on behalf of the Province with 'industrial undertakings' that have considered establishing facilities in the Province," "play[ing] a role in treaty formation and implementation," and "serv[ing] as the vehicle for the Province's . . . attempt to create an auction market for electricity trading." *Id*. at 1100. As discussed previously, the documents filed in this case do not remotely suggest that the Pangang Companies played this kind of governmental role.

A case more analogous to the one at hand, and which supports our conclusion, is our decision in *Patrickson*. There, two Israeli companies argued that they were organs of a foreign state under the FSIA because they were "created by Israel for the purpose of exploiting the Dead Sea resources owned by the government" and "were classified as 'government companies' under Israeli law, which gave the government certain privileges reflecting its ownership stake." 251 F.3d at 808. The appointment of directors and officers, changes to capital structure, and the use of corporate profits were subject to the government's approval, and the companies "were obliged to present an annual budget and financial statement to various government ministries." *Id*.

Nonetheless, we held that the Israeli companies were not organs of a foreign state. *See Patrickson*, 251 F.3d at 808. We observed that the Israeli government's control over the companies "[was] not considerably different from the control a majority shareholder would enjoy under American corporate law." *Id*. And, we noted, the Israeli companies were distinguishable from companies that prior caselaw had

deemed to be organs. *See id.* These other companies had additional factors weighing in favor of organ status beyond mere shareholder control. One was "controlled by government appointees; employed only public servants; and had the exclusive responsibility for refining and distributing [foreign] government property." *Id.* (citing *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 654–55 (9th Cir. 1996)). Another "exercised regulatory authority delegated by the government; its decisions could be appealed to a government agency; and its members enjoyed immunity from suit for their official duties." *Id.* (citing *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1461 (9th Cir. 1995)). Because the Israeli companies in *Patrickson* lacked many of these factors, we viewed them "as independent commercial enterprises, heavily regulated, but acting to maximize profits rather than pursue public objectives." *Id.*

Like the Israeli companies in *Patrickson*, the Pangang Companies lack any such distinguishing factors. Nothing in the record indicates, for example, that the Pangang Companies were created by the PRC with the purpose of exploiting or administering exclusive state property, that they employ only public servants, or that they exercise any regulatory or public authority over others. They may operate in a heavily regulated sector of the Chinese economy at the direction of the PRC, but that alone is not enough to establish immunity under § 66(g).

Because the record does not suggest that the Pangang Companies are anything more than conventional corporate entities engaged in commercial activities, the Pangang Companies fail to establish a prima facie case that they are entities "exercising functions comparable to those of an agency of the state." RESTATEMENT, *supra*, § 66(g).

Therefore, under the Restatement's test, which aptly summarizes the relevant standard, they are not entitled to foreign sovereign immunity under federal common law.

**V**

Finally, to the extent that we had any residual doubt about the correctness of our conclusion, principles of deference to the political branches on matters touching on foreign relations firmly counsel against recognizing foreign sovereign immunity here.

"For much of our history, claims of foreign sovereign immunity were handled on a piecework basis . . . ." *Opati v. Republic of Sudan*, 590 U.S. 418, 420–21 (2020). "Typically, after a [*private*] *plaintiff* sought to sue a foreign sovereign in an American court, the Executive Branch, acting through the State Department, filed a 'suggestion of immunity'—case-specific guidance about the foreign sovereign's entitlement to immunity." *Id*. at 421 (emphasis added); *see also Samantar v. Yousuf*, 560 U.S. 305, 311 (2010); RESTATEMENT, *supra*, § 71 cmt. a. "Because foreign sovereign immunity is a matter of 'grace and comity,' and so often implicates judgments the Constitution reserves to the political branches, courts 'consistently . . . deferred' to these suggestions." *Opati*, 590 U.S. at 421 (citations omitted); *see*, *e.g.*, *Schooner Exchange*, 11 U.S. at 147; *Ex parte Peru*, 318 U.S. 578, 586–90 (1943); *Hoffman*, 324 U.S. at 30–37; *Bank Markazi v. Peterson*, 578 U.S. 212, 235 (2016) ("[C]ourts accepted [the Executive Branch's] determinations as binding.").

This case, of course, does not involve a private plaintiff at all. It is a criminal prosecution brought by the Executive Branch in the name of the United States. Without inquiring into what internal processes the Executive Branch followed

Case: 22-10058, 04/28/2025, ID: 12927912, DktEntry: 60-1, Page 36 of 37

36          USA V. PANGANG GROUP COMPANY, LTD.

before filing this case, we cannot help but conclude that a
prosecution pursued for 13 years by the Executive Branch
against the Pangang Companies—in the face of their
persistent claims of foreign sovereign immunity—reflects
the Executive Branch's considered judgment that the
companies do not qualify for immunity. *See*, *e.g.*, *Halkbank
III*, 120 F.4th at 49 ("[T]he decision to bring federal criminal
charges against Halkbank reflects the Executive Branch's
determination that Halkbank is not entitled to sovereign
immunity . . . ."); *United States v. Noriega*, 117 F.3d 1206,
1212 (11th Cir. 1997) ("[B]y pursuing Noriega's capture and
this prosecution, the Executive Branch has manifested its
clear sentiment that Noriega should be denied head-of-state
immunity."); *cf. Pasquantino v. United States*, 544 U.S. 349,
369 (2005) ("[W]e may assume that by electing to bring this
prosecution, the Executive has . . . concluded that it poses
little danger of causing international friction."); *Mujica v.
AirScan Inc.*, 771 F.3d 580, 609–11 (9th Cir. 2014)
(deferring to the Executive Branch's preference for
dismissal in a matter involving foreign policy); *Alfred
Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682,
699 (1976) (regarding as "severely diminished" the authority
of a prior case in which the Supreme Court had granted
immunity despite the absence of any suggestion of immunity
by the Executive Branch).

The deference we accord under the common law to the
Executive Branch's sustained prosecution of this case only
reinforces our conclusion that, under federal common law,

the Pangang Companies are not entitled to immunity. *Accord Halkbank III*, 120 F.4th at 48–49.**[8]**

*        *        *

For the foregoing reasons, we affirm the district court's order denying the Defendants' motion to dismiss the indictment.

**AFFIRMED.**

---

[8] Like the Second Circuit in *Halkbank III*, "we leave for another day whether deference to the Executive in this context should be cabined if, unlike here, the Executive's denial of immunity to a foreign sovereign derogated from the common law." *Halkbank III*, 120 F.4th at 59.